UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                          :

    *-v.-*                                                      :          24 Cr. 605 (JPO)

LISA ANN SCHIFF,                                          :

                Defendant.               :

----------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York


Jennifer Ong
Cecilia Vogel
Assistant United States Attorneys
- Of Counsel -

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

I.      The Defendant's Art Advisory Business................................................................. 2

II.     The Defendant's Fraud Scheme ............................................................................. 3

        A.      *Overview of the Defendant's Fraud Scheme* ............................................ 3

        B.      *The Defendant's Victims* ......................................................................... 5

        C.      *The Defendant's Extravagant Spending During the Fraud Scheme* ...... 7

        D.      *The Defendant Doubles Down in Committing Fraud* ............................ 8

III.    The Collapse of the Defendant's Fraud Scheme .................................................. 9

IV.     The Guidelines Calculation and Probation's Recommendation.................... 11

V.      Forfeiture and Restitution.................................................................................... 12

VI.     The Defendant's Additional Objections to the Presentence Report............... 13

DISCUSSION ...................................................................................................................... 15

I.      Applicable Law ..................................................................................................... 15

II.     A Substantial Term of Imprisonment at the Low-End of the Range Contained in the Parties' Plea Agreement Is Warranted ............................................................................. 16

        A.      *The Nature and Seriousness of the Offense and the Need for Just Punishment Call for a Significant Prison Term* ............................................................ 16

        B.      *The Need for Specific Deterrence Merits a Significant Prison Term*................ 20

        C.      *The Sentence Imposed Should Reflect the Need for General Deterrence of Fraud in the Art Market* ....................................................................... 21

        D.      *The Defendant's Arguments Do Not Merit a Non-Custodial Sentence* ............ 24

        E.      *The Court Should Consider the Sentence the Defendant Is Likely to Serve to Evaluate the Section 3553(a) Factors* ............................................ 26

CONCLUSION.................................................................................................................... 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

    -*v.*-                                              :         24 Cr. 605 (JPO)

LISA ANN SCHIFF,                            :

               Defendant.              :

-------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Lisa Schiff is scheduled to be sentenced on March 19, 2025, at 11:00 a.m. The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum, which the defendant has temporarily filed under seal. ("Def. Mem.").

## PRELIMINARY STATEMENT

Behind the veneer of a genuine and successful art advisory business, the defendant operated an extensive fraud. Dissatisfied with her legitimate financial success, the defendant turned to fraud to fund her extravagant spending. For years, the defendant lied to and stole millions from her art advisory clients, several of whom were close friends. She exploited her role as a trusted intermediary acting on behalf of her clients to accomplish her fraud. The defendant recognized her wrongdoing and considered confessing to her victims several years ago, but instead she chose to continue to steal from them and others on an ever-greater scale for three more years while maintaining her lavish lifestyle. Even when the defendant made the decision in the spring of 2023 to confess and self-report her conduct to law enforcement, for weeks she continued to steal from her victims, up until a few days before she turned herself in.

While the defendant's decision to self-report her crime and her acceptance of responsibility are certainly relevant factors for this Court to consider at sentencing, the extensive harm she caused over many years nevertheless demands a significant punishment. Therefore, for the reasons that follow, the Government recommends a sentence at the low-end of the 41 to 51 months of imprisonment stipulated in the parties' plea agreement.

## BACKGROUND

### I.    The Defendant's Art Advisory Business

The defendant founded and operated what became a high-profile art advisory business, Schiff Fine Art ("SFA"), focused on contemporary art and based primarily in Manhattan, with a presence in Los Angeles and London. (PSR ¶ 7). As an art adviser, the defendant bought and sold artworks on behalf of her clients in exchange for a commission—typically ten percent. (PSR ¶¶ 7, 12). In doing so, the defendant acted as an intermediary between her clients, who were collectors, and galleries and auction houses. (PSR ¶ 8).

Payments for these transactions almost always passed through SFA, and Schiff took custody of artworks to handle the logistics of sending or receiving artworks sold or purchased on behalf of clients. (PSR ¶ 8). For example, if a client was purchasing an artwork, the client paid SFA directly based on SFA's invoice for the artwork, and SFA remitted the client's payment to the seller on behalf of the client, paying down the invoice from the seller to SFA. (PSR ¶ 8). The defendant was responsible for coordinating delivery of the artwork to the client's home or the client's art storage facility. (PSR ¶ 8). If the defendant was selling an artwork on behalf of a client, SFA invoiced the buyer directly and received payment from the buyer. (PSR ¶ 9). SFA provided a statement of sale to the client selling the artwork and remitted from SFA's bank account the payment from the buyer to the client selling the artwork. (PSR ¶ 9). The defendant coordinated the delivery of the sold artwork, which was typically already in her custody once she

agreed to sell the artwork on behalf of the client. (PSR ¶ 9). Thus, the defendant's clients practically never dealt directly with their counterparties to execute a purchase or sale, although the defendant did frequently bring clients to galleries to view artworks and meet the gallerists. In part because of the desire for confidentiality, it has been common practice in the art market to transact through an art advisor or art dealer. Also consistent with common practice in the art market, the defendant conducted transactions for her clients based on invoices and statements of sale, not written contracts. (PSR ¶ 10).

