# Exhibit B

**Victim Impact Statement,** Victim-2

Your Honor,

My name is Victim-2. I am a wife, mother, art collector and philanthropist. My family (including my husband ███████, and a trust set up for our children) and I are, in terms of dollars and the number of affected artworks, the biggest victims of Lisa Schiff's scheme to steal and defraud, bearing 60% of the losses that have been filed to date. Instead of applying our funds and assets as we directed, Lisa stole them for her own purposes or for other clients.

To date, the losses we know of come to over $5 million, in terms of artworks we paid for in full, but for which Lisa failed to pay the sellers (in whole or in part), and artworks we owned which Lisa sold without our permission and/or without remitting the sale proceeds to us. We also paid sales taxes, insurance premiums and shipping fees on works that Lisa was supposed to but did not pay for with the funds we designated. On top of this, Lisa refused to identify or help us determine the scope of her fraudulent activity with our funds and artworks. As a result we have incurred over $1 million to date in attorney fees, in three lawsuits in New York state courts, two cases in U.S. Bankruptcy Court, and in connection with these criminal proceedings.

Lisa's misappropriation of funds and assets was not just a bookkeeping error or mix-up of two clients' transactions, and we believe we still do not know the full extent of her theft from us. Rather, it was a premeditated plan to steal. In the last week before Lisa confessed to me on May 8, 2023 that for years she had been stealing from her clients, including my family and our friends, Lisa was in my ear constantly and met up with me three times, throwing me a birthday lunch, doing a studio visit with me, and effectively distracting me from the disaster that was coming – while asking me for more money.

Similarly, Lisa made a conscious decision not to help mitigate the damage she caused to us. We reached out to Lisa's lawyers following her guilty plea, hoping that given her waiver of Fifth Amendment rights she would cooperate with us and provide information regarding our affected assets, if only to help herself at sentencing. Her attorneys finally responded about two weeks ago, designating what they provided as "for settlement purposes" – although we have had no discussions about settling our claims against Lisa. Further, the limited information provided to us does not address much of the information we requested, but further misrepresents Lisa's fraudulent conduct. In short, we are still getting the same runaround that began when she first admitted her theft to me nearly two years ago.

My family and I are lucky that our losses from Lisa's theft and fraud have not ruined us, but that does not mean that we have not felt the tremendous financial hardship of a six-million-plus dollar loss, including the legal fees which continue to accrue. Since May 2023, much of my time has been devoted to trying to determine the extent of our losses, regrouping and trying to figure out a different path forward in the art world, rather than providing support to artists and art institutions to the extent I have in the past, because the extent of our losses prevents me from doing so. I have also had to be extensively involved in multiple lawsuits, to try to get to the bottom of what happened to our funds and artworks.

I try to do good in the world through my philanthropy, and try to see the good in people. For many years I considered Lisa one of my closest friends, like a member of my family, and trusted her

implicitly; and I thought she considered me the same way.  Instead, it seems that our relationship allowed her to take greater advantage of me and my family than of her other clients, and by doing so, to wreak chaos and damage on the artists and institutions that are close to my heart as well.

**BACKGROUND**

I was introduced to Lisa Schiff nearly twenty years ago by my good friend [Victim-8], and his husband [redacted]. [Victim-8] and I have known each other even longer, and he is a well-regarded and highly experienced professional in the art world, having worked for galleries, museums, auction houses, and serving as president and vice president of the Art Dealers Association of America. [Victim-8] knew Lisa professionally and personally, and thought we would get along. All three of us had similar taste in art.

When I met Lisa, I was already collecting art and was looking to expand my collection from its focus on black and white photography to different media.  Lisa and I set out to build an institutional collection, emphasizing contemporary art and exploring social and political themes in society.  My collection now is in the neighborhood of over 800 works in various media, and will eventually be donated to museums and universities.

Typically the works I have purchased have been by emerging artists; I do not generally have multimillion dollar works in my collection.  Lisa specifically pushed for me to acquire large, expensive pieces of contemporary art – works that I would not necessarily see, because they would be placed in storage for substantial periods.  This was particularly the case in 2018, when I liquidated one asset and put 100% of the proceeds into art purchases.  Lisa made $1 million in commissions from me *alone* in that year, and to my knowledge had no financial hardship then.

The art that I buy tells a story—it's part of what's happening today and references the current historical situation.  I'm very interested in the cultural impact of the Internet and how it has transformed art.  My post-photography collection started with works by artists who have come to be known as Painting Factory artists.  I've also collected quite a lot of figurative work, and works by artists who use technology to explore technological impacts on society such as automation and AI.  I love the artists I collect and am very close to a lot of them.

I have been on the board of the Sculpture Center; served on the Painting, Sculpture, Drawing and Education Committees of the Whitney Museum of American Art; and served on the advisory board of the Mead Museum at Amherst College and at the University of Michigan Museum of Art. I love to bring contemporary art to college campuses, as artists and students are often grappling with the same issues. I also frequently underwrite museum shows, and support and sponsor artists' shows at museums and art fairs.  I always lend my work when asked, and have lent multiple works to museums. It's important to me to get the works out to be seen, as I am just a temporary custodian of the works for the time being, trying to tell the story of the art of our time.

