# Exhibit C

**Victim Impact Statement, Victim-2's Husband**

Your Honor,

I am Victim-2's husband, ▮▮▮▮▮ father, and a lawyer for the 9/11 community. My wife Victim-2 has provided a statement to the Court which describes in detail the fraud conducted against our family by her former supposed best friend, Lisa Schiff, and our efforts to determine the extent of her Ponzi scheme and obtain justice.

Victim-2 is a kind, caring person, and a philanthropist whose mission is to give a voice to the most important artists of our generation, including young emerging artists. She has donated time, money, and endless energy to support exhibitions, artists and museums, sponsoring shows, lending works to museums, and working to build a significant institutional collection that someday will be donated to museums and universities.

For almost two years, much of Victim-2's time and energy has been devoted to uncovering and trying to obtain legal redress for Lisa's criminal activity and the harm it has caused to our family and to the institutions and artists that Victim-2 works with. By our current calculation, Lisa stole artworks and funds from us – including Victim-2 and me, a trust set up for our children after Victim-2's brother passed away, and a family LLC -- totaling over $5 million. While we were only one of a dozen collectors victimized by Lisa, we are by far the largest victims in terms of the financial loss. Our losses exceed what Lisa owes the IRS and several other federal and state taxing authorities (in New York, Florida, and California), what she owes to American Express and other banks, and what she owes to other clients.

Lisa used the money we gave her (to buy art) to fund a lavish lifestyle, including an $1,800 per month luxury SUV with a fulltime driver, five-star vacations and shopping sprees, her son's over-the-top $20,000 birthday party at the Barclays Center, a $100,000 summer house rental in the Hamptons, multimillion dollar rentals of her apartment and office, and renovations of rental properties. Lisa said she "had to spend money to make money," and by all appearances, she was excellent at spending money. The ironic thing is that she didn't need our money to have a very nice lifestyle, because she earned hundreds of thousands, if not millions of dollars per year, from her clients. It seems to me that Lisa was desperate to show the art world how successful she was, so more collectors would hire her. She wanted to be like her clients or at least keep up with their lives, and felt like she was entitled to use their money to do so.

For almost twenty years, Victim-2 considered Lisa one of her closest friends. They were introduced by Victim-2's friend Victim-8 one of Lisa's other victims, who Victim-2 has known even longer, and who since 1990 has been an art professional with elite galleries and institutions. Victim-8 has an excellent reputation and a broad base of knowledge of the art world and players in it; and he is known for being hardworking, scrupulous, and circumspect. The fact that he was friends with Lisa, and trusted and did business with her, conveyed an immediate level of comfort to Victim-2  Lisa assiduously fostered that. She and Victim-2 talked or texted every day. Lisa and her son were treated like members of our family, and joined us for holidays and special occasions. Lisa traveled with Victim-2 and our children (who are older than Lisa's son) for art fairs across the United States and around the world.

1

It was an absolute shock and betrayal when Lisa admitted to [Victim-2] on May 8, 2023, that she did not have the $1,800,000 in proceeds from the sale of an important painting by Adrian Ghenie, *The Uncle 3*, that [Victim-2], [Victim-8] and his husband [redacted] owned together. She confessed she could not pay either [Victim-2], or [Victim-8] and [Victim-8's husband], the $900,000 shares they were entitled to, which Lisa had been promising [Victim-2], [Victim-8] and [Victim-8's husband] for four months with stories that the purchasers of the painting needed payment terms. Further, while Lisa indicated she had applied an earlier installment of $225,000 from the Ghenie sale, to purchases of artworks that [Victim-2] made with Lisa at Art Basel Miami in December 2022, it now appears that she did not credit [Victim-2] with the full $225,000, or apply all of the initial installment to our purchases. And the fact that Lisa made sure she got her quarter-million-dollar commission on the Ghenie sale, before [Victim-2], [Victim-8] and [Victim-8's husband] were paid in full, just added insult to injury.