At times, the defendant sold artwork on consignment on behalf of artists and other galleries, for which she took commission, pursuant to written consignment agreements. (PSR ¶ 10). At other times, when assuming more of the role of art dealer rather than art adviser, the defendant purchased and sold artworks for herself and her business. (PSR ¶ 7). Over time, the defendant's business gained a following, and before the defendant's fraud was exposed, her advisory business was featured in various prominent publications.[1]

## II.    The Defendant's Fraud Scheme

### A.  Overview of the Defendant's Fraud Scheme

Beginning in 2018, the defendant began using her otherwise legitimate and successful art advisory business to defraud her clients. (PSR ¶ 11). She defrauded her clients by diverting their

---

[1] *See, e.g.*, Victoria Woodcock, The Who's Who of Art Advisors, *Financial Times* (Feb. 23, 2023), https://www.ft.com/content/9e79368c-f8bc-44fa-a6ee-4047ff151263; Farah Nayeri, Ask an Art Adviser: Is Art a Bubble? Are NFTs Art?, *The New York Times* (Mar. 17, 2022), https://www.nytimes.com/2022/05/17/arts/design/lisa-schiff-art-consultant.html; Nick Glass, The People Making Million Dollar Art Deals for the Super Rich, *CNN* (Oct. 7, 2019), https://www.cnn.com/style/article/art-advisers-inside-the-art-buying-world/index.html; ; Pilar Vidas, Lisa Schiff, *Galerie* (Aug. 12, 2019), https://galeriemagazine.com/womenofart/lisa-schiff/; Anny Shaw, How Lisa Schiff Is Disrupting the Art Advisory Business, *Financial, Times* (Apr. 26, 2019), https://www.ft.com/content/cbedaaa6-5f82-11e9-9300-0becfc937c37; Henri Neuendorf, A New Frontier for Art Advisors? Veteran Art Advisor Lisa Schiff Will Open an Experimental Showroom in Tribeca, *Artnet* (Dec. 12, 2018), https://news.artnet.com/art-world/lisa-schiff-tribeca-showroom-1418575.

funds to pay her own personal and business expenses, which were accruing due to her lavish and extravagant spending. (PSR ¶¶ 11, 15). Specifically, the defendant defrauded her clients by either: (1) taking for herself payments owed to her clients when she sold artwork on their behalf, or (2) taking for herself payments clients sent to SFA to purchase artworks, thus not purchasing the art on their behalf. (PSR ¶ 11). The defendant defrauded her clients while simultaneously conducting legitimate transactions for them—diverting their funds in certain transactions while at the same time faithfully executing other transactions, which helped hide and thus perpetuate the fraud. (PSR ¶ 11).

The defendant told lies to her clients and others to hide her scheme, making various excuses to explain delayed payments. (PSR ¶ 11). For example, when defrauding clients on a sale, the defendant lied to clients, claiming she had not sold the artwork yet, or blaming the buyer for the delayed payment when the buyer had in fact already paid the defendant, but the defendant had diverted the payment to cover her own personal or business expenses. (PSR ¶ 12). When defrauding clients on purchases, the defendant did not use clients' funds to purchase artwork as she represented she would in the invoices she gave clients. (PSR ¶ 12). At times, she lied to galleries, claiming the delay in payment was because of a client when, in fact, the defendant had diverted the client's payment for her personal or business expenses. (PSR ¶ 12). At other times, the defendant made partial payments to galleries over an extended period on behalf of clients purchasing artworks to delay discovery of her fraud scheme. (PSR ¶ 12). Because, however, the defendant never finished paying the galleries, the galleries kept the artworks. (PSR ¶ 12).

The defendant continued her scheme for approximately five years, from 2018 to May 2023. (PSR ¶¶ 11, 35). The defendant executed this fraud in connection with the purchase or sale of just over fifty-five artworks, ranging in value from approximately ten thousand dollars to over

two million dollars. (PSR ¶ 18). The defendant defrauded her victims collectively of over $6.5 million. (PSR ¶ 18).

B. *The Defendant's Victims*

The defendant defrauded twelve of her advisory clients, one artist, the estate of another artist, and a gallery. (PSR ¶ 18). The defendant defrauded some of her victims in connection with one or a few artworks. (PSR ¶¶ 19, 22, 23, 25, 26, 30, 32, 33, 34). Other victims the defendant defrauded repeatedly over the years in connection with many artworks. (PSR ¶¶ 20-21, 28). Several of the advisory clients the defendant defrauded were also her close friends. (PSR ¶¶ 20, 27, 28, 31). Victim-9—the same victim to whom the defendant had considered confessing in 2020—had loaned the defendant several hundred thousand dollars in 2016 to purportedly help the defendant through hard times, and although the defendant repaid Victim-9 by 2021, the defendant simultaneously stole over $1.8 million from Victim-9. (PSR ¶ 28).

Most of the advisory client victims sent and received money from the defendant's business, SFA, to buy and sell artwork using the defendant's services. Victim-2, who is a prolific art collector, instead typically re-invested the proceeds from the sale of artworks directly into the purchase of new artworks. (PSR ¶ 20). Victim-2 generally kept her sale proceeds in the defendant's custody until they were reinvested in new artworks and trusted the defendant to remit the payment for the purchase of new artworks. (PSR ¶ 20). In addition, Victim-2 made payments to SFA for the defendant to acquire additional artworks and pay expenses on Victim-2's behalf. Given the number of works in her collection and the size of some her artworks, Victim-2 kept many of her artworks for periods of time in a storage facility to which the defendant had access. (PSR ¶ 20). This combination of factors—keeping sale proceeds with the defendant for reinvestment and the fact that Victim-2 kept artworks in storage, as well as Victim-

2's trust in the defendant as a friend and the volume of business Victim-2 did with the defendant—enabled the defendant to defraud Victim-2 on a greater scale. Victim-2 has suffered the greatest financial loss among the defendant's victims.