I have been designated an ArtNews top 200 collector for several years.  This is significant in the art world, and connotes regard for how and what I'm trying to build and accomplish with my collection. It helps in dealing with certain galleries and artists, because they want to place work with serious and respected collectors.

**WORKING WITH LISA SCHIFF**

Virtually immediately after I met Lisa in around 2004, she began cultivating a personal friendship with me that went beyond our business relationship, to the point that my family and I considered her and her son like members of our family.  Lisa and I spoke on the phone and/or texted each other multiple times each day about art and everything else going on in our lives.  We traveled together to art shows, and went to each other's family celebrations.  I supported her when her mom was sick and was present at the birth of her child, who called me "auntie."

After I met Lisa, I began using her services as an art advisor to help build my collection.  An art advisor gets to know clients and their families, including their taste, character and goals in collecting art.  Their services include finding artworks for sale which fit these attributes, conducting due diligence such as provenance checks; administrative tasks such as coordinating payment for artworks and taxes; coordinating vendor services such as framing and installation; transfers of funds and artworks; and organizing logistics such as transportation, shipping, and storage.

Lisa also had an education in art/art history and experience working at Phillips auction house and in at least one art gallery, which made me comfortable and trust that she knew what she was doing and the correct/proper way to handle art transactions (purchases and sales).

Managing the details of information about artworks, sales, offers, updating records, etc. can be a big job for an active collector.  As our collection grew, and as Lisa had cultivated a relationship of trust and confidence with me and my family, she took over the role of managing our collection – as other art advisors do for their clients.  She handled purchases and sales of artworks as I directed, payment of galleries, vendors, etc., and framing, installation, transportation, handling, and storage of our artworks.  Lisa was the only art advisor with whom we worked, and trust was a crucial dimension of the relationship between us.

For most of the years that I worked with Lisa, I paid by check for art purchases, commissions, expenses, etc.  About two years ago I began having funds wired to her and her company (Schiff Fine Art LLC, or "SFA").  When she sold one of my works, I rarely cashed out; we generally used the proceeds to purchase other works for my collection.  I expected and trusted that Lisa held the funds that I wired to her, and proceeds from sales of artworks that I owned, separate from other clients' funds and operating funds, and used them as I directed for purchases of artworks.  The fact that a work showed up at my door or in my storage – or as it turns out, that fact that Lisa said a work was there – was proof that I owned it.  (This is not an uncommon practice among art dealers and galleries.)

Lisa accepted and benefited from the trust and confidence that we placed in her, as  certain galleries and artists would only give access to certain works if they were being purchased by/for me and/or my family.  I knew people in the art world, and eventually Lisa used my name to help build her relationships and business with galleries.

I thought Lisa was very good at what she did and very successful, although now I question whether that was because of Lisa's work, or the work of the publicist she kept on retainer for $50,000 per month.  By anyone's standard, Lisa made a very good living as an art advisor – to the best of my knowledge, at the start of the period in which she admits she conducted the fraud, she was making over $1,000,000 per year.  Lisa advised wealthy and high-profile collectors and investors on establishing,

3

growing and managing their art collections and storage.  I was never her biggest collector, in terms of the price of works purchased or sold.  As compensation for her services Lisa charged a ten percent commission when a work was bought or sold, based on the stated price of a work (before any discounts were applied).  Throughout the years that I worked with Lisa, I never haggled with her over commissions, or asked her to discount a commission; although sometimes she would offer to take less than ten percent.  In retrospect I believe she probably advised me to sell some works that I would have been better off keeping – but on which she received commissions from the sales; and she probably advised me to buy some works because she needed funds, rather due to the works' merits.

In all our dealings since we met, Lisa presented herself as an ethical, sophisticated, knowledgeable, and financially successful businesswoman, and gave no hint to me or my family that she or her business were in financial distress, or that any of their business dealings were other than aboveboard.  Nor did any of Lisa's employees give any indication that Lisa or SFA were in any financial distress.

Lisa and I worked together until May 2023 without (to my knowledge) incident.  With the benefit of hindsight and the investigation that my attorneys and I have undertaken since Lisa acknowledged her fraud to me in May 2023, I now know that Lisa took advantage of what I believed for years was a mutual friendship to make me and my family her biggest mark.

My attorneys and I have repeatedly asked Lisa and her attorneys to identify which of my and my family's artworks and the extent of our funds that were affected by Lisa's fraud, but have not received a definitive response; Lisa's recent responses to some of our questions raise more issues than they resolve.  There may still be additional losses that we don't know about.


**LISA'S STATEMENTS ABOUT TRANSPARENCY IN THE ART MARKET**

For several years prior to May 2023, Lisa purported to recognize the lack of transparency in the art world, and professed to strive for this in dealings with her clients.  She gave interviews with news outlets like CNN, the New York Times, and Artnet.  For example, in a 2017 interview with Artnet, Lisa talked about taking pride in making the art world "transparent," by teaching, talking, and "understanding and explaining the invisible relationships that make up the art world," "to help collectors have confidence and to show them the best sides of the art world, while not lying about the bad things." https://news.artnet.com/buyers-guide/15-minutes-with-a-price-database-power-user-founder-and-president-of-sfa-advisory-lisa-schiff-on-finding-humor-in-the-art-world-2001701.