During the May 8, 2023 phone call in which Lisa admitted to [Victim-2] that the proceeds of the Ghenie sale were gone, Lisa also said she "did not know" what had happened to another $340,000+ that Lisa had demanded that [Victim-2] wire to Lisa's company account in April and May 2023 (including a $190,000 transfer that Lisa demanded from [Victim-2] who then sent the funds on May 3, 2023) for [Victim-2]'s artwork purchases. Normally [Victim-2] would have told Lisa to apply the Ghenie sale proceeds to those purchases, but in these instances Lisa told [Victim-2] the purchasers had not yet paid for the Ghenie. She told [Victim-2] that other sellers were chasing her for payment. We now understand that the $340,000+ that [Victim-2] wired to Lisa was an outright theft; Lisa had no intention of paying for [Victim-2]'s art purchases with those funds.

After Lisa admitted her "business troubles" to [Victim-2] and [Victim-8], [Victim-2] asked Lisa to send her a list of our losses and which artworks were affected. Lisa promised to get [Victim-2] a list, and suggested that [Victim-2] call Lisa's longtime lawyer.

Immediately, [Victim-2] tried to talk with Lisa's attorney. We were both shocked when he refused to answer our questions after Lisa's confession, and he told us to get a lawyer. We did hire counsel, thinking that they would be able to negotiate with Lisa's attorney. They were also surprised when they spoke with him, to find that he was not willing to provide any information. We did not understand why Lisa and her lawyer were taking this approach with us, although it now seems it was because Lisa had stolen so much of our family's funds and artworks. (It took Lisa 20 months to get us an incomplete and incorrect list of artworks.)

Under the circumstances, not knowing what had happened to our funds and the extent of the damage, and given Lisa's and her lawyer's unwillingness to work with us, [Victim-2] and [Victim-8]'s husband [redacted] immediately filed a lawsuit regarding Lisa's theft of the funds from the sale of our Ghenie painting. After the Ghenie case was filed, [Victim-2] began investigating the extent of what Lisa had stolen from our family, and received numerous text messages, phone calls and emails from galleries around the world regarding works that Lisa purported to purchase for our family, some of which were partially paid for, but most of which were never paid for.

The tragic irony is that Lisa had no need to steal from her clients; since she was making a ten percent commission on every purchase and every sale, which I understand amounted to at least $ 1 million per year. She didn't need to steal; she wanted to steal.

2

Without help from Lisa or her attorney, Victim-2 and I and our counsel performed our own investigation to try to figure out which of our artworks in addition to the Ghenie and one Sarah Lucas sculpture that Lisa mentioned to Victim-2 had been affected by Lisa's fraud. We learned that most of the funds we provided to Lisa over the past several years had not been used for artworks we purchased. Instead Lisa apparently used them to fund her lavish lifestyle, her business, and we suspected, to cover art purchases by other clients who (unlike Victim-2) were insistent on seeing the art they purchased – particularly an installation in January 2023 for a wealthy client of hers in Massachusetts, that she had told us about. Lisa wanted it known that she was putting important artworks in another client's vacation home, and name-dropped and bragged about the Massachusetts installation. However, to install the artworks they first had to be paid for; it is common knowledge that galleries will not release works unless they are paid in full.

Victim-2 eventually learned that Lisa had not paid in full for a number of artworks that we bought; in some cases she had paid nothing toward the works. Lisa also sold some of our artworks and pocketed the money for herself; and in at least one case, she had Victim-2 pay for shipping to the U.S. a work that never left China – and which we understand she later resold to the originating gallery without Victim-2's knowledge, and kept the entire sale amount (including the profit).

Our damages include more than the money we paid for the artworks and the artworks themselves. Lisa charged commissions of ten percent (which Victim-2 never haggled with her about) on all purchases and sales of artworks – so if we bought a work through Lisa and later sold it through her, she received ten percent of each transaction (including on any appreciation in the work's value). At Lisa's suggestion, we insured the most valuable artworks that we purchased and believed we owned, at the values that Lisa appraised them for. In hindsight, for years we paid insurance premiums for artworks that Lisa never paid for, as well as litigation fees for two cases that we filed in New York State Supreme Court, an assignment proceeding that Lisa initiated for her company Schiff Fine Art, LLC ("SFA"), and two subsequent Chapter 7 bankruptcy cases filed by Lisa and against SFA. The New York state litigation has been stayed, but the bankruptcy cases are ongoing, and legal fees continue to accrue.