The artwork that carries the biggest loss in the defendant's fraud scheme—and which largely contributed to the timing of the scheme's collapse—was *The Uncle 3* by Adrian Ghenie. Victim-2 owned fifty percent of the artwork, and Victim-8—a couple—owned the other fifty percent of the artwork. (PSR ¶¶ 21, 27). In December 2022, on behalf of Victim-2 and Victim-8, the defendant sold *The Uncle 3* via an auction house to an Asia-based collector for $2.5 million. (PSR ¶ 21). The defendant falsely told Victim-2 and Victim-8 that the buyer would pay in installments in January 2023 and on March 26, 2023; Victim-2 and Victim-8 were supposed to receive $225,000 each in the first installment and $900,000 each in the second installment. (PSR ¶ 21). In fact, the auction house paid the defendant in full for the work on December 16, 2022, and January 17, 2023. (PSR ¶ 21). The defendant stole most of the proceeds from the sale of the artwork to pay her own personal and business expenses. (PSR ¶ 21). She paid $225,000 to Victim-8, and she applied a portion of the $225,000 owed to Victim-2 to purchase other artworks for Victim-2, but the defendant used the remainder of the $2.5 million to pay her own debts. (PSR ¶ 21). The defendant told various lies to Victim-2 and Victim-8 to hide her fraud and explain the late payment, including that the buyer had not yet paid—when in fact, the defendant was paid in full months before. (PSR ¶¶ 21, 27). Because the defendant had custody of *The Uncle 3*, she shipped it to the buyer upon receiving full payment from the auction house, and she lied Victim-2 and Victim-8 about retaining custody of the artwork.

C.  *The Defendant's Extravagant Spending During the Fraud Scheme*

During the years she committed her fraud scheme, the defendant lived lavishly and spent extravagantly on herself and her business. (PSR ¶ 15). For example, the defendant's personal credit cards show she spent the following between December 2018 and May 2023, among other purchases:

- $142,000 on beauty products and treatments;
- $49,000 on dry cleaning;
- $209,000 on medical expenses, which included $24,000 on dermatology;
- $25,000 on addiction psychiatry;
- $34,000 on a concierge medical service;
- $19,000 at an optical boutique;
- $329,000 on jewelry and other luxury goods;
- $129,000 on pet expenses;
- $6,300 at the Lego Store;
- $5,900 at the Play Station Network;
- $75,000 on furniture;
- $119,000 at Amazon;
- $21,000 at the Apple Store;
- $11,700 with a decluttering service;
- $146,000 with a business and spiritual coach;
- $15,000 on the NBA Brooklyn Nets;
- $251,000 in interior design fees;
- $568,000 in designer clothing;
- $167,000 in airfare; and
- $222,604 in hotels.

(PSR ¶ 16). The defendant's corporate credit cards reveal additional extravagant spending during the same time period, such as:

- $304,000 in interior design fees;
- $275,700 on travel;
- $334,700 on hotels;
- $36,200 on Uber;
- $14,800 on furniture;
- $10,000 at a chocolatier;
- $28,400 on a parking garage; and
- $20,000 at the Apple Store.

(PSR ¶ 17). This is merely a sampling of the defendant's spending and not a full accounting. Although the defendant's legitimate art business was successful, the defendant spent well beyond her means, and she used her clients' money to do so.

   D. *The Defendant Doubles Down in Committing Fraud*

By 2020, the defendant had already stolen millions from her clients, and she considered confessing to her clients about her fraud. (PSR ¶ 14). In or about March 2020, the defendant prepared two draft typed letters to two of her most significant clients—Victim-2 and Victim-9—confessing her fraud. (PSR ¶ 14). In these draft letters, the defendant admitted that she owed approximately $5 million in debt and that she had "misappropriated" about $2.2 million from Victim-2 and about $1.374 million from Victim-9. (PSR ¶ 14). In the draft letter to Victim-2, the defendant wrote "I betrayed your trust – the cardinal rule in this industry.  Please know I didn't do it intentionally and I will do everything I can to earn it back and make things right." The defendant further wrote to Victim-2, "[m]y one request is that you allow me to keep my reputation so that I am able to make the money to pay you back," "I will have to pay everyone at the same time but will prioritize you," and "I know that what I have done is unfathomable but I implore you to stick with me and let me make it right." Similarly, the defendant wrote in the draft letter to Victim-9, "I have betrayed your trust," "I am beyond ashamed and sorry," and "I don't really have any assets to back this and whatever I do have, I will try to sell to put towards this."

The defendant, however, never sent these letters to her victims, nor did she disclose her fraud to them. (PSR ¶ 14). Instead, over the next three years, she continued to defraud these two clients, as well as many others. (PSR ¶ 14). The defendant caused her victims' losses to grow while she continued spending excessively.

**III.       The Collapse of the Defendant's Fraud Scheme**

By the spring of 2023, the defendant's debts mounted, and the defendant was unable to keep the scheme going. (PSR ¶ 35; Def Mem. 12-14). On May 8, 2023, the defendant confessed her fraud to some of her clients. (PSR ¶¶ 35, 36). On May 9, 2023, the defendant emailed her clients advising them her business was closed and to contact her attorney. (PSR ¶ 35). That same day, the defendant told Victim-9 on a phone call that the defendant had been "robbing Peter to pay Paul." (PSR ¶ 28). Several clients promptly sued the defendant. (PSR ¶ 35).

Notably, the defendant continued to defraud clients in the weeks and days leading up to her confession on May 8, 2023, even though she had purportedly decided to confess as early as April 2023 (Def. Mem. 13). Indeed, between March and early May 2023, the defendant defrauded ten of her fifteen victims, some of whom she had defrauded previously. For example, the defendant stole over $300,000 in payments made on April 7 and May 3, 2023, made by a trust for Victim-2's children to purchase various artworks through SFA. On April 13 and May 4, 2023, the defendant was paid over $90,000 for the sale of various artworks that the defendant owed to Victim-1 and the art dealer representing Victim-1, but which the defendant stole to pay her own expenses. (PSR ¶ 19). On May 2, 2023, Victim-4 paid the defendant approximately $72,000 to purchase two artworks, but the defendant stole the payments to pay her own expenses (PSR ¶ 23). On multiple dates in April 2023, the defendant received payments totaling over $115,000 for the purchase of four artworks on behalf of Victim-10, as well as from the sale of one artwork belonging to Victim-10, and the defendant stole all of those funds to pay her won expenses. (PSR ¶ 29). In March, April, and May 2023, the defendant stole approximately $109,000 that Victim-12 had paid to purchase six artworks. (PSR ¶ 31).