In a 2019 interview with CNN, she discussed how complex the art world is, and talked about trying to protect her clients and **"buffer them a bit,"** by sparing them the "ugly side," the wheeler-dealer. Nick Glass, *The people making million-dollar art deals for the super rich,* CNN, Oct. 7, 2019, https://www.cnn.com/style/article/art-advisers-inside-the-art-buying-world/index.html.

In a 2023 interview for *Gotham* magazine, Lisa talked more about transparency, and that she tries to make the art world more transparent "by explaining [how she views the advisor's job as educating clients on the aesthetic and critical value of the work, its historical relevancy, and that art is not liquid and should not be bought solely for investment] and by making sure that my clients understand that I work for them, not the galleries and not the artists. I can work to buffer them from too

4

much contact or connect them for full contact— each collector is different. What I will try to do, however, is try to create a positive experience of the art world and so might leave out some unseemly details about waitlists and offensive demands and such unless they truly need to know or ask." Lisa Schiff, quoted in https://gothammag.com/top-nyc-wealth-advisers-to-know (January 2023).

It's incredible to me now that Lisa was promoting herself with all these statements about trying to do good and protect her clients, during the exact same time that she has admitted to this Court that she was lying to her clients and taking the funds they entrusted to her to purchase artworks, and selling their artworks, and using their art and funds for herself.

**LISA ADMITS HER FRAUDULENT CONDUCT AND THEFT**

Lisa's scheme fell apart in May 2023. At that time, my friends Victim-8 and Victim-8's husband and I were waiting to receive the balance of the proceeds from Lisa's sale on our behalf of an important painting by Adrian Ghenie, *The Uncle 3*, which we had purchased (through Lisa) together in 2020. I owned 50% of the work and Victim-8's husband and Victim-8 together owned the other 50%. We had purchased the painting through Sotheby's for $1,750,000 ($875,000 from me, and $875,000 from Victim-8 and Victim-8's husband). On or about December 8, 2021, Lisa re-appraised the work at $4,500,000. I presumed that this was a fair evaluation, based on Lisa's knowledge and experience.

In or about November 2022, Lisa told us there was an offer from a Chinese purchaser to buy our Ghenie painting for $2.5 million. I questioned why we would sell for so much less than the reappraised value; Lisa said a comparable Ghenie had recently sold at auction for about $2.5 million. Also, Victim-8's parents were not well and he needed to move them to assisted living; and Victim-8's husband had concerns about the art market softening. In early to mid-November 2022, Victim-8's husband, Victim-8's and I agreed with Lisa that she would broker the sale of the Ghenie for $2.5 million; the proceeds would be split between Victim-8's husband and Victim-8's on the one hand, and me on the other, less Lisa's 10% commission – amounting to $250,000 -- on the purchase price.

In hindsight, it is clear to me that Lisa's advice to sell the Ghenie at $2.5 million was just a cash grab – she manipulated us to fund her fraud when she was in desperate need of money.

Lisa brokered the sale of the Ghenie for $2.5 million through Sotheby's Hong Kong in or about December 2022. The painting was delivered to Sotheby's New York on December 5, 2022 per Lisa's instructions.

In January 2023 Lisa told us that $700,000 of the $2.5 million sale price had been paid. (In fact that was a lie; $810,000 had been paid on December 16, 2022, and the entire price was paid in full by January 17, 2023, although Victim-8, Victim-8's husband and I did not know it.) Lisa said the buyers were not backing out of the sale but needed payment terms, and laid out a schedule that she said the purchasers would follow. On or about January 18, 2023, $225,000 of the Ghenie sale proceeds were wired from SFA's account at City National Bank to Victim-8, who then transferred half ($112,500) to Victim-8's husband. Also on or about January 18, 2023, I understood that Lisa credited $225,000 of the sale proceeds to me, to be applied to several artworks I had agreed to purchase when she and I attended Art Basel Miami in December 2022. (I now understand that Lisa credited me with less than Victim-8 and Victim-8's husband's $225,000 share - and that while about $100,000 of my share was to be applied to two artworks, by Mimosa

5

Echard and Hayv Kahraman, Lisa never paid the galleries for these works.)  I understood that Lisa also took her 10% commission of $250,000 on around January 18, 2023.

Lisa promised to disburse the remaining $1,800,000 to ($900,000 to Victim-8 and Victim-8's husband, and $900,000 to me) on March 26, 2023.  However, before March 26, Lisa asked us to give an extra thirty days to make the payment to accommodate the purchasers in Hong Kong, who she again assured us were not backing out of the sale.  Lisa guaranteed that the $900,000 payments would be made.

Lisa followed up with Victim-8 on April 10, 2023, that she had checked on the upcoming Ghenie payments.  On April 23, 2023, she said the purchasers needed another two weeks to make the payments, and again assured us that the payments would be made and that the purchasers were not backing out.