The following are the affected works that we know of. The list and financial details are likely incomplete, as Lisa and her counsel have refused to give or even show us the database of our art collection that Lisa was supposed to keep, which should include all the works that Victim-2 purchased, and confirm what other artworks were affected by Lisa's fraud. At various times they have inconsistently said (a) that we should be able to get the database, (b) that there is no database of our artworks, (c) that they cannot separate out our artworks from the rest of the database, and (d) that we should pay for Lisa or a vendor to put together a database for us.

| Artwork | Amount |
|---|---|
| **Adrian Ghenie, *The Uncle 3,* oil on canvas, 86.61 x 102.36 inches (2019) (Sotheby's)** | • Purchased by Victim-2 Victim-8 and Victim-8's husband in 2020 through Lisa via Sotheby's Hong Kong for $1.75 million.<br>• Lisa's purchase commission was $175,000.<br>• Sold by Victim-2 Victim-8 and Victim-8's husband thru Lisa, via Sotheby's Hong Kong in December 2022 for $2.5 million.<br>• On or about January 18, 2023, Lisa purportedly distributed $700,000 from the sale proceeds, for: (a) Lisa's sale commission of $250,000, which was to be split |

3

| Artwork | Amount |
|---|---|
|  | 50/50 between Victim-2 on the one hand and Victim-8 and Victim-8's husband on the other; (b) $225,000 wired to Victim-8's bank account; (c) $225,000 credited to Victim-2 which was to be applied to purchases at Art Basel Miami in December 2022. We now understand that Lisa did not actually credit Victim-2 with the full $225,000, and did not apply them all to our art purchases; we discovered after May 8, 2023 that Lisa had not made payment for many of those purchases.<br>• Lisa charged us $1675.00 + tax for shipping the Ghenie painting, which was delivered to Sotheby's New York in early December 2022.<br>• On May 8, 2023, Lisa acknowledged that she could not remit the remaining $1.8 million of the sale price ($900,000 to Victim-2 and $900,000 to Victim-8 and Victim-8's husband), and that the money was "gone." |
| **Wangechi Mutu, *The Seated IV*, 2019, Bronze, 80 ½ x 36 ¾ (Gladstone Gallery)** | • Victim-2 purchased this work through Lisa in December 2019.<br>• SFA's invoice to Victim-2 showed the price was $650,000, although Gladstone Gallery gave a 10% discount. We understand Lisa kept the $65,000 discount as her 10% commission.<br>• Lisa forwarded $332,099 to Gladstone toward the Mutu.<br>• Gladstone appeared in the New York State Supreme Court and acknowledged that the funds they were holding belong to Victim-2<br>• Gladstone recently turned the funds over to the SFA bankruptcy trustee, without consulting us, and cancelled the sale. |
| **Sarah Lucas, *CASANOVA*, 2018, Bronze, 44 1/8" x 35 7/8" (Gladstone Gallery)** | • Victim-2 purchased this sculpture through Lisa in March 2020 and paid $390,000 to SFA.<br>• Lisa paid the gallery nothing. She confirmed to Victim-2 on May 8, 2023 that the sculpture was affected by her fraud.<br>• Gladstone cancelled the sale. |
| **Hayv Kahraman, *Torshi and eyes*, 2022, oil and torshi on linen, 50 x 50 inches (Pilar Corrias Gallery, London, England)** | • Victim-2 purchased this work through Lisa in January 2023 and paid $52,260 ($48,000 price, less 10% ($4,800) discount from gallery, plus 10% commission ($4,800) to SFA, and tax of $4,260).<br>• Lisa paid the gallery nothing. |
| **Alvaro Barrington, *Brazil*, 2021 mixed media on burlap in artist** | • Victim-2 purchased this work in January 2023 and paid $179,643.75 ($150,000 price plus taxes, fees, etc.). |