On May 15, 2023, after confessing her fraud to some victims and closing her business, the defendant placed her business in proceedings for the Assignment for the Benefit of

Creditors in New York State Court, an alternative to bankruptcy that transfers all assets from a debtor to a trust for liquidation and distribution to creditors. (PSR ¶ 35). By January 2024, the assignment was paused and the defendant and SFA were in Chapter 7 bankruptcy proceedings. (PSR ¶ 35). Multiple victims had filed claims in the Assignment proceedings and have since filed claims in the bankruptcies. Some of these victims are litigating with the trustees regarding their ownership of artworks that were in SFA's custody at the time her fraud and business collapsed or regarding partial payments SFA made to galleries on behalf of clients. The bankruptcies are ongoing and will be the victims' main avenue for recovery given SFA and the defendant do not appear to have significant assets outside of the bankruptcy estates because the defendant largely dissipated her crime proceeds.

On or about May 8, 2023, the same date the defendant confessed to some of her clients, she self-reported her conduct, via criminal defense counsel, to the Manhattan District Attorney's Office. (PSR ¶ 36). Shortly thereafter, the U.S. Attorney's Office for the Southern District of New York took over the criminal investigation of the defendant. (PSR ¶ 36). The defendant, through counsel, provided law enforcement a copy of her laptop and cellphone, a database she used to catalogue artworks and transactions, and spreadsheet summaries of the fraudulent transactions, including backup documentation. (PSR ¶ 36).

On October 17, 2024, the defendant waived indictment and, pursuant to a plea agreement, pled guilty to an information charging her with a single count of wire fraud.

**IV.    The Guidelines Calculation and Probation's Recommendation**

In the plea agreement, the parties stipulated to an advisory Guidelines range of 41 to 51 months' imprisonment. The plea agreement calculates the defendant's advisory Guidelines range, as follows:

- In this case, involving a violation of 18 U.S.C. § 1343, the offense is governed by U.S.S.G. § 2B1.1.

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for the offense is 7, because the statutory maximum term of imprisonment is 20 years or more.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the offense involved a loss that exceeded $3,500,000, but did not exceed $9,500,000, the base offense level is increased by 18 levels.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims, the offense level is increased by 2 levels.

- Pursuant to U.S.S.G. § 4C1.1(a), based on information now available to the Government, the defendant satisfies the criteria set forth in § 4C1.1(a)(1)-(10), and the offense level is increased by two levels.

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by two levels, because the defendant demonstrated acceptance of responsibility for the offense.

- Pursuant to U.S.S.G. § 3E1.1(b), the offense level is decreased by one additional level, because the defendant timely notified authorities of the intention to enter a plea of guilty.

The plea agreement thus calculated the offense level to be 22.  The defendant has no known prior convictions, so her Criminal History Category is I.  Based upon these calculations, the defendant's stipulated advisory Guidelines range is 41 to 51 months' imprisonment.

In its Guidelines calculation, the Probation Office includes a two-level increase to the offense level for abuse of trust, pursuant to U.S.S.G. § 3B1.3. Consistent with the terms of the plea agreement, the Government is not seeking to apply the enhancement and recommends a sentence within the Guidelines range contained in the parties' plea agreement, specifically a sentence at the low end of the range of 41 to 51 months' imprisonment contemplated by the plea agreement, for the reasons explained below.

11

As is provided in the plea agreement:

> It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the [stipulated Guidelines range], either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office of the Court contemplates any Guidelines adjustments, departures, or calculations different from [the stipulated Guidelines range], or contemplates any sentence outside of the [stipulated Guidelines range], the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

(Plea Agreement, at 4); *see generally United States v. Gordon*, No. 18 Cr. 373 (RJS), 2020 WL 529301 (S.D.N.Y. Feb. 3, 2020).

Considering all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's self-reporting of her criminal conduct to law enforcement, the Probation Office recommends a below-Guidelines sentence of 30 months' imprisonment, followed by two years of supervised release.[2] (PSR pp. 35-37).

## V.    Forfeiture and Restitution

The Court must order forfeiture and restitution. In connection with the defendant's plea, the Court has already entered a consent preliminary order of forfeiture in the amount of $6,408,538.29, representing the payments the defendant diverted in her fraud scheme. The Court should include forfeiture in this amount as part of the judgment and should orally pronounce said forfeiture when imposing sentence.

---

[2] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).

As part of the plea agreement, the defendant agreed to pay restitution in an amount ordered by the Court.  The Government intends to seek restitution as required under the Mandatory Victims Restitution Act. The Government has provided a proposed restitution order to the defendant, and the Government expects to submit the proposed restitution order to the Court in advance of sentencing.  In the event restitution cannot be determined by sentencing, the Court may delay determination of restitution up until 90 days after sentencing. 18 U.S.C. § 3664(d)(5).

As indicated in the Presentence Report, consistent with the Government's investigation to date, the defendant does not at present appear to have assets sufficient to pay forfeiture or restitution. Virtually all of the defendant's assets have been incorporated into the bankruptcy estates for the defendant personally and SFA. The defendant's personal and business assets are unfortunately deficient to cover her debts. The defendant largely dissipated her crime proceeds during the fraud. The defendant has thus left it up to her victims and creditors to fight amongst themselves to recover their losses in the bankruptcy proceedings. The Government expects that many victims, unfortunately, will never be made whole.

**VI.    The Defendant's Additional Objections to the Presentence Report**

In her sentencing submission, the defendant raises additional objections to the Presentence Report. (Def. Mem. 2-7). The Government addresses each of the objections here, but none of the factual issues raised by the defendant are material to assessing the defendant's culpability, nor should they affect the sentence.