On May 5, 2023, Victim-8's husband texted Lisa to confirm that payment would be forthcoming on Monday, May 8, 2023.  Lisa texted Victim-8's husband and me that she was "working on it…."

On Monday, May 8, 2023, Lisa called me and admitted that that she could not remit the remaining proceeds from the Ghenie sale owed to me, Victim-8 and Victim-8's husband, and that the sale proceeds were gone.  She said she had been in financial trouble for several years, and had been using her clients' money for her own purposes; that she had fallen into a deep financial hole that she could not get out of; and that she had thought of declaring bankruptcy before the COVID pandemic began in 2020, but had been afraid of a criminal investigation.  She also said she had gone to rehab to figure out a plan to get out of her financial hole, but had not figured one out.

Lisa confessed to me that she did not pay for many artworks that my family and I had purchased through her, and for which we had paid in full or made arrangements for payment in full (from the proceeds of sales of other artworks we owned), per her demands to me for funds, and the invoices I received from her.

I was blindsided and shocked by what Lisa said, and could not even process it as she was talking to me.  I could not comprehend that a person who was so close to me for so long would have done this.  Lisa had spent time with me on three of the seven days before her May 8 confession – at my birthday lunch the week before, at a walkthrough, and for a studio visit – and we were supposed to meet in Minneapolis the next day, May 9, for an art exhibit (which clearly, she had no intention of doing).  She never gave a hint that week that she was concerned about money or that she had betrayed my trust in her.  In retrospect it seems like she was distracting me from her fraud by keeping me busy.

I had no idea that Lisa had been stealing my/our family's money and artworks until her admission on May 8, 2023.  It was so incongruous with my experience with Lisa that my first reaction was to ask if she was okay and why she hadn't told me if she was in trouble, and to tell her I would have helped her if she had asked.

Looking back, Lisa's claims that she was afraid of criminal prosecution in 2020, and meant to figure out a plan to make things right while she was in rehab, are not really about contrition or aimed at righting the wrongs she did to my family and others, but sympathy for herself and excuses for her continuing fraud.  Regardless of what she told me on May 8, Lisa did not stop stealing from clients in 2020; she continued for three more years.  Likewise, it seems the plan that Lisa came out of rehab with

6

was to continue to steal from clients, galleries, etc. From the time we purchased the Ghenie, it seems Lisa's main focus was keeping her fraud hidden for as long as possible.

The last of Lisa's demands to me for funds was a $190,000+ wire that I had sent on or about May 3, 2023, five days before her May 8, 2023 confession, from my children's trust to Lisa's SFA account. When I asked Lisa on May 8 where those funds were, plus $150,000 that I wired on April 7, 2023 at her request to pay for artworks I purchased when we attended Art Basel Miami, she responded that she "did not know" and told me to call her lawyer. This was pure, premeditated theft; Lisa knew when she demanded the May 3, 2023 transfer (and when she forwarded it on May 4 to a bank that has nothing to do with me) that her scheme was unraveling.

I also had no idea of the extent of Lisa's wrongdoing at that time, and asked her to identify which of my family's artworks were affected. She identified one artwork by Sarah Lucas, and said she would send me a full list of the affected works that day; she never did, on May 8 or at any time since.

### OUR INVESTIGATION AND RESULTING CIVIL LAWSUITS AGAINST LISA AND SFA

Lisa's actions completely violated the confidence that my family and I, our friends, gallerists, artists, and her clients and employees placed in her. I still do not know the entire extent of Lisa's malfeasance; she has not identified all of our artworks that were affected by her scam, or how she used all the funds that we provided at her request.

Right after Lisa told [Victim-8] and me to call her longtime lawyer, [Victim-8] and I phoned him and tried to talk with him. I was shocked when he told me to get a lawyer. My husband and I, along with [Victim-8] and [Victim-8's husband], hired counsel to assist, thinking that they would be able to negotiate with Lisa's lawyer. They were also surprised when they spoke with him, to find that he was not willing to provide any information, although he said he was working with other clients of Lisa's.

I spoke with several of Lisa's other clients, who received statements from Lisa's attorney showing their affected artworks, and amounts at issue. I tried to reach Lisa by phone and text, but she never responded. Her attorney wrote to my lawyers that I should not try to get in touch with Lisa and that all contact should be between counsel. I did not understand why Lisa and her lawyer were taking this approach with my family, or with [Victim-8] and [Victim-8's husband] – although it now seems it was because Lisa had stolen so much more of my family's funds and artworks.

It was never my desire to get into litigation, but under the circumstances we had no choice. My husband, [Victim-8] and [Victim-8's husband], and I were worried that we did not know what had happened to our funds and artworks and the extent of the damage Lisa had caused. Given the lack of communication from Lisa, and her lawyer's unwillingness to work with us, [Victim-8's husband] and I immediately filed an action regarding Lisa's theft of the funds from the sale of our Ghenie painting.