4

| Artwork | Amount |
|---|---|
| frame, 170 cm x170 cm x 5 cm (Sadie Coles Gallery, London, England) | • Lisa paid the gallery nothing. |
| **Andrea Bowers,** *Another Kind of Strength,* **2022, acrylic marker on cardboard, 66 cm x 25.4 cm, (Kauffman Repetto Gallery, NY)** | • Victim-2 purchased this work in January 2023 and paid $32,100 plus VAT.<br>• Lisa did not pay the gallery, which cancelled the sale and sold the work to someone else. |
| **Ernie Barnes,** *Sandlot Football,* **(Andrew Kreps Gallery)** | • Victim-2 agreed to purchase this work in November 2022, and paid a $50,000 deposit against the total price of $650,000.<br>• The balance of the price was to be paid from the Ghenie sale.<br>• Lisa stole the Ghenie sale proceeds, and the balance due to Andrew Kreps Gallery was not paid.<br>• Victim-2 lost the $50,000 deposit, which the gallery kept. |
| **Harminder Judge,** *Untitled (hair in hands)***, 2022, 95 15/16" x 45 ¼", mixed media on panel (Pace Gallery)** | • Victim-2 purchased this work in January 2023 and paid $45,090.58 from our children's trust account ($37,650.00 price, $3,765 for SFA's 10% commission, and sales tax of $3,765.58).<br>• Pace acknowledges the work belongs to Victim-2 and is paid in full, but will not release it because Lisa caused Pace to invoice it to SFA.<br>• Lisa's bankruptcy schedules claim no interest in the work, but the Chapter 7 trustee has demanded that Victim-2 pay extra to get possession. |
| **Louis Hammond,** *False Flag* **(2023) (47 Canal Gallery, New York)** | • Victim-2 purchased this work in February 2023 and paid $10,000.<br>• Lisa paid nothing to the gallery. |
| **Hadi Falapishi,** *Self Portrait***, 2023, mixed media on panel, 84" x 54," (Andrew Kreps Gallery, New York)** | • Victim-2 purchased this work in February 2023 and paid $45,000.<br>• Lisa paid nothing to the gallery. |
| **Hadi Falapishi,** *Praying Man***, 2023, glazed ceramic, 18" x 16," (Andrew Kreps Gallery, New York)** | • Victim-2 purchased this work in February 2023 and paid $25,000.<br>• Lisa paid nothing to the gallery. |

5

| Artwork | Amount |
|---|---|
| **Mindy Shapero, *Portal scar, Don't wait for the buy in,* 2023, Acrylic, gold and silver leaf on linen, 90" x 72" (Nino Mier Gallery, Los Angeles)** | • Victim-2 purchased this work in March 2023 and paid $80,000.<br>• Lisa paid nothing to the gallery. |
| **Adrian Berg, 50% share in four paintings:**<br>**(1) *Kew 20th August*, oil on canvas, 30 1/8 x 36 1/8 inches (1997);**<br>**(2) *Glyndebourne III,* oil on canvas, 24x 36 inches (1990);**<br>**(3) *Beachy Head 7th September,* oil on canvas, 25 x 35 1/8 inches (1994); and**<br>**(4) *Gloucester Gate, Regent's Park, October,* oil on canvas, 32 x 32 inches (1983) (Frestonian Gallery, London)** | • Victim-2 purchased these four works with Lisa in March 2023 and paid $54,437.50 ($50,000 plus $4,437.50 tax) for a half-share of each of the four works (priced at $25,000 each).<br>• The Chapter 7 trustee has possession of these works and wants us to pay extra to get them back. |
| **Anicka Yi, *Kn£M§†R,* 2023, acrylic, UV print on aluminum 67 ¼" x 55 ¼" (47 Canal Gallery, New York)** | • Victim-2 purchased this work in April 2023 and paid $157,500 from our children's trust. (The price of this work was included in the last $190,000+ wire that Lisa demanded.)<br>• Lisa did not pay for the work. |
| **Nicholas Party, large cat (Xavier Hufkens Gallery)** | • Victim-2 purchased this work in 2019. It was coming from a foundry in China.<br>• The price of the cat was $176,253.37, based on the current exchange rate (which is not very different than in 2019 when Victim-2 purchased it. Victim-2 paid 157,500€ on or about July 16, 2019 (180,000€ less a 25,500€ discount)).<br>• Lisa charged Victim-2 $9,733.40 to ship the sculpture from the Hong Kong foundry to Connecticut.<br>• The sculpture never left China; we do not know if or when it was cast.<br>• Without telling Victim-2, Lisa resold the sculpture back to the Hufkens Gallery on November 10, 2020 for $250,000 - $275,000.<br>• We learned this history after our counsel attempted to subpoena the gallery. |
| **Arthur Jafa, four works:** | • Victim-2 purchased these four works through Lisa. |