*Paragraph 15*

The defendant claims she used the diverted payments "in great part" to pay SFA's expenses. The defendant, however, used the money she stole from her clients to pay both her

personal and business expenses. The defendant does not dispute that she spent extravagantly and beyond her means for herself and for her business.

*Paragraphs 21 and 27*

The defendant claims she did not know Victim-8's spouse was an owner of *The Uncle 3* by Adrian Ghenie and claims she did not seek to sell the artwork to make money for herself. The Government previously provided a response to the Probation Office regarding these objections. Paragraphs 21 and 27 are accurate as written. The defendant was aware that *The Uncle 3* was a co-investment. Invoices show that Schiff invoiced Victim-2 in February 2021 for a "1/2 share" of the artwork and invoiced Victim-8 for a "1/2 share" of the artwork in April 2021. The defendant at least at some point was aware that Victim-8's spouse had an interest in the artwork. In a text message exchange in November 2022 between the defendant, Victim-2 and Victim-8 in which they discuss whether to sell the artwork for the $2.5 million offer, Victim-8 informed the defendant that "[My spouse] and I agree to sell at $2.25m net," and Victim-8 reiterated in the same conversation that "we feel very good about the decision." In addition, in the spring of 2023, when there were delays receiving the payment after the sale, Victim-8's spouse had a direct conversation with the defendant regarding the delayed payment, during which the defendant falsely reassured Victim-8's spouse that the buyer would pay (when in fact the auction house had already provided the defendant full payment, but the defendant had stolen the majority of the payment to cover her personal and business expenses).

*Paragraphs 35- 38*

The defendant objects to the timeline of self-reporting. However, after consulting with the Manhattan District Attorney's Office, the Government has learned that the defendant self-reported her conduct as of May 8, 2023. The Manhattan District Attorney's Office was not able

to identify earlier contact. On May 9, 2023, the defendant provided her electronic devices on consent to the Manhattan District Attorney's Office. Paragraphs 35-38 are otherwise accurate as written.

## DISCUSSION

### I.    Applicable Law

As the Court knows, the Sentencing Guidelines, while no longer mandatory, still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), courts must treat them as the "starting point and the initial benchmark" for sentencing proceedings, *id.* at 49.

After calculating the Guidelines range, the Court must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7).  See *Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)    to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## II.    A Substantial Term of Imprisonment at the Low-End of the Range Contained in the Parties' Plea Agreement Is Warranted

The factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a term of imprisonment at the low-end of the Guidelines range stipulated in the parties' plea agreement.

### A.    The Nature and Seriousness of the Offense and the Need for Just Punishment Call for a Significant Prison Term

The nature and seriousness of the offense, and the need for the sentence imposed to provide just punishment, warrant a significant sentence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). As outlined at some length above, the defendant's fraud was extensive with respect to the number of victims, the number of artworks, the length of time, and the loss amount. The defendant's crime was not an isolated error in judgment.  Rather, it was an extended course of deception that required one lie after another. During a five-year period, the defendant defrauded at least 15 victims, which included art collectors who were the defendant's advisory clients (and in some instances, close friends), artists, and a gallery. The defendant stole over $6.5 million from these victims. The defendant defrauded a number of these victims multiple times in connection with multiple works of art. Indeed, the defendant chose to steal from her clients over fifty-five times as reflected by the fifty-five different artworks involved in the defendant's fraudulent transactions.

The defendant's fraud is also particularly serious because she took advantage of her victims' professional and personal trust to conceal her fraud for years. The defendant abused her successful art advisory business and deep expertise in art to conceal her fraud scheme in a veneer

16

of legitimacy. The defendant exploited the clients who were also her friends, maintaining friendships with them—and in the case of Victim-9, borrowing hundreds of thousands of dollars—while at the same time stealing from them behind their backs. The defendant was able to extend the duration of her fraud and delay the suspicions of her victims by engaging in legitimate transactions with them while simultaneously defrauding them.

The defendant also took advantage of the practices of the art market to execute and hide her fraud. Indeed, the defendant was only able to execute her fraud because she was the intermediary between her advisory clients, on the one hand, and the galleries and auction houses, on the other hand, which gave her the opportunity to divert the payments between them and to lie to either side regarding the reasons for the delays in executing the transactions. Moreover, the defendant took advantage of the fact that she had custody of her clients' artworks to execute transactions on their behalf, which is common practice in the art market, to execute her fraud. For example, because she had custody of her clients' artworks when selling them, she was able to accept payment from the buyer, divert the payment for her personal and business expenses, ship the artwork to the buyer, and lie to her client that she still held the artwork and had not yet sold it. Absent these practices typical in the art market, the defendant would not have succeeded in perpetuating such an extensive fraud.

The defendant's crime was not borne out of necessity or a struggle to meet ends meet. Rather, greed is what motivated the defendant to engage in the fraud. The defendant was running a successful art advisory business from which she made a respectable and comfortable living. She nevertheless chose to spend frivolously and far beyond her means—in her personal life and in her business. She financed her extravagant spending by stealing from her clients. To cover it up, the defendant "robbed Peter to pay Paul," as she confessed to one of her victims at the

17

collapse of her fraud. Moreover, when the defendant reached an inflection point in March 2020 and considered admitting her fraud to her victims, the defendant instead doubled down to continue her fraud scheme for three more years. At that time, the defendant explicitly recognized that stealing from her clients was "unfathomable" and that she had "betrayed [her clients'] trust", but she continued doing so anyway to maintain her lavish spending and avoid the consequences of being caught in her fraud.