After the Ghenie case was filed, I began investigating the extent of what Lisa had stolen from us, and received numerous text messages, phone calls and emails from galleries around the world regarding works that Lisa purported to purchase for me/my family, and which we paid for in full, but which Lisa either never paid for, or did not fully pay for. With over 800 pieces in our art collection, the investigation – checking through thousands of emails, text messages, reviewing invoices, and speaking

7

with galleries and artists, and learning how Lisa deceived us -- has been and continues to be an enormous undertaking, in terms of my time and the emotional impact on me.

From emails and communications that I received since May 8, 2023, and my own and my lawyers' investigation of whether and which of my artworks had been affected by Lisa's fraud, we learned that much of the funds my family had provided to Lisa over the past several years had not been used for artworks we purchased. Instead it appeared that they had been used to fund her lavish lifestyle, and we suspected, to cover art purchases by other clients – particularly an installation in January 2023 for a wealthy client of hers in Massachusetts, that she had told me, Victim-8 and Victim-8's husband about.

I learned that Lisa had not paid in full for a number of artworks that I bought; in some cases she had paid nothing toward the works. They are addressed in detail in my husband's victim impact statement. Lisa also sold some of our artworks and pocketed the money for herself. In at least one case, she had me pay for shipping a work that never left China – and which I understand she later resold without my knowledge to the originating gallery, and kept the entire sale proceeds (including the profit). On top of that, because Lisa had access to my fine art storage accounts, I had to have her blocked from dealing with my accounts and artworks.

I also learned after Lisa admitted her fraud to me, while my attorneys and I were investigating the extent of our losses, that she had been pushing off overdue payments by slandering me, telling gallerists that payments were delayed because *I* was supposedly having financial problems – which was not true. She insisted that galleries only deal with her – not me - about any payments for artworks. Lisa told people I was in financial difficulty and asked them to be sensitive, so people didn't bother me about delayed payments or past due amounts.

I did not know about any of these statements by Lisa at the times she made them. Her characterizations were embarrassing and false. The reason payments weren't made for artworks was because *Lisa* was stealing the money we entrusted to her for art purchases and sales.

Given the information we learned about additional artworks Lisa had not paid for or not fully paid for, a week after our counsel filed the Complaint regarding the theft of the Ghenie painting and proceeds, my husband and I filed a second civil lawsuit against Lisa, relating to those additional artworks. Our initial estimate was that Lisa/SFA stole about $3 million of our artworks and funds. After the second complaint was filed, we continued to discover works that had not been paid for in full or in part, and unauthorized uses by Lisa of our property. We continue to investigate where Lisa diverted the funds that my family transferred to Lisa and her LLC.

Our attorneys were able to obtain an injunction against Lisa and SFA doing anything with funds or assets in their possession, except for paying living expenses and attorney fees. However, both of the lawsuits we filed became a battle. We propounded discovery to Lisa and SFA and served numerous subpoenas, trying to find out what happened to our artworks and funds, and the extent of our losses. Lisa and SFA refused to respond to discovery requests, citing their supposed Fifth Amendment rights. We filed motions trying to get compliance with our discovery, which sat undecided for months after our initial assigned judge retired, because a new judge was not assigned to our cases.

Given the difficulty of obtaining discovery from Lisa and SFA, we subpoenaed unrelated third-party Deep Tech Inc., which was Lisa's and SFA's IT provider, and in possession of their server. In response, Lisa's attorney moved on behalf of Lisa, SFA and Deep Tech to quash the subpoena, arguing that it violated Lisa's and SFA's purported Fifth Amendment rights. Lisa's unending efforts to prevent us from finding out what she did with our art and funds simply reinforced the importance of what she was trying to hide, which *still* has not been disclosed to us.

In between the two cases we filed, we learned that Lisa had filed an assignment for the benefit of creditors of her company, SFA. In the ABC proceeding, at the assignee's request we served him with a subpoena seeking the same information we sought from Lisa and SFA in our other two New York lawsuits; he ignored it. The assignee filed motion after motion, insinuated that I/my family was party to Lisa's scheme, and tried to get what he could from us and our lawyers, rather than working for the benefit of the largest creditors (me and my family).

After we had to spend huge legal fees without getting anywhere in New York Supreme Court, Lisa filed a Chapter 7 petition in January 2024 in the U.S. Bankruptcy Court for the Southern District of New York. On behalf of my family, Victim-8 [Victim-8's husband] and several other creditors, our lawyers then filed an involuntary Chapter 7 petition against SFA in January 2024 so that at least everything would be in one court, and hopefully we would finally be able to get discovery and resolution.