6

| Artwork | Amount |
|---|---|
| (1) *Apex Grid* (2018)*,* Epson fine art print face-mounted to Diasec acrylic on aluminum panel (105 1/2 by 352 1/2 by 2 1/4 inches, 268 by 895.4 by 5.7 cm), Edition 2 of 3, + 2*;*<br>(2) *Big Wheel II* (2018), Chains, rim, hubcap, and tire (91 by 91 by 37 inches, 231.1 by 231.1 by 94 cm);<br>(3) *Mickey Mouse was a Scorpio* (2017), C-Print (52 x 83 inches, 132.1 by 210.8 cm), Edition 1 of 10, + 2; and<br>(4) *APEX film* (2013), Video (color, sound), 8 minutes, 12 seconds, 1, Edition of 10, + 2 | • Lisa arranged for the sale of these four works to in 2023 for a total of $800,000 (including a $50,000 commission).<br>• SFA bank statements show the buyers wired approximately $800,000 in full payment in September 2022, in two transactions.<br>• We understand that although Lisa claims the sale proceeds would be or were applied to Victim-2's purchases of other artworks, and expenses. Given that Lisa refused to respond to discovery in the New York state cases that we were forced to file, we cannot say that is true.<br>• The works were released to the buyers, notwithstanding that to the best of our knowledge, we did not receive the sale proceeds. |
| | |
| James Nares, *Untitled (Yellow)* (2002) | • Victim-2 bought this work for $10,000 in or about June 2005; it has long been paid for in full.<br>• The work is currently in the Chapter 7 trustee's possession, although Lisa/SFA claim they do not know what it is.<br>• The Chapter 7 trustee has demanded that Victim-2 pay extra to get this work back. |
| | |
| Roberto Gil de Montes, Chino (2021), Oil on Canvas 13 ¾ x 10 2/3 inches | • Victim-2 purchased a half-share in this work in July 2022, and paid $8,165.63 ($7,500 + $665.63 tax).<br>• The Chapter 7 trustee demands that Victim-2 pay extra to get it back. |
| | |
| Mimosa Echard, *Broken Waters* (2022) (Chantal Crousel Gallery) | • Victim-2 purchased this work at Art Basel Miami in December 2022.<br>• Victim-2 remitted payment of $48,993.75 ($45,000 less $4,500 discount, + $4,500 commission to SFA, + $3,993.75 sales tax).<br>• Victim-2 also paid $833.75 + tax, which Lisa charged her for shipping.<br>• Lisa never paid the gallery.<br>• The work went to Victim-2's storage unit after the art fair; Victim-2 has reached out to the gallery about donating to museum. |
| | |
| Frederik Vaerslev, *Untitled (Drobak Kunsforening #11)* (2013) | • Victim-2 bought this work years ago. She paid $29,420.11 ($27,244 less $2,724 discount, + $2,724 commission, + NYC sales tax of $2,126.11). |

7

| Artwork | Amount |
|---|---|
|  | • The work is in the Chapter 7 trustee's possession and Lisa has acknowledged it belongs to Victim-2.<br>• The Chapter 7 trustee demands that Victim-2 pay extra to get it back. |
|  |  |
| **Cory Arcangel, TOPLINE installation: 14 scanner paintings, 2 custom benches and rug (Thaddeus Ropac Gallery)** | • Victim-2 purchased this work in 2020, at around the same time as the Ghenie painting, from the same gallery.<br>• This is a massive work which takes up an entire room, and was intended to go to a museum.<br>• The invoiced price was $750,000 (44% discount from $1,350,000 price). Victim-2 paid the full $750,000 for the work.<br>• Lisa partially paid the gallery, remitting $575,000.<br>• The artist and gallery agreed with Victim-2 y to accept the $575,000 as full payment; and title passed to Victim-2.<br>• Victim-2 has been insuring the work since she acquired it.<br>• The Chapter 7 trustee refuses to allow the transfer to Victim-2 and wants her to pay more to get the work. |
|  |  |
| **Yayoi Kusama, *The Sun Rises,* (Victoria Miro Gallery)** | • Victim-2 purchased this work in 2019 and paid $892,500, as confirmed by Lisa, who acknowledged that it was fully paid for from sales proceeds of other specific artworks owned by Victim-2.<br>• Per the Gallery's counsel, the total price was $812,372.16, including $4,872.16 in Lisa's credit card fees (which Victim-2 reimbursed).<br>• The gallery, in London, acknowledges that it is holding $660,483.27 which Lisa forwarded for Victim-2's purchase of this work, and that the work will be transferred to Victim-2 upon Victim-2's payment (again) of the unpaid balance of $151,888.89.<br>• The Chapter 7 trustee has challenged the sale and contends it is entitled to the $660,483.27 held by the gallery.<br>• Victim-2 has been insuring the work since she acquired it. |