The harm to victims is not only the direct financial loss from the defendant's fraud. The collapse of the defendant's business and the subsequent assignment and bankruptcy proceedings have left victims to untangle the defendant's mess. Victims have had to file claims in the assignment and bankruptcy proceedings, competing against each other and the defendant's non-victim creditors, to attempt to recover their losses. Both the victims and others had artworks in SFA's custody that are now subject to litigation to determine whether they are part of the bankruptcy estate. Moreover, the defendant's partial payments to galleries through SFA on behalf of victims to purchase artworks are also being litigated as potentially part of the bankruptcy estate. Victims have had to hire lawyers and accrue substantial legal fees to assert their rights in these proceedings.

Multiple victims have described the impact of the fraud beyond the direct financial loss in written statements to the Court.[3] For example, the representative of an artist's estate, Victim-1, wrote "[w]e feel mocked and taken advantage of by a person who was supposed to be acting in our interest but instead has no scruples and did terrible damage to us both financially and personally." (Ex. A). Victim-2 expressed, "I now know that [the defendant] took advantage of

---

[3] The Government has redacted the names of the victims in the impact statements filed publicly to protect their privacy, in accordance with the Crime Victims' Rights Act. 18 U.S.C. § 3771(a)(8).

what I believed for years was a mutual friendship to make me and my family her biggest mark."
(Ex. B at 4). Victim-2 described her reaction when the defendant confessed her fraud to Victim-2, stating, "I was blindsided and shocked by what [the defendant] said, and could not even process it as she was talking to me. I could not comprehend that a person who was so close to me for so long would have done this." (Ex. B at 6). Victim-2 further described that her investigation to determine her losses from the fraud, which entailed "checking thousands of emails, text messages, reviewing invoices, and speaking with galleries and artists, and learning how [the defendant] deceived us—has been and continues to be an enormous undertaking, in terms of my time and the emotional impact on me." (Ex. B at 7-8). In his impact statement, Victim-2's husband addresses the defendant, stating, "you broke my wife's heart and my children's hearts. My family loved you and we trusted you. You hurt us and betrayed us." (Ex. C at 10). Victim-2's son recounts "seeing [his mother] cry" in the aftermath of the fraud and that "[the defendant] wasn't just a friend to my mom; she was family. That's what makes this so devastating. [The defendant] exploited my mom's love and trust in the cruelest way possible." (Ex. D. at 1). Victim-8, an art dealer, described that being defrauded by the defendant "did damage to the reputation I have spent my entire 35 years of professional life to build," and that the defendant "caused more pain for me, my spouse, and my family than I've ever experienced. I was a friend who was always there for her for decades." (Ex. E at 6, 7). Moreover, Victim-8 explained, "I was depending on the Ghenie sale proceeds to pay for my parents' immediate medical needs for heart failure and advanced dementia. When those funds were not available, I had to scramble to free up other resources in order to take care of my parents and meet commitments." (Ex. E at 6).

The impact of the defendant's fraud also has had a cascading effect on other innocent participants in the art market. When the defendant failed to pay galleries for artworks purchased

by her clients, the galleries could not pay the artists. Worse, when the defendant made partial payments to galleries, purchases would be delayed for months or years, preventing the gallery, and thus the artist, from selling the particular artwork to a different buyer. Victims' losses have decreased their ability to continue to patronize the arts. As Victim-2 describes, "much of my time has been devoted to trying to determine the extent of our losses [ . . . ] rather than providing support to artists and art institutions to the extent I have in the past, because the extent of our losses prevents me from doing so." (Ex. B at 1). In addition, the fire sale of the defendant's and SFA's artworks at auction in the bankruptcy depresses the price of artworks of the up-and-coming artists the defendant previously promoted. One such artist has written the Court to explain that she had trusted the defendant to help place her artworks with reputable collectors, but instead finds her works being auctioned at low prices in the bankruptcy, depressing the works' market price, and forcing her to buy back her own artwork to prevent a further decline in value. (Ex. H).

These second-layer impacts constitute an additional harm that the Court should be cognizant of in imposing sentence. And while the Government is seeking forfeiture and restitution, the defendant appears to have dissipated much of the proceeds of her crime, so that many victims will never be made whole. The extensive and irreparable damage the defendant caused calls for a significant term of imprisonment.

### B. The Need for Specific Deterrence Merits a Significant Prison Term

A substantial sentence is warranted to achieve specific deterrence and promote respect for the law. 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C). The defendant may be a first-time offender, but her conduct demonstrates a need for specific deterrence. The defendant's recurrent decisions to lie and steal from her clients, including her friends, were not simply the actions of an

entrepreneur who made a few bad business decisions or naively over-leveraged her business, as the defendant appears to claim at one point in her submission. (Def. Mem. at 8). The defendant chose to steal from her clients repeatedly to fund her lavish lifestyle and extravagant business expenses. The defendant's lack of self-control regarding spending puts her at risk of re-offending. As reflected in the defendant's draft confession letters from March 2020, the defendant made a conscious decision not to accept responsibility for her actions. Fully aware of the gravity of her fraud, as reflected in her own words in those draft letters and as she admits in her submission, (Def. Mem. at 10), the defendant was not deterred and instead continued to defraud the same and new victims for three more years. Even when the defendant's scheme began to fall apart in the spring of 2023, and the defendant purportedly made the decision that April to confess, (Def. Mem. at 13), she continued defrauding victims of hundreds of thousands of dollars in new transactions over the next month, until she self-reported to law enforcement on or about May 8, 2023. Taken together, the defendant's behavior over the course of her fraud scheme signals a need for specific deterrence.

C.   *The Sentence Imposed Should Reflect the Need for General Deterrence of Fraud in the Art Market*

Finally, the need for general deterrence weighs in favor of a substantial sentence. *See* 18 U.S.C. § 3553(a)(2)(B). A substantial term of imprisonment is necessary to provide general deterrence and to dissuade others—particularly those who transact in the art market with its extremely valuable assets and notable lack of oversight or regulation—from engaging in this type of crime. Conditions in the art market are ripe for abuse by fraudsters like the defendant. Buyers and sellers regularly transact through brokers or advisors for several reasons, including to maintain anonymity of the buyers and sellers and because of the expertise necessary to evaluate

and handle the artworks. Thus, the art market traditionally operates on relationships and trust to maintain the confidentiality of the buyers and sellers and the price of artworks.