**LISA'S SPENDING**

During the time that I worked with Lisa, I knew she was a spender and liked expensive things, but presumed she was spending within her means, and/or just spending whatever she earned – she was by all appearances a very successful art advisor. As (I thought) her best friend, I saw firsthand how lavishly she spent; she talked to me about how much she paid in rent and what she spent on her son, and we went shopping together at times. The following are a few examples of Lisa's expenses:

- Buying her son $600 Smythson personalized leatherbound notebooks for elementary school;
- Giving iPads as party favors to her son's friends;
- Renting a Manhattan apartment for $25,000 per month in the Jenga building (the fanciest building in Tribeca);
- Renting a Tribeca storefront space and flagrantly spending to over-improve and renovate it, which was unnecessary for an art advisor:
  - An art advisor is not a gallerist or an art dealer. An art advisor spends most of their time out with clients visiting galleries, studios, etc. to see new artworks, and liaises between collectors, galleries and artists. An art advisor has no need herself for a studio or retail space the way an artist or gallery does.
  - It made no sense to spend $2 million to renovate a rented space, especially as it now appears that was likely done with money that did not belong to Lisa.
- Keeping unnecessary offices in London and Los Angeles, even though most art advisors don't have outside office space because it is unnecessary;

9

- Traveling first class, staying in five-star hotels, and traveling with an entourage of assistants to art fairs.
- Taking expensive vacations – for example, when Lisa vacationed in Greece one year, she took a helicopter from Athens to Mykonos rather than the ferry (like most people), rented a villa and a yacht, and had a full-time driver while she was there.
- Lisa went on couture shopping sprees – for example, spending $30,000 in two visits to Loewe while we were in Paris for an art fair – she actually did this in front of me at the same time that she was stealing my/my family's money and property;
- She flew to Paris and St. Barth's for our friend [Victim-8's spouse]'s birthday celebrations;
- She spent $100,000 for a summer rental house in the Hamptons;
- She traveled regularly to St. Barth's, and made significant jewelry purchases there (but could not be bothered to wait in line with other travelers for foreign tax refunds);
- She regularly purchased expensive jewelry from German jeweler Hemmerle;
- Lisa had a full-time driver, chef, person to care for her pets, and childcare, in addition to the employees of her advisory business. She kept a public relations firm on a $50,000 monthly retainer.
- Lisa told friends before everything blew up, and before we knew about her fraud, that her son, who attends a very expensive private school, was "all set."

If Lisa personally had the money to fund everything she spent on, no one could say anything about it. But it is one thing to spend her own money – if she wasted it or managed it poorly, that would be on her. It is entirely another thing for her to steal and spend other people's money on her extravagant habits.

**LISA'S NONCOOPERATION**

I find it unconscionable that on top of the theft and the fraud that my family has experienced because of Lisa's actions, she has absolutely made no effort to make things right with us – despite what Lisa's lawyer has said in the press about her wanting to do so, and working toward a comeback. Frankly, her continued noncooperation indicates to us that she stole and misappropriated even more from us than we have been able to uncover so far, and is still trying to hide it.

First, if Lisa had had legitimate cashflow problems – as many small businesses do -- or if her business wasn't doing well and she needed help with her home bills, she could have asked me or a number of other people, who would have helped her. But clearly, looking at just some of the places where it seems her clients' money went, that is not what happened.

On May 8, 2023, when Lisa admitted her theft to me, she promised to get me a list of all of my family's artworks that were affected. She never did so then, or at any time thereafter.

ArtBase is a program that Lisa was supposed to maintain and update, containing records of my art purchases and sales, prices, the provenance of the artworks, etc. This is basic information that I understand many art advisors keep for clients, especially those with more extensive collections.

Lisa's lawyers have commented on several occasions that Lisa has a database with the details of my art collection and that it should not be a problem to get it to me – but that has never happened.  In fact, when asked to provide my ArtBase database, Lisa's lawyers, the SFA assignee, and the Chapter 7 trustees have responded with directly conflicting tales.  In the last several months they have variously said that Lisa and/or they and/or the trustees have the information and we ought to be able to get it, and also that she never created such a database for me but will work on it.  This is ludicrous; my family and I have hundreds of artworks, and at various times Lisa provided printed catalogs (some over 100 pages) of certain information regarding artworks owned by me and my family during the nearly twenty years that she was our art advisor.  Recently they have suggested that we could pay a vendor to create it.

After Lisa entered her guilty plea in October 2024, her criminal lawyer made statements to the press, stating that Lisa wanted to make things right, get back into the art world, and how "everyone loves a comeback story."  That is not evident in any of our counsel's interactions with Lisa's counsel.

After the plea hearing and Lisa's waiver of her Fifth Amendment rights, my lawyers contacted Lisa's criminal lawyer to see if we could work together for Lisa to provide information we had already repeatedly requested but not received.  Her lawyer's initial response was that he had to check with Lisa's bankruptcy counsel and the prosecutors to see if he could talk with my lawyers (although he had already been on calls with them and my bankruptcy lawyers).

Lisa's criminal attorney let our lawyers know that he had been given the OK to talk with them, and they had a call before Thanksgiving in which our lawyers described for him the information we need relating to (1) certain works that Lisa stole; (2) the scope of our loss, for tax purposes; (3) confirmation regarding certain issues for the bankruptcy proceedings, (4) assistance in getting artworks that we own and fully paid for returned to us.  Our lawyers spoke with Lisa's criminal defense attorney for an hour that day; he said he would be traveling but worked while he was away and would speak to Lisa.  They also preliminarily discussed with him what form the information requested might take, as it would have to be admissible in court.  Lisa's criminal defense attorney took the position that the he would work on what we asked about and we could subsequently determine the form.