Given the new information we learned from Victim-2's investigation of additional artworks Lisa had not paid for, or not fully paid for, Victim-2 and I filed a second civil lawsuit in New York State Supreme Court against Lisa and SFA, relating to those additional artworks (the list above also includes affected works that we learned of after the second complaint was filed).

Originally, Lisa told Victim-2 that our loss was $2 million, including our family's artworks and funds; our estimate is now approximately $5.8 million. Through Victim-2's and our lawyers' investigation of the extent of our losses, we learned that while we believed Lisa was paying for the works we purchased with funds that we provided (including proceeds from sales of certain of our other artworks), Lisa was falsely

8

blaming Victim-2 for payment delays -- telling selling galleries that payments were behind or not being made because Victim-2 was having financial difficulties – when in fact the fault lay with Lisa's fraudulent conduct.

Victim-2's reputation has always been pristine and at the highest level in the art world; it is very important to her. Lisa's lies about Victim-2 have hurt Victim-2 in the eyes of the entire art world. And of course, Lisa's payment delays also held up the galleries which patiently waited for payment, in vain.

In July 2023 we were able to obtain an injunction in New York State Supreme Court prohibiting Lisa and SFA from doing anything with funds or assets in their possession, except for paying living expenses and attorney fees. However, our two New York state lawsuits became a battle. We propounded discovery to Lisa and SFA and served numerous subpoenas, trying to find out what happened to our artworks and funds, and the extent of our losses. Lisa and SFA refused to respond, citing their purported Fifth Amendment rights. We filed motions trying to get compliance with our discovery, which sat undecided for months after our initial assigned judge retired and a new judge was not assigned.

Given the difficulty of obtaining discovery from Lisa and SFA, we subpoenaed unrelated third-party Deep Tech Inc., which was Lisa's/SFA's IT provider, and in possession of their server. In response, Lisa's attorney moved on behalf of Lisa, SFA and Deep Tech to quash the subpoena, arguing that it violated Lisa's and SFA's purported Fifth Amendment rights. Lisa's unending efforts to prevent us from finding out what she did with our art and funds simply reinforced the impression that she is *still* trying to hide the extent of her fraud against us, which *still* has not been disclosed to us.

In between the two cases we filed, we learned that Lisa had filed an assignment for the benefit of creditors of her company, SFA, and the assignee initiated an action in the New York State Supreme Court (the "ABC proceeding"). In the ABC proceeding we served a subpoena on the assignee at his request, seeking the same information we requested from Lisa and SFA; he ignored it. The assignee filed motion after motion, insinuated that Victim-2/my family was party to Lisa's scheme, and tried to get what he could from us and our lawyers, rather than working in the interest of the largest creditor (Victim-2 and our family).

After we spent huge legal fees and received no discovery from Lisa or SFA in New York State Supreme Court, Lisa filed a Chapter 7 petition in January 2024 in the U.S. Bankruptcy Court for the Southern District of New York. On behalf of our family, Victim-8, Victim-8's husband and several other creditors, our lawyers then filed an involuntary Chapter 7 petition against SFA in January 2024 so that at least everything would be in one court, and hopefully we would finally be able to get discovery and resolution.

Our legal fees continue to accrue in the two bankruptcy court proceedings, and we have recently filed a complaint in Lisa's Chapter 7 case, for nondischargeability of her debts to us.

**LISA'S NONCOOPERATION**

If I were to speak in court at Lisa's sentencing, I would say to Lisa that, "I am truly sad and disappointed as well as angry, that on top of the theft and the fraud that my family has experienced

because of YOUR actions, you have shown no remorse and you have refused to cooperate to mitigate any of the damage you've inflicted on us.

"You have made no effort to make things right with us – despite what your lawyer has said in the press about you wanting to do so, and 'working toward a comeback.' Frankly, your continued noncooperation indicates to us that you stole and misappropriated even more from us than we have been able to uncover so far, and that you are still trying to hide it. You had commented to us that your son was 'all set' – how much of our money and sales of art were responsible for him being financially 'all set'?