This combination of conditions—secrecy, valuable assets, and lack of regulation— creates opportunities for fraud schemes such as the defendant's scheme. In particular, the reliance on art dealers and advisors as intermediaries to exchange payments, communicate between buyers and sellers, and take custody of artworks, creates opportunities for fraud. This combination of conditions means that trusted intermediaries have immense opportunity to engage in fraud if they so choose, and it further means that such fraud is difficult to detect. As discussed above, it was this combination of conditions that gave the defendant the opportunity to commit her fraud and conceal it for years. A significant custodial sentence is necessary to send a corrective message and ensure that other similarly situated participants in the art market are not tempted to abuse their position to engage in fraud on their clients.

In addition, general deterrence is relevant because the defendant's crime was motivated by financial gain. *See United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.") (citing *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.)); *United States v. Vrancea*, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015), *aff'd*, 688 F. App'x 94 (2d Cir. 2017) ("[T]he Second Circuit has noted the appropriateness of significant sentences for those who feel white collar crime is 'a game worth playing.'"); *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (Garaufis, *J.*) (explaining that the "need for general deterrence is particularly acute in the context of white-collar crime"); *United States v. Martin*,

455 F.3d 1227, 1240 (11th Cir. 2006) (explaining "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence"); *United States v. Eddy Alexandre*, 22 Cr. 326 (JPC), Dkt. 107 at 102 ("There is a value for would-be fraudsters to [know] that if they choose to engage in fraud, they may be caught and face serious consequences. And economic-based fraud that requires sophistication, planning and deliberation, such as the crime here, is the sort of more rational and calculated crime for which general deterrence is likely to have a stronger impact"). This factor counsels in favor of a substantial sentence.

Lastly, the public attention that this case has received heightens the relevance of general deterrence. There has been substantial public reporting on the defendant's fraud, and the defendant was recently interviewed by *The New York Times* regarding her fraud.[4] Thus, the deterrent message and the effect of the sentence imposed by the Court in this case will resonate significantly with others in the art market who may be tempted to engage in a fraud like the defendant's. There is a risk that an insufficiently high sentence will send the message to others considering embarking on a similar fraud that the consequences are minimal.

---

[4] Sara Maslin Nir and Zachary Small, Art Adviser: Friend. Thief., *The New York Times,* (Feb. 18, 2025), https://www.nytimes.com/2025/02/18/arts/design/lisa-schiff-art-adviser-theft.html; *see also* Ian Frisch, How an Art Advisor to the Elite Conned Her Client Friends, *Town & Country* (Oct. 22, 2024), https://www.townandcountrymag.com/society/money-and-power/a45024892/lisa-schiff-art-advisor-lawsuits/;  Ben Kochman, Lisa Schiff, Art Advisor to Stars, Including Leonardo DiCaprio, Pleads Guilty in $6.5M Fraud, *New York Post* (Oct. 17, 2024), https://nypost.com/2024/10/17/us-news/lisa-schiff-nyc-art-advisor-to-stars-including-leonardo-dicaprio-pleads-guilty-in-6-5m-fraud/; Joe Miller, New York Art Consultant Pleads Guilty to Stealing $6.5mn From Clients, *Financial Times* (Oct. 17, 2024), https://www.ft.com/content/ac8ab4fa-7602-462e-8daa-41c85c6e3db3.

### D. The Defendant's Arguments Do Not Merit a Non-Custodial Sentence

In her sentencing submission, the defendant primarily argues for leniency based on her acceptance of responsibility and her family circumstances. (Def. Mem. 43-47). The Court should consider these factors pursuant to Section 3553(a), but they do not outweigh the seriousness of the offense, the need for just punishment, or the need for specific and general deterrence.

The defendant's acceptance of responsibility is notable. She self-reported her conduct to law enforcement, voluntarily provided her electronic devices and summaries with backup documentation of the fraudulent transactions, offered to be interviewed by law enforcement, and waived indictment and pled guilty at her first court appearance. The summaries and backup documentation in particular saved law enforcement resources to investigate various complex transactions. Largely because of these actions, the Government recommends a sentence at the low-end of the Guidelines range stipulated in the parties' plea agreement.

However, the defendant's acceptance of responsibility is not "extraordinary," as she claims. (Def. Mem. 43-45). The defendant considered and rejected self-reporting her fraud in March 2020, instead doubling down on her fraud. The defendant self-reported her fraud to law enforcement only when it was inevitable that her fraud would be discovered. When the defendant self-reported her conduct in May 2023, her fraud scheme and her business were on the precipice of collapse because her debts had become insurmountable, as the defendant recognizes in her own submission. (Def. Mem. 11-14). It was foreseeable that her victims would soon learn of her fraud, that they would sue her, and that the media would report on the fraud given the high-profile of the defendant's business. Indeed, this Office initially learned of the defendant's fraud from media reporting.

In addition, the defendant's self-reporting to law enforcement was not extraordinary because the defendant continued to steal hundreds of thousands of dollars from her victims in new transactions in the weeks between her purported decision to self-report in early April 2023, (Def. Mem. 13), and her confession on May 8, 2023. As the son of Victim-2 describes, "Just a week before it all unraveled, [the defendant] sat across from my mom and me at lunch, told me she loved me, and then tricked my mom and me into writing $190,000 from my trust. She knew exactly what she was doing, and she didn't care." (Ex. D at 2).