The next week, another one of Lisa's attorneys reached out to our counsel, saying that her criminal defense attorney had given him notes of the prior call, and he wanted to discuss clarification of a few things.  They set a time to talk on Tuesday, December 10 at 10:30 a.m.  During that call, rather than ask for clarification about any particular entry or issue, Lisa's attorneys first suggested that our lawyers propound interrogatories, although counsel had discussed and we intended a more streamlined process (and interrogatories got us nowhere in the past).  Lisa's lawyers said they wanted to go over the entire discussion that our attorneys already had with her criminal defense attorney; our attorneys asked them to review his notes and come back with any specific questions that required clarification.  We heard nothing back from them until February 18, 2025, when one of Lisa's lawyers emailed our counsel documents that partially addressed some of our questions, but mainly focused on trying to exonerate Lisa and characterizing me as having demanded that Lisa do certain things with our money and artworks, which is not true.  The documents Lisa's counsel provided also misrepresent what she actually did with at least some of our money – asserting that I agreed or demanded that the funds be applied to certain things, but omitting that Lisa failed to do so, even though we had paid in full.

11

The one piece of information we may have gleaned during this call was regarding the last $190,000+ transfer of funds I made from my children's trust, at Lisa's request, days before she confessed her fraud to me, to pay for certain artworks I purchased when we went to Art Basel in December 2022.  Records that my attorneys obtained in discovery in the New York state actions showed that, the day after I transferred those funds to SFA's account, there was a transfer of $190,000 from the SFA account to East West Bank.

I have no idea what this account was.  Our lawyers tried to find out and subpoenaed East West bank, but got nothing productive in return.  Lisa's attorney and the SFA assignee were aware of this, because our lawyers provided them with copies of all the subpoenas served and documents produced.

Our lawyers discussed this transfer with her criminal defense attorney, thinking that perhaps we would be able to claw it back in the bankruptcy proceedings.  He said he did not know about it and would ask Lisa.  During the December 10 call with her other lawyers, they remarked that this money went to Marc Selwyn, which is a gallery with two locations in Beverly Hills, California.  My husband and I have not purchased anything from this gallery since February 2019.  I believe this is just further proof that Lisa knowingly defrauded our family to pay for other clients' artworks – and that there is more that we have not yet uncovered, and she is still trying to hide the full extent of her fraud from us.

**CONTINUING IMPACTS OF LISA'S FRAUD IN THE ART WORLD**

The art world (including artists, galleries, advisors, dealers, auction houses, shows, museums/boards, logistics/storage/transport, etc.) is fairly small – you get to know the people in it and how the business side of things work, when you are a collector or an art professional.  People in the art world and social circles knew that Lisa was my art advisor.

Even though we discovered Lisa's fraud and obtained an injunction against her and SFA in June 2023 in the New York actions, and even though she has filed for bankruptcy and pleaded guilty to wire fraud, the effects of her fraud continue to reverberate through the art world (as well as for her direct victims).

At least some of the artworks that have been touched by Lisa's fraud now bear the taint of that fraud.  In some cases, transfers and sales of those works have been held up – for example, for almost two years my attorneys and I have been trying to get possession of artworks that I fully paid for, that Lisa does not contest that I own, but that Lisa's attorneys, the SFA assignee and/or the bankruptcy trustees have been holding onto to try to obtain some further payment or advantage from me.

The galleries holding these works cannot readily sell them, have had to hire attorneys to deal with Lisa's attorneys and the New York state actions and ongoing federal bankruptcy proceedings, and have demanded that I indemnify them in case they face further legal challenges (for example, if they turn the artworks over to me).

The artists themselves are also affected.  A contemporary artist's career may have some hot moments/periods, as well as longer periods when their work is less in demand.  Of course, they want and need to be able to make the most of their peak periods; but if their works cannot be sold because

they are involved in a third party's crime, that will not happen. In addition to missing out on sales altogether, they may suffer reduced prices for their work.

For example, when Lisa stole the Ghenie sale proceeds, she did not pay all the galleries from which I had purchased artworks with the intent of applying the Ghenie proceeds as payment. Nonpayment to the galleries in turn affected the artists whose works I had purchased, as galleries typically pay artists their share of sale proceeds after the purchasers pay the galleries.

Lisa's fraud also continues to affect the prices that the artists' works command. For example, if works that were in Lisa's possession are sold en masse at auction, flooding the market will result in lower sale prices. That happened immediately in Lisa's case, as the assignee in the ABC proceeding (who was not versed in the art market) insisted on selling works by several in-demand artists at prices well below their market values. When I heard that he was doing so, I tried to find bidders who would be willing to pay more than the assignee's low-ball prices, for the artists' sakes. Works by certain other in-demand artists that were in Lisa/SFA's possession were sold by the Chapter 7 trustees to a lower-tier New Jersey auction house where they were offered and sold at well below the artist's usual prices. The reduced prices will follow these works, and may impact the prices of the artists' other works, for years.