"Lisa, you broke my wife's heart and my children's hearts. My family loved you and we trusted you. You hurt us and betrayed us."

After Lisa entered her guilty plea in October 2024, her lawyer made statements to the press, stating that Lisa wanted to make things right, get back into the art world, and how "everyone loves a comeback story." That is not evident in any of her actions to date. Neither Lisa nor her attorney have "tried to make things right," such as by trying to make the disclosures that we have requested many times since May 8, 2023. And it's absurd to believe that Lisa will ever return to the art world. I can't imagine anyone inside or outside the art world who would trust a convicted felon.

After the plea hearing and Lisa's waiver of her Fifth Amendment rights, our lawyers contacted her criminal lawyer to see if we could work together for Lisa to provide the information we've repeatedly requested but not received. Her lawyer's initial response was that he had to check with Lisa's bankruptcy counsel and the prosecutors if he could talk with our lawyers (he had already been on calls with them and our bankruptcy lawyers).

Lisa's criminal attorney let our lawyers know that he had been given the OK to talk with them, and they had a call before Thanksgiving in which our lawyers described for him the information we need relating to (1) certain works that Lisa stole; (2) the scope of our loss, for tax purposes; (3) confirmation regarding certain issues for the bankruptcy proceedings, (4) assistance in getting artworks that we own and fully paid for returned to us.

The one piece of information we gleaned during this call was regarding the last $190,000+ transfer of funds [Victim-2] made from our children's trust at Lisa's request, days before Lisa confessed her fraud to [Victim-2] to pay for certain artworks [Victim-2] purchased when they went to Art Basel in December 2022. Our lawyers obtained records in discovery in the New York state actions showing that, the day after [Victim-2]'s transfer to SFA's account, there was a transfer of $190,000 from the SFA account to East West Bank.

Our lawyers tried to find out what this account was and subpoenaed East West Bank, but got nothing productive in return. Lisa's attorney and the assignee were aware of this, because our lawyers provided them with copies of all the subpoenas and documents produced.

Our lawyers discussed this transfer with Lisa's criminal defense attorney, thinking that perhaps we would be able to claw it back in the bankruptcy proceedings. He said he did not know about it and would ask Lisa. During the subsequent call with her lawyers, they remarked that this money went to Marc Selwyn, which is a gallery with two locations in Beverly Hills, California. We have not purchased anything from this gallery since February 2019. This was just further proof that Lisa knowingly

defrauded our family to pay for other clients' artworks – and that there is more that we have not yet uncovered, and she is still trying to hide the full extent of her fraud against us.

Lisa's attorneys finally got in touch with us on February 18, 2025, when one of them emailed our counsel a chart and some documents that partially addressed some of the questions our attorneys raised before Thanksgiving. Lisa's attorney designated what they provided as "for settlement purposes" – although we have had no discussions about settling our claims against Lisa. The limited information provided does not address much of the information we requested and is more focused on the story that Lisa wants to tell, even including further misrepresentations of what Lisa did with our funds. In short, we are still getting the same runaround that began when Lisa admitted her theft to Victim-2 nearly two years ago.

**SENTENCING**

Reading Lisa's criminal attorney's comments to the press about her working to make things right, to set the stage for a comeback, like her prior attorney's comments that she deserves sympathy or leniency because she's a single mom, has been infuriating. From my perspective, since entering her guilty plea, instead of trying to help my family, and Victim-8 and Victim-8's husband, Lisa and her advisors have continued to try to keep us in the dark and hide the extent of her wrongdoing against us.

In a February 18, 2025 New York Times article on Lisa, she seems to be unhappy and bitter about some of her past choices, claiming that she was miserable during her five-star vacations and wearing the clothes she bought on luxury shopping sprees. But she didn't stop, "didn't allow [herself] to even think that [she] was doing criminal behavior," and incredibly, "didn't think through what [she] was potentially doing to [her] son." https://www.nytimes.com/2025/02/18/arts/design/lisa-schiff-art-adviser-theft.html. There isn't a word indicating she understands the impact of her actions on the people she stole from. The focus is still on herself.