The defendant's family circumstances—namely that the defendant is a single mother caring for a minor son—are sympathetic and should be considered by the Court in fashioning an appropriate sentence. But these circumstances are not so unique that they amount to a justification for undue leniency. The Government acknowledges the impact any term of imprisonment the defendant serves will have on the defendant's son, and the Government has no reason to doubt that the defendant is a loving and caring mother. The Government does not intend to minimize these facts. It is, however, unfortunately quite common for those who commit serious offenses to have young children. *See, e.g.*, *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (quoting *id.*).  Furthermore, the unfortunate consequences of the defendant's criminal conduct on her son were entirely foreseeable to the defendant; no one else but the defendant made the choices to commit crime that have placed the defendant at risk of imprisonment. *See United States v. Al Kassar*, No. 07-CR-354 (JSR), 2020 WL 4813199, at *2 (S.D.N.Y. Aug. 19, 2020) ("[W]hile the Court is cognizant of the burden imposed by defendant's inability to see his loving family, anyone who commits as serious a

crime as this defendant must know in his heart that if he is caught and imprisoned, it is his own family who may suffer the worst."). As set forth in the defendant's submission, the defendant's brother will care for the defendant's son during any term of imprisonment the defendant serves, which distinguishes this from cases where there is literally no close family that can care for the minor child.

### E. The Court Should Consider the Sentence the Defendant Is Likely to Serve to Evaluate the Section 3553(a) Factors

As this Court knows, the sentence of imprisonment that it imposes only represents the outer bounds of the time that the defendant may have to serve; due to a series of credits available to defendants—of which the vast majority of defendants take advantage—the defendant will serve a much shorter effective sentence of incarceration. The laws and regulations regarding these credits have recently changed, and the Government provides further information as to how such credits may apply in the case of the defendant so that the Court can take them into account, as they directly affect certain Section 3553(a) factors, including: "provid[ing] just punishment," 18 U.S.C. § 3553(a)(2)(A); "afford[ing] adequate deterrence," 18 U.S.C. § 3553(a)(2)(B); "protect[ing] the public from further crimes of the defendant[s]," 18 U.S.C. § 3553(a)(2)(C), and "the kinds of sentences available," 18 U.S.C. § 3553(a)(3). *See United States v. Tocco*, 135 F.3d 116, 131 (2d Cir. 1998) (holding that a district court may consider "maximum good-time credit in its calculation of a defendant's sentence"); *see also United States v. Fowler*, 948 F.3d 663, 670 (4th Cir. 2020) (holding that consideration of future good time credit was proper in light of the factors relating to "protection of the public and deterrence"); *United States v. Roberts*, 919 F.3d 980, 992 (6th Cir. 2019) ("The mention of the availability of good-time credits does not render the sentence substantively unreasonable . . . ."); *United States v. Greer*, 189 F. App'x 457, 460 (6th Cir. 2006) ("The court demonstrated consideration of the kinds of sentences available by

26

sentencing [the defendant] to a term of incarceration that would allow her to earn good time credits and by recommending to the [BOP] that [she] serve her sentence in a minimum security prison"); *United States v. Prevatte*, 66 F.3d 840, 848 (7th Cir. 1995) (Posner, C.J., concurring) ("I do think the maximum good-time credits should be subtracted. The defendant should not be allowed to say, 'My sentence is too long because I am planning to be a bad boy in prison so won't earn the maximum good-time credits.'").

The First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018), enacted on December 21, 2018, expanded the available credits for defendants to reduce their terms of imprisonment. As relevant here, a prisoner can earn time credit under the FSA in two ways: Good Conduct Time and Earned Time Credit.

As to Good Conduct Time, a well-behaved prisoner can earn "up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the [BOP] that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b). All inmates convicted of a federal offense are eligible to earn Good Conduct Time. Before the FSA, there had effectively been a cap of about 47 days earned annually on such Good Conduct time. Section 102(b) of the FSA amended 18 U.S.C. § 3624, making this provision more generous by allowing additional credit for good conduct. *See id.*; 18 U.S.C. § 3624(b)(1).

The FSA established a second, new system under which a prisoner can earn credit— Earned Time Credit. In addition to Good Conduct Time, eligible defendants, such as this defendant, can accrue up to 15 days of Earned Time Credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities. *See* 18 U.S.C. § 3632(d)(4)(A)(i)–(ii). In other words, the defendant is eligible to earn 15 days per

27

month of credit toward "prerelease custody or supervised release." 18 U.S.C. § 3236(d)(4)(C).

Eligible prisoners are automatically enrolled in the program. Temporary operational or

programmatic interruptions authorized by the BOP will not ordinarily affect an eligible inmate's

"successful participation[.]" 28 C.F.R. § 523.41(c)(3). Up to twelve months of Earned Time

Credits may be used to reduce a defendant's sentence, *i.e.*, the defendant can apply up to twelve

months of Earned Time Credit to be released early to supervised release, this shortening the

defendant's sentence by one year. *See* 18 U.S.C. § 3624(g)(3). After earning a year off one's

sentence, the remaining Earned Time Credits "shall be applied toward time in prerelease

custody[,]" such as a residential reentry center ("RRC") (also referred to as a hallway house) or

home confinement. 18 U.S.C. § 3632(d)(4)(C).

     Good Conduct Time and Earned Time Credit will thus substantially reduce any sentence

the defendant serves. To determine what sentence is "sufficient, but not greater than necessary,

to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), the Court should consider the

term of imprisonment the defendant will effectively serve. The Section 3553(a) factors, and the

impact of credits on the Section 3553(a) factors, counsel in favor of a meaningful sentence.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully recommends that the Court impose a sentence at the low-end of the Guidelines range stipulated in the parties' plea agreement, a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing.

Dated:  New York, New York
        March 12, 2025

                                    Respectfully submitted,

                                    MATTHEW PODOLSKY
                                    Acting United States Attorney

By:            /s/
                                    Jennifer Ong
                                    Cecilia Vogel
                                    Assistant United States Attorneys
                                    (212) 637-1926/1084