In short, Lisa's fraud was more than "just" a financial crime; it has affected, and continues to affect, the entire art ecosystem.

**SENTENCING**

Lisa's criminal attorney's post-plea comments to the press about her supposed remorse and desire to make things right and set the stage for a comeback, and another of her attorneys' comments in the New York state court actions that she deserves sympathy or leniency because she's a single mom, have been infuriating. From my perspective, since entering her guilty plea, instead of trying to help me, my family, and [Victim-8] and [Victim-8's husband], Lisa and her advisors have continued to try to keep us in the dark and hide the extent of her wrongdoing against us. In a February 18, 2025 New York Times article on Lisa, she seems to be unhappy and bitter about some of her past choices, claiming that she was miserable during her five-star vacations and wearing the clothes she bought on luxury shopping sprees. But she didn't stop, "didn't allow [herself] to even think that [she] was doing criminal behavior," and incredibly, "didn't think through what [she] was potentially doing to [her] son." https://www.nytimes.com/2025/02/18/arts/design/lisa-schiff-art-adviser-theft.html. There isn't a word indicating she understands the impact of her actions on the people she stole from. The focus is still on herself.

No one made Lisa steal from us or her other clients. This was her choice. And what happened to us, with the Ghenie painting and proceeds, makes very clear that Lisa made a deliberate, calculated decision every time she lied to us about the purchasers needing payment terms, when actually the purchaser paid in full long before and she never told us. Likewise, no one made Lisa misappropriate artworks and funds from my family, deceive me about them, and slander me to the art community, except Lisa. Lisa is the person responsible for the situation she is in and in which she left all of us.

The art world is built on relationships – you have to learn over time who is reputable and trustworthy. Lisa took the most advantage of the people who were closest to her. She especially

13

fostered a relationship with me and my family, got us to trust her, and then took advantage of that trust and used it against us.

I have read the transcript of Lisa's plea hearing and her statement to the Court about her actions. The fact that after a year and a half she decided to plead guilty does not make up for the chaos and the damage she created for me and my family and which we are still dealing with.

Similarly, whether or not my family and I ultimately made a net profit on the artworks we purchased and sold through Lisa, does not excuse or justify her theft. First, it is impossible to quantify – the art market is always changing, and there is the question of whether Lisa pushed us to buy or sell works based on their actual merit, or on her need for cash. Second, whether we made a profit is irrelevant – if we did, that doesn't mean Lisa was entitled to take it for herself. She was no Robin Hood redistributing wealth to the poor – she was already very well paid for her services.

The fact that Lisa is a single parent makes what she did all the more inexplicable. Her child didn't make her do what she did, but it seems she didn't take him into account when she was stealing from her clients. Her comment in a recent New York Times article, "But I am shocked that I didn't think through what I was potentially doing to my son," flies in the face of her counsel's call for leniency because she has a 12-year-old son. See https://www.nytimes.com/2025/02/18/arts/design/lisa-schiff-art-adviser-theft.html.

When Lisa pleaded guilty and waived her Fifth Amendment rights at her plea hearing, I really hoped we would be able to work with her to get information that could be helpful to us in the other litigation that we have had to be part of. We didn't expect necessarily that we would be able to recover anything close to what she stole, but my lawyers talked with her attorneys about providing information that would be helpful to us in the other litigation that we were forced to file and the Chapter 7 proceedings, to get back some of the art that we fully paid for. We presumed she would want to do that, at the least because it might be helpful to her at sentencing. Their belated response has been surprising and disappointing; it has just been another runaround.

I have heard that Lisa is working with other former clients, has apologized to them, and her criminal attorney has talked about her wanting to make things right. I have not seen any action like this by Lisa toward my family, or demonstrating remorse. My family and I are by far the biggest victims of Lisa's scheme, having been cheated of over $5 million. Nearly two years after Lisa's May 8, 2023 admission, I still am in the same position as when we started and I had to do my own investigation of the facts:

- I do not have my artworks;
- I do not have the funds that I sent her for purchases of the artworks;
- We do not have the database containing the details of the artworks in our collection;
- She has slandered me in the art community;
- I do not have any indication that she will help me in any way;
- She has said that her child is "all set" – but she stole from my children's trust;
- I have received no apology (although at this point it would be meaningless);

- I have received no response to the questions I've been asking for nearly two years – what is the extent of my losses, where did the money go, where are my artworks? Where is the database of our collection?

If Lisa really wanted to help herself (much less try to make something right with me and my family), it seems like she would be trying to be helpful. I wish she would have helped us, so that I could share that information with the court. That has not happened; and from our perspective, any action Lisa has taken might indicate that she's sorry that she got caught – but not for what she did, the harm she caused to others, including my family, and the chaos she left behind.

For all of these reasons, as much as I wish this wasn't the case, I think the Court should send Lisa a message that recognizes the seriousness and consequences of her actions. The AUSA has already recommended a sentence well below the maximum 20-year sentence for wire fraud. I would submit that a sentence at the upper end of the agreed range, fifty-one months, is the least she should be sentenced to.

Thank you for your time and consideration.

Very truly yours,

Victim-2

March 3, 2025