No one made Lisa steal from us or her other clients. This was her choice. And what happened to us, with the Ghenie painting and proceeds, makes very clear that Lisa made a deliberate, calculated decision every time she lied to us about the purchasers needing payment terms, when actually the purchaser paid in full long before and she never told us. Lisa is the person responsible for the situation she's in and in which she left all of us.

Lisa took the most advantage of the people who were closest to her. She especially fostered a relationship with Victim-2 and our family, got us to trust her, and then took advantage of that trust and used it against us.

I have read the transcript of Lisa's plea hearing and her statement to the Court about her actions. The fact that after a year and a half she decided to plead guilty, does not make up for the chaos and the damage she caused my family.

The fact that Lisa is a single parent makes what she did all the more inexplicable. Her child did not make her do what she did, but it seems she did not take him into account when she was stealing from her clients -- other than to make sure that her son is all "set," presumably with funds obtained from her clients, including Victim-2's and my children. Given the difficulties we have had in trying to obtain discovery and information about Lisa's conduct and the extent of our losses, it seems safe to say that any

11

money she set aside somewhere for her son is effectively gone and beyond any creditor's reach. Thankfully, her son will now be brought up by her brother who is not a convicted felon.

      When Lisa pleaded guilty and waived her Fifth Amendment rights at her plea hearing, I really hoped that we would be able to work with her to get information that could be helpful. We didn't expect necessarily that we would be able to recover anything close to what she stole, but our lawyers talked with her attorney about providing information that would be helpful to us in the other litigation we have been forced to file and the bankruptcy matters, and in order to get back some of the art that we fully paid for. We presumed she would want to do that, at the least because it might be helpful to her at sentencing. As noted above, the information we just (finally) received two weeks ago is incomplete and creates as many new questions as it purportedly answers.

      Victim-2's requests to Lisa's lawyers, the ABC assignee, and the Chapter 7 trustees for her ArtBase database (which is a program Lisa was supposed to maintain containing records of our art purchases and sales, the provenance of the artworks, etc.) have been met with directly conflicting tales. This is basic information that I understand many art advisors keep for clients, especially those with more extensive collections. In the last several months Lisa's lawyers have variously said that she and/or they and/or the trustee have the information and we ought to be able to get it, that they cannot sort our artworks in the database, that Lisa never created such a database for Victim-2, that a vendor could create one for us (for which we would have to pay), or that Lisa could do it (although at this point she has had nearly two years to do so, but has not). This is ludicrous; we have hundreds of artworks, and at various times Lisa provided printed catalogs (some over 100 pages) of certain information regarding artworks owned by my family during the nearly twenty years that she was our art advisor.

      I have heard that Lisa is working with other former clients, has apologized to them, and her criminal lawyer has talked about her wanting to make things right. I have not seen any action like this by Lisa toward my family or demonstrating remorse. My family is by far the biggest victim of Lisa's scheme, having been cheated of over $5.8 million. Nearly two years after Lisa's May 8, 2023 admission, we still are in the same position as when we started:

- We do not have our artworks;
- We do not have the funds that were sent to her for purchases of the artworks;
- We do not have the database containing the details of the artworks in our collection – where is it?;
- She has slandered Victim-2 in the art community;
- We do not have any indication that she will help us in any way;
- She has said that her child is "all set" – but she stole from our children's trust;
- We have received no apology (although at this point it would be meaningless);
- We have received no response to the questions we have been asking for a year and a half – what is the extent of our losses, where did the money go, where are our artworks?

      If Lisa really wanted to help herself (much less try to make something right with my family), it seems like she would try to be helpful. That has not happened; and from our perspective, any action Lisa has taken might indicate that she's sorry that she got caught – but not for what she did, the harm she caused to others, including my family, and the chaos she left behind. Every artist and gallerist we know is following this case closely to see what kind of prison sentence Lisa is given. I urge the court to

send a message to the entire art world that theft from art collectors, galleries, and artists will not be condoned…even if the theft is by a single mother.

    The AUSA has already recommended a sentence well below the maximum 20-year sentence for wire fraud. I would submit that Lisa deserves much more than the fifty-one month maximum sentence that the AUSA recommended, for the devastation she has caused to her clients in general, my family in particular, and innumerable galleries and artists.

    Thank you for your time and consideration.

    Very truly yours,

Victim-2's husband

March 3, 2025