P3JKSCHS

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                          24 CR 605 (JPO)

5  LISA ANN SCHIFF,

6                                       Sentence
              Defendant.
7  ------------------------------x

8                                       New York, N.Y.
9                                       March 19, 2025
                                        11:00 a.m.
10

11 Before:

12                   HON. J. PAUL OETKEN,

13                                       District Judge

14                      APPEARANCES

15 MATTHEW D. PODOLSKY
        United States Attorney for the
16      Southern District of New York
   CECILIA VOGEL
17 JENNIFER ONG
        Assistant United States Attorneys
18

   RANDY S. ZELIN
19      Attorney for Defendant

20

21

22

23

24

25

P3JKSCHS

1              (Case called)

2              MS. VOGEL:  Good morning, your Honor.  Cecilia Vogel,

3        for the government, and I am joined at counsel's table by my

4        colleague, AUSA Jennifer Ong.

5              THE COURT:  Good morning.

6              MR. ZELIN:  Good morning, your Honor.  My name is

7        Randy Zelin.  I represent Lisa Schiff, who is to my right and

8        your Honor's left.

9              THE COURT:  Good morning.

10             We're here for sentencing in this case.  Ms. Schiff

11        pleaded guilty to wire fraud on October 17, 2024.  I want to

12        start by going over the documents I received and making sure I

13        have received everything I should have.

14             I've received and reviewed the presentence report

15        prepared by the probation department, with an addendum and

16        sentencing recommendation; defense counsel's submission, with

17        letters from several family members and friends and other

18        additional background information, a supplemental letter, and I

19        have reviewed all of that information; and, also, the

20        submission by the government and the letters from several

21        victims.

22             Do I have everything I should have from the

23        government?

24             MS. VOGEL:  Yes.

25             THE COURT:  And from the defense?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JKSCHS

1              MR. ZELIN:  Yes, your Honor.  Thank you.

2              THE COURT:  Thank you.

3              Mr. Zelin, have you reviewed the presentence report

4    and discussed it with your client?

5              MR. ZELIN:  Both iterations, your Honor, yes.

6              THE COURT:  All right.

7              Are there any remaining objections that I need to

8    resolve in the presentence report?

9              MR. ZELIN:  No, your Honor.

10             THE COURT:  All right.

11             Are there any objections from the government?

12             MS. VOGEL:  No, your Honor.

13             I just want to note, there were objections that the

14   defense raised in their sentencing submission.

15             THE COURT:  Oh, okay.

16             There are objections that you raised to the factual

17   recitation; is that right?

18             MR. ZELIN:  Yes.  If your Honor please, to be clear,

19   with respect to the initial presentence investigation report,

20   there were written objections filed by letter.  There was a

21   subsequent supplemental objection letter provided to the

22   probation department and the government.

23             Subsequent to that, there was the revised presentence

24   investigation report.  The probation officer, Officer McMahon,

25   asked me, rather than to submit another round of objections to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      the probation department, that I instead address them directly

2      with your Honor.  They are, I believe, part 1 to my client's

3      sentencing submission, but, as I said earlier, if your Honor

4      please, after careful consultation with my client, there are no

5      remaining outstanding objections, and we would withdraw those

6      objections that are reflected in Ms. Schiff's sentencing memo.

7                  THE COURT:  All right.  Thank you.

8                  In any event, just for the record, none of those

9      issues that are raised there would make a difference in the

10     sentence that I would ultimately impose.  So, based on that, I

11     will adopt the facts set forth in the presentence report as my

12     findings of fact for sentencing.

13                 The starting point in sentencing in the federal system

14     is the sentencing guidelines, which are essentially a book that

15     provides a recommended punishment for every case in the federal

16     system based on various considerations and the criminal history

17     of the defendant.  The Court is not required to follow the

18     sentencing guidelines, but I am required to start with an

19     accurate calculation of the guidelines.

20                 In this case, I do adopt the sentencing guideline

21     calculation that's in the parties' plea agreement.  I find that

22     the base offense level is 7.  Based on the loss amount of

23     between 6 and 7 million dollars, that is increased 18 levels,

24     and it is increased two levels because of the number of victims

25     being ten or more.  There's a decrease of two levels because

P3JKSCHS

the defendant is a Zero-Point Offender, meaning she has no

prior convictions and, therefore, zero criminal history.  And

because she accepted responsibility in a timely manner, there's

a decrease of three points.  And that results in a total

offense level of 22, and she's in the lowest criminal history

category based on her lack of criminal convictions, and that

means that the sentencing guideline range is 41 to 51 months'

imprisonment.  Again, that's not mandatory, but that is the

starting point and the benchmark for sentencing in our system.

Now, I'd like to give each of you an opportunity to

speak.  I'll start with counsel for the government, then any

victims who want to speak, then defense counsel, and then the

defendant, if she wishes to speak.

So I'll start with Ms. Vogel.

MS. VOGEL:  Thank you, your Honor.  Is it all right if

I remain seated?

THE COURT:  Yes, I think it's easier if you just

remain seated.  If you want to go to the podium and stand,

that's fine, but if you want to stay at the table, you can

remain seated.

MS. VOGEL:  Thank you.

So, as we wrote in our Sentencing Commission, the

government is recommending a sentence at the low end of the

guidelines.  We think that's an appropriate sentence to achieve

the goals of sentencing, particularly here, just punishment,

P3JKSCHS

1    the need to reflect the seriousness of the offense, and then

2    specific and general deterrence.

3         I'm not going to reiterate all the points we made in

4    our written submission, but there are a few that I want to

5    emphasize to you, your Honor.

6         First, this fraud was truly extensive.  It went on for

7    five years.  It involved many victims and many works of art.

8    And that means that with respect to each artwork, each one of

9    those is a transaction, where the defendant made a decision to

10   steal and lie, from her clients and to her clients.  And so

11   this shows that the defendant repeatedly decided to engage in

12   fraud over a long period of time.

13        Obviously, the defendant's submission spends a lot of

14   time focusing on the defendant herself, but I really ask the

15   Court to consider the victims and the harm to the victims in

16   this case.  I want to make sure that that's not lost.

17        The defendant defrauded, in some instances, her

18   friends, people who trusted her professionally and personally.

19   She inflicted significant emotional and financial harm on them,

20   and we excerpted in our letter from some of the statements,

21   which I just want to reiterate because I think they're

22   powerful, about how this affected them.

23        Victim 1 described, "We feel mocked and taken

24   advantage of by a person who was supposed to be acting in our

25   interest, but instead had no scruples and did terrible damage

P3JKSCHS

1    to us both financially and personally."

2              Victim 2 expressed, "I now know that the defendant

3    took advantage of what I believed for years was a mutual

4    friendship to make me and my family her biggest mark."

5              The husband of Victim 2 wrote, "You broke my wife's

6    heart and my children's hearts.  My family loved you, and we

7    trusted you.  You hurt us and betrayed us."

8              And the son of Victim 2 wrote about it.  He described

9    seeing his mother cry after she learned about this fraud, and

10   that the defendant wasn't just a friend to my mom, she was

11   family.  "That's what makes this so devastating.  The defendant

12   exploited my mom's love and trust in the cruelest way

13   possible."

14             Victim 8 described how the defendant "did damage to

15   the reputation I've spent my entire 35 years of professional

16   life to build and that the defendant caused more pain for me,

17   my spouse, and my family than I've ever experienced.  I was a

18   friend who was always there for her for decades."  And he goes

19   on to describe about how he was going to use the proceeds from

20   the sale of one of these paintings, proceeds that she stole, to

21   pay for medical needs and care for his parents.

22             So, the harm here is significant, and I think it's

23   important for the Court to remember that when considering the

24   seriousness of the offense and the need for just punishment.

25             Another point I want to address is the defendant's

P3JKSCHS

self-reporting of her criminal conduct.  That is the reason the

government is recommending a sentence at the low end of the

guidelines.  She does deserve credit for that.  It is not

common for defendants to report their conduct and provide

information to law enforcement over the course of the

investigation, where it's not for cooperation against others,

but just purely to implicate oneself.  That is unusual, and we

acknowledge that, and she deserves some credit for accepting

responsibility in that way.

        But that self-reporting needs to be looked at in

context.  At the time the defendant chose to self-report, in

the spring of 2023, it was essentially inevitable that her

fraud was about to be exposed.  She herself admits in her

sentencing submission she reached a point where her debts had

become insurmountable.  She couldn't keep the fraud going any

longer.  Her clients were going to learn that she'd taken the

money and couldn't pay them back, and it was likely that there

were going to be lawsuits and public reporting.  In fact, this

office learned about the conduct initially through public

reporting, not through the defendant's disclosure, which was to

the Manhattan DA's office.

        THE COURT:  So, did the government learn about it

after the May 2023 reporting to the Manhattan DA's office or

before?

        MS. VOGEL:  After.

P3JKSCHS

1          THE COURT:  After?  Okay.

2          MS. VOGEL:  Yes.

3          So that is one key point, to put the self-reporting in

4    context.  She'd essentially reached a point where she couldn't

5    continue the fraud anymore, and discovery was inevitable.

6          Another point is that, according to the defendant, she

7    had made the decision to disclose her fraud and was preparing

8    to do so several weeks before she did so, at least by early

9    April 2023.  It is important to recognize that the defendant

10   stole hundreds of thousands of dollars in those couple of weeks

11   alone, from various victims.  She continued to accept money

12   from her clients for purchasing artworks or selling artworks on

13   their behalf, and diverted the funds for her own purposes, at a

14   point where she claimed she had already decided to confess and

15   stop the fraud.  I think that is a notable aggravating factor

16   here.

17         Somewhat similarly, as described in our submission, in

18   2020, the defendant made a conscious decision to continue the

19   fraud.  We recovered from her computer, which, again, she did

20   turn over to law enforcement voluntarily, but we identified on

21   her computer two draft letters to two of her largest victims in

22   which she admitted the fraud and that she'd stolen millions

23   from them and claimed that she would try to pay them back and

24   prioritize trying to do the right thing for them.  She never

25   sent those letters to her victims in 2020 or thereafter.  She

P3JKSCHS

```
1    continued to defraud those victims and others.  And the fraud
2    only grew in the three years that she continued after that
3    point.  So I think that's another important factor, aggravating
4    factor, for the Court to consider in terms of the seriousness
5    of the offense and considering the weight to assign to her
6    self-reporting her criminal conduct.
7              The other point I want to emphasize is, I think
8    general deterrence is an important factor in this case.  I have
9    actually worked on several cases in the art market involving
10   fraud.  There are some unique circumstances in how business is
11   done in the art market that leave opportunities for fraud.  As
12   we described, it is not uncommon for art advisors or art
13   dealers to be the intermediary to accept payments for
14   transactions on behalf of their clients, and often to take
15   custody of artworks or handle the shipping or transmittal of
16   artworks.  That leaves open the door for fraud.  It gives an
17   opportunity for dealers or advisors to divert payments because,
18   essentially, they are a buffer between the buyer and seller,
19   and they can provide misinformation to either side.  And that
20   is exactly what the defendant did here.  She took advantage of
21   those circumstances to commit her fraud and to keep it going
22   for so long.
23             So I do think it's important, in this case, and in
24   others in the art market, to impose a serious sentence, to
25   signal to others who may consider committing fraud in the art
```

P3JKSCHS

1    market that such conduct will have serious consequences and,

2    hopefully, deter them from doing so.  And I think that is also

3    important here because of the news attention that this case has

4    gotten.  I think the message will get out that this type of

5    fraud will not be tolerated if the Court imposes a substantial

6    sentence.

7          Lastly, I'm asking the Court to consider the credits

8    under the FIRST STEP Act that the defendant is likely to

9    receive with respect to any jail sentence that the Court

10   imposes.  Those credits are relevant for the Court to assess

11   what sentence is necessary to achieve the appropriate sentence

12   under the goals of Section 3553(a).  It matters how long the

13   defendant will actually spend in jail to assess what is the

14   appropriate sentence for specific deterrence, for general

15   deterrence, for just punishment.  We outlined generally what

16   those kinds of credits are that the defendant can receive, and

17   so we're asking the Court to just take that into account when

18   assessing all of these factors.

19         THE COURT:  So, basically, if someone is sentenced to

20   more than a year, they get close to two months off per year, 54

21   days per year, if they are engaged in good conduct, and then

22   there's an additional credit under the new law; is that right?

23         MS. VOGEL:  That's right.

24         So, under the FIRST STEP Act, defendants get 54 days

25   per year for good conduct, for the total sentence imposed, so

P3JKSCHS

1    regardless of how much time they serve, assuming good conduct

2    while incarcerated, which I think, in this case, there's little

3    doubt that probably this defendant will earn that good-conduct

4    time.

5          The FIRST STEP Act also adds that for every 30 days

6    that a defendant serves, they can get 15 days' credit off their

7    sentence — or I shouldn't say off, but it's called earned-time

8    credit — up to the first year that they earn total can be

9    applied to early supervised release.  So that is, essentially,

10    one year off the sentence.  And then any additional time that

11    they earn of earned-time credit can go to release to a halfway

12    house or home confinement.  So, technically, still serving the

13    sentence, but not in a BOP facility.

14          So, those are the additional credits that the

15    defendant can earn, and it really can have a substantial

16    reduction in terms of the overall time that the defendant will

17    serve, and so I think it's appropriate for the Court to

18    consider that, not -- I just want to make clear, we are not

19    advocating the Court should simply add that time back — that is

20    not what we are suggesting — but just in evaluating what is

21    appropriate under the 3553(a) factors, what sentence is

22    appropriate to meet the goals of sentencing.  It is appropriate

23    for the Court to consider how much time will the defendant

24    actually spend in jail.

25          THE COURT:  So, for example, you recommended

P3JKSCHS

1    41 months.  Usually, you take off 54 days per year from that if

2    there's good conduct.  I wasn't familiar with the 15 days per

3    30 days being sort of routinely granted.  That's if you engage

4    in certain programs, right?

5            MS. VOGEL:  But the defendants are automatically

6    enrolled in the programs.

7            THE COURT:  Okay.

8            MS. VOGEL:  And they get the credit for the programs

9    even if the facility doesn't have the programs or if, for some

10   reason, the programs are temporarily suspended or can't be

11   held.  So, unless a defendant opts out affirmatively, they

12   essentially get these credits.

13           Now, there are certain types of crimes and defendants

14   that do not qualify, but, based on my review of those, I do not

15   see those as being one of those cases.

16           THE COURT:  So it's up to one year off in the end?

17   For a 41-month sentence, that could be one year off?

18           MS. VOGEL:  It can be one year off.

19           In addition, to the extent that she earns additional

20   earned-credit time — so for every 30 days she serves, she

21   receives an additional 15 days — any additional time earned can

22   go to early release to home confinement or to a halfway house

23   on top of the one year.

24           THE COURT:  Okay.  Thank you.

25           MS. VOGEL:  Thank you.

P3JKSCHS

```
 1              Unless the Court has other questions, those were the
 2      factors that I wanted to emphasize.
 3              THE COURT:  I also received the order of -- well, I
 4      previously signed the order of forfeiture.
 5              MS. VOGEL:  That's right.
 6              THE COURT:  And there's also a restitution order.
 7              Do you have the restitution order, as well?
 8              MS. VOGEL:  I do have a printed copy, your Honor.
 9              THE COURT:  Have you all signed it, or no?
10              MS. VOGEL:  We have not signed it, I apologize.
11              THE COURT:  You can do it after.
12              MS. VOGEL:  Okay.
13              THE COURT:  I think I can do that after the
14      sentencing.  But it's in the amount of the proposed order that
15      you provided?
16              MS. VOGEL:  Yes, it is.  The order I have here today
17      is the order that was provided to your Honor in advance of
18      sentencing.
19              THE COURT:  Okay.  Thank you.
20              And victims also have a right to speak.  I understand
21      that Mr. Barasch would like to speak today.
22              Yes, sir?
23              MR. BARASCH:  Do you want me to do it from here or the
24      podium?
25              THE COURT:  The podium, please.  Thank you.
```

P3JKSCHS

1          And if you would just please state your name for the

2     court reporter?

3          MR. BARASCH:  Thank you for this opportunity.  My name

4     is Michael Barasch.  I am married to Candace, and I am the

5     father of Robert and Julia.  We're all victims.  I speak today

6     on behalf of my entire family.

7          And while I appreciate everything you've done,

8     Ms. Vogel, and all the hard work that your office has done, I

9     think it's important that your Honor sees that these are people

10    and not just names on a piece of paper, that this has really

11    impacted us in ways that don't really come across in your

12    papers.

13         I'm not going to repeat everything at all, you were

14    very comprehensive, but I do want to respectfully ask the Court

15    to consider the fact that in addition to the $6-1/2 million

16    that Lisa stole from her clients and the $1-1/2 million in

17    unpaid taxes to the government, the victims have incurred

18    indirect losses amounting to millions of dollars.  Lisa advised

19    her victims to insure all the art that she supposedly bought,

20    but did not buy, and she has forced her clients, because of no

21    cooperation with us at all, to spend millions of dollars on

22    attorneys and legal fees in bankruptcy court and trying to

23    ascertain what this woman did and what she did buy.  We still

24    don't know everything.

25         I noticed in your papers, Ms. Vogel, that you said

P3JKSCHS

1    it's unlikely that we're going to receive everything back.

2    Dealing with the bankruptcy court, I can tell you, we'd be

3    lucky to get five cents on the dollar.  No victim is going to

4    be made anything close to whole.

5         We respectfully ask the Court consider the total

6    amount of losses, which will be well in excess of $10 million

7    when you consider all these unpaid taxes and indirect losses.

8         Regarding remorse:  I heard you say this morning very

9    eloquently that she was going to get caught anyway.  Her house

10   of cards was about to collapse.  Indeed it was.  It was

11   obvious.  She could not continue this.  But ironically — and

12   you said it a little bit — within the two months before she

13   went to the DA's office to confess — in fact, within one week

14   of that confession — she demanded that we send an additional

15   $190,000 to her for new art that she said we had to have for

16   our collection.

17        This isn't something that someone does who's racked

18   with guilt.  Why did she continue to steal when you knew that

19   you were about to confess?  She was addicted to her lifestyle,

20   to her $25,000-a-month apartment, to the private yacht and

21   helicopters that she flew to show off to the art world, to show

22   how successful she was.

23        The AUSA is correct that she had no choice but to

24   self-report her Ponzi scheme, not because she was racked with

25   guilt, because it was going to obviously all come out.

P3JKSCHS

1          Lisa, your disgraceful conduct goes well beyond stolen

2     money.  The worst thing you did, as I said, was break my wife's

3     heart.  And Candy tried to hide it from the kids, who saw her

4     crying occasionally.  I live with her, and for months, she

5     would be weeping.  You were her best friend, or so she thought.

6     We had you to every family event with your son.  Every holiday,

7     you were always invited to.  Shame on you.

8          You've hurt so many young artists and so many

9     gallerists who you pretended to care about.  You publicly

10    championed these artists and said they had to be wary of fraud

11    because this art world has no boundaries.  And, yet, look what

12    you did.  Their losses are incalculable.

13         Your Honor, no matter what sentence you impose, it

14    really won't do anything other than perhaps send a message, as

15    Ms. Vogel said, which would be great, but, in our opinion,

16    based on the totality of everything, she deserves the maximum

17    sentence within that parameters that you've negotiated with her

18    attorney.

19         Thank you for your time.

20         THE COURT:  Thank you, Mr. Barasch.

21         Mr. Zelin, I want to give you a chance to speak.  I've

22    read all the submissions, all the documents you've attached,

23    including all the background information.

24         And you're welcome to either sit or speak either way.

25         MR. ZELIN:  And I'm old school, if your Honor please,

P3JKSCHS

1    so I prefer to stand.

2              THE COURT:  Sure.

3              MR. ZELIN:  I'm going to take what your Honor just

4    said as an invitation for me to simply say to your Honor, does

5    the Court have any questions of me?  Is there anything that the

6    Court would like me to clarify?  Is there anything that the

7    Court would like me to answer?  If I may be so bold, my sense

8    of me being up here is that I really should not be up here,

9    that today is not about me.  It is about Lisa Schiff.  And my

10   sense of it is that the Court is far more interested in hearing

11   what my client has to say than what I have to say.

12             So, as I said, if your Honor please, I have done the

13   best that I can to put the Court in a position where the Court

14   does not need to hear anything more from me.  And to the extent

15   that the Court needs to hear something from me, I will do the

16   best that I can to answer it.

17             I have learned, through experience and really learning

18   the hard way, that there are times to speak and there are times

19   to listen.  So, I would much prefer to be listening rather than

20   speaking, unless it is the Court that needs to hear something

21   from me.

22             THE COURT:  I don't think I do.  You've laid

23   everything out well in your submission, and, obviously,

24   Ms. Schiff has written an extensive part of that, and I

25   appreciate all the background you provided, the letters, all of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P3JKSCHS

1    which I have read, from members of family, friends, as well as

2    victims.  So I don't think I have any additional questions, but

3    thank you for that.

4              MR. ZELIN:  The only other thing, then, that I would

5    like to bring to the Court's attention, to the extent that your

6    Honor may have any questions, my client's brother,

7    David Schiff, is present in the courtroom.

8              THE COURT:  Thank you.

9              MR. ZELIN:  And, unfortunately, my client's parents,

10   as much as they wanted to be here, simply could not be here.

11   Given their age and given the gravity of this moment, it was

12   simply too much to ask of them, and the sacrifice that my

13   client would be asking of her parents to fly here — they don't

14   fly anymore — and to watch whatever is going to be unfolding

15   today was simply too much to ask of them, and it would have

16   been very selfish on Lisa's part.  So I just wanted your Honor

17   to understand, while there are people -- and we are so thankful

18   for the people that are here to support Lisa, and we also

19   appreciate, because of the solemnity of this moment, the

20   gravity of the offense conduct, the seriousness of it, that

21   there are victims here.

22              The only other thing that I would like to point out to

23   the Court is this:  This notion of a lack of cooperation -- and

24   I can speak firsthand on that because I have been asked to

25   become not simply a criminal defense attorney, but to become a

P3JKSCHS

1    bankruptcy attorney as well, and I have gone way outside of my

2    lane when it comes to that, but I have been fortunate enough to

3    be blessed with lawyers who continue to work, who are here

4    today, without pay, who are experts.  The reason why I bring

5    this to your Honor's attention is because I probably spend, at

6    least on a weekly basis, speaking directly with the counsel for

7    both bankruptcy trustees, both the personal bankruptcy case and

8    in the corporate bankruptcy case.  Not only have I acted as a

9    liaison between the bankruptcy trustees and my client, I've

10   also acted as a liaison between the bankruptcy trustees and

11   victims, and people who we made sure did not become victims.

12   There is a laundry list of parties I dealt directly with to

13   ensure that their artwork was returned at the cost, if your

14   Honor please, to my client.  There were works that the trustees

15   felt belonged in the bankruptcy estates, which would have gone

16   towards — after payment of the bankruptcy trustee expenses and

17   other expenses — would have gone into the pot available to

18   creditors who were victims.

19           We fought on behalf of owners.  To the extent that it

20   was not appropriate for works of art to be calculated and to be

21   sold and to be made part of the bankruptcy estate, and at least

22   one of those pieces of art is worth at least seven figures, and

23   I worked directly with the owner's lawyer, David Herzberg, in

24   conjunction with the bankruptcy trustees to have that piece of

25   art returned.  And we did that on a number of occasions.  I met

P3JKSCHS

1    with one of the gallerists in London.  I spoke to counsel for

2    owners, and, quite frankly, your Honor, I have met on more than

3    one occasion with counsel for victims who are present in this

4    courtroom today, and I provided your Honor with a comprehensive

5    analysis, based upon questions put to me that would not be put

6    in writing, that I had to make notes from, and then, from my

7    notes, go back, reconstruct the questions, and then do an

8    analysis and provide answers.

9         So, the last thing I'm interested in doing, your

10   Honor, because it's just not productive, and I know that, to

11   get into a tit for tat, but I do think it's important for your

12   Honor to know there has been a tremendous, tremendous amount of

13   cooperation from this table to the government.  The government,

14   I don't think can refute the fact that I begged, I literally

15   begged the government, from the first moment I got into this

16   case, for my client to be made available to the government to

17   explain, as she had done with the New York County District

18   Attorney's Office, exactly what had happened, to be able to

19   take the massive documents, and not merely make it a data dump,

20   but to actually be able to explain what everything meant.

21        And I have done that on a weekly basis with the

22   trustees.  My client has spoken directly with counsel for the

23   trustees on more than one occasion.

24        I can't, and my client, undo what happened.  She can

25   accept responsibility for it, she can be devastated over it,

P3JKSCHS

1    but all we can do is move forward.  And the moving forward, if

2    your Honor please, began with the self-reporting on May 8,

3    2023, and the hard drives that were provided to the district

4    attorney's office, the phones that were provided to the

5    district attorney's office, the laptops, the iPads, all of it.

6    Your Honor is aware of the drop box that was provided to the

7    district attorney's office well before -- regardless of what my

8    client may have felt, regardless -- and before she had any

9    notion that she was actually going to be charged criminally.

10           And I would respectfully submit, your Honor, that is a

11   form of self-reporting that goes well beyond merely accepting

12   responsibility.  And it's not even a matter of, well, of course

13   you came in and told us, you were already under arrest, or of

14   course you came in and told us, you had gotten a knock on the

15   door from an FBI agent.  No, none of this was in play at that

16   time.

17           So, at the risk of perhaps overstaying my welcome, I

18   did want your Honor to know that there has been cooperation on

19   every imaginable level with the New York County District

20   Attorney's Office, with the government here, with counsel for

21   both bankruptcy trustees.  In fact, the last hearing has been

22   adjourned to March 26th because we continue to work with

23   counsel for the trustees to determine what works are going to

24   auction, what works should be returned to the owners.  There

25   were peculiarities in consignment when it comes to art, which I

P3JKSCHS

1    also learned the hard way, and we are working with counsel for

2    the trustees.

3             My client provided the analysis to victims' counsel.

4    My client is working on, I believe, two complete catalogs for

5    victims.  The difficulty in getting it done quicker is just

6    there's so much documentation, and the program, which is called

7    ArtBase, is not exactly cooperative when it comes to being able

8    to pull out individual owners, but those efforts have been

9    ongoing, and those efforts are going to continue.

10            And with regard to the bankruptcy, I did show your

11   Honor, there has been in excess of $1 million, I believe, on a

12   net basis that has already been recovered.  I mean, Lisa Schiff

13   literally said to the trustees, here, here's my coffee maker.

14   I think the only thing that did not go to sale was a dining

15   room table.  My client lost books that really had more

16   sentimental value than anything else.  Those went.  Everything

17   went.  Everything that Lisa Schiff has done from the day that

18   she self-reported has brought us to this moment before your

19   Honor.

20            And with that, if your Honor does not have any

21   questions of me, then I guess it's time for me to turn the

22   floor over to Lisa.

23            THE COURT:  Thank you very much.

24            MS. VOGEL:  Your Honor, I do want to respond to one or

25   two points from defense counsel, if I'm permitted?

P3JKSCHS

```
1              THE COURT:  Sure.

2              MS. VOGEL:  There is no question, Ms. Schiff reported

3    her conduct, provided devices to the government, provided

4    summaries to the government, but I just want to be clear, as I

5    think some of the victims have been clear, they are frustrated

6    with the level or lack of cooperation that they feel that

7    they've received.  And I think it's important that the Court

8    hear that.

9              I understand that Ms. Schiff gave some of the victims

10   some summaries and backup documentation.  I know that was in

11   February of this year.  She self-disclosed on May 8th, 2023.

12             With respect to the bankruptcy, again, not denying

13   conversations or information that she provided, but there is

14   plenty of litigation going on in the bankruptcy that is

15   impacting the victims.  For example, partial payments of

16   hundreds of thousands of dollars that the victims made through

17   Ms. Schiff — so Ms. Schiff made them, but it was the victims'

18   money — to purchase artworks, the payments were never completed

19   because Ms. Schiff stole the money, and now the trustee is

20   trying to claim those funds for the bankruptcy estate, not for

21   the victims.  There are several litigations of that nature.

22   Other artworks that are still in dispute.  There is no question

23   that the assets will not cover all the claims, and,

24   essentially, even though Ms. Schiff had decided to self-report

25   and confess in the spring of 2023, she basically just dropped
```

P3JKSCHS

1    her whole business.  There was no really attempt to orderly

2    unwind or return things or provide an accounting in advance

3    despite the fact that there seems there was some advance

4    discussion of this.

5           I know she did initially seek to go through an

6    assignment proceeding in state court, but that is essentially

7    bankruptcy, and the litigation started there.

8           So I just want to provide the Court with that

9    additional context about the cooperation.  It remains a

10   challenging situation for victims.  They do not have all the

11   information they've been seeking, and there is no question that

12   they will not recover entirely.

13          THE COURT:  Thank you.

14          MR. ZELIN:  Your Honor, I am almost ready to bite my

15   thumb that I'm standing up, but there are two things I do want

16   to bring to your Honor's attention.

17          First of all, and maybe a couple of fold, with regard

18   to the bankruptcy, I have been asked whether or not my client

19   would consent to none of her debts being discharged in

20   bankruptcy.  And I have had extensive conversations with both

21   counsel for the trustees on that issue.  And I will tell, your

22   Honor, as I've told counsel for the trustees, that is something

23   that we are very seriously considering, which means there would

24   be no further litigation.  In fact, as I understand it, that

25   conversation has already been had and has already occurred with

P3JKSCHS

regard to a number of victims where there has been an agreement

that there's not going to be a contesting of my client's right

to a discharge.

So that will ostensibly put an end to any adversarial

proceedings in the bankruptcy estate with regard to at least my

client having the right to say, I'm in bankruptcy, I want these

debts discharged.

That's number one.

Number two, the assignment for the benefit of

creditors — and I am no bankruptcy lawyer, but what I do know

is, and I do know in this instance, the reason why there was a

decision to make an assignment for the benefit of creditors was

exactly for the reason that it's called that, which is, my

client said, with bankruptcy counsel, what's the easiest way to

do this, and the easiest way to do it was to give the keys to

Schiff Fine Art to the assignee and let the assignee gather up

all of the assets and figure out a way to get them distributed.

So that was done in an effort to assist victims, not to hurt

them.

The other thing that I have come to understand, that

the bankruptcy filing, one of which was voluntary and one of

which is involuntary -- and I understand, your Honor, I'm in a

criminal courtroom talking like I'm in front of Judge Jones in

the bankruptcy case, which I have no right to be doing because

I'm not a bankruptcy lawyer, but the point is, with regard to

P3JKSCHS

1    the bankruptcies, one was voluntary, one was involuntary, but

2    the reason for the voluntary bankruptcy filing was because

3    litigation had been commenced, and temporary restraining orders

4    had been lodged against all of the assets, which means,

5    ostensibly, only one victim would get everything.

6          So, by filing for bankruptcy, it actually enabled

7    other creditors, other victims, to be able to share in the pot

8    of assets, which, again, from coffee makers, to sunglasses, to

9    expensive works of art, I mean literally everything, and I

10   think at this point, I can promise your Honor, I will sit down

11   and shut up.

12         THE COURT:  Okay.  Thank you.

13         Ms. Schiff, I want to give you a chance to speak.

14   You're not required to speak, but you have an opportunity to

15   speak at sentencing, and you may do so now.  And you can either

16   stay seated or go to the podium, whatever you prefer.

17         THE DEFENDANT:  Thank you, your Honor.

18         THE COURT:  Sure.

19         THE DEFENDANT:  Today I am standing here, and I am

20   sorry to read, I just don't think I can do this off the cuff.

21         I am standing here as a criminal who hurt clients,

22   colleagues, and friends, who lied to them, who stole from them,

23   and who betrayed them.  And that is as far from my hopes and

24   dreams as anyone can imagine.  I set out to do something

25   important with my life, yet here I am.

P3JKSCHS

1          In 2020, I prepared a confession and a plan to close

2    down and come clean, and, yet, I did nothing.  When I learned

3    that my actions might be punishable by prison, I panicked.

4    Fear led to self-delusion, which led to magical thinking that a

5    better solution would be just one big deal away.  I was a

6    coward.

7          At that point, I knew making any -- making any

8    meaningful change would involve sobriety, but I lacked the

9    self-honesty and commitment that is required.  I lasted a few

10   months before returning to heavy drinking.  This led to the

11   kind of hopelessness that usually precedes real sobriety.

12   Defeated, I showed up on the doorstep of AA in 2023.  I had my

13   first sobriety date in September of that year, followed by one

14   relapse.  February 14th of 2024 is now my official, and

15   hopefully final, sobriety date.  It's been over one year now,

16   and I truly have the fellowship of AA to thank for supporting

17   me and loving me despite my shortcomings and failings.

18          If there is a place for self-interest comes to die,

19   it's in the rooms of AA.  Unbridled self-interest is what got

20   me here today.  I have dedicated myself to the program because

21   without it, there is no way forward for somebody like me.

22          Today, I have earnestly listened to what the

23   U.S. Government has said, and I have read every victim letter

24   carefully.  I understand exactly why I'm here and the gravity

25   of what I have done.  And with your permission, your Honor, not

P3JKSCHS

only would I like to say that I am sorry to every victim of my

crime, but I would like to face the audience and address the

victims that are here to apologize directly.

Specifically, I would like to apologize to Candy

Barasch and Michael Barasch and their children, Julia and

Robert.  I would like to apologize to Adam Sheffer and Richard

Grossman.  I would like to apologize to Lauren Geller, the

Abularach estate, and many others.  To Nicole Wittenberg.  I am

not only sorry for lying and stealing, but for flagrantly

behaving with hubris and greed while doing so.

The words "I'm sorry" ring pretty hollow, I know.  So

I have tried to back them up with action.  I have provided any

information down to the most granular level requested of me by

the government or victims through legal counsel and sometimes

directly.  I have provided information unsolicited where I

thought it might be helpful.  I worked through my legal counsel

to assist as many of my victims supplying any missing

information needed.  I voluntarily dissected my own criminal

behavior in excruciating detail for the government.  I

forensically detailed financial transactions from start to

finish.  I tried to avoid bankruptcy so as to maximize any

value from the sale of assets.  I hid zero information.  I

collected all written lies that I could find and painstakingly

figured out every omission.

In short, I did the math, and it forced me to arrive

P3JKSCHS

1    at a conclusion that went well beyond the numbers.  I had no

2    choice but to see myself for what I was, and it's hard to

3    articulate how that felt.  I have sat with psychiatrists,

4    therapists, and fellow addicts working on myself, learning what

5    honesty is, what self-honesty is, and how dangerous wrong

6    action and wrong thinking truly can be.  I haven't cried in

7    several decades, but seem to cry daily these days, not in

8    self-pity, but in true remorse for the pain I have caused so

9    many people.  I hurt people who loved and trusted me.  I stole

10   from them and lied to them, and I lived lavishly.

11        Sorry.

12        So, after listening to everyone today, I am hearing

13   what I have done or expressed up until now may not be enough,

14   I'm standing here today as a guilty person who is ready to take

15   responsibility.  I am prepared to be held to account for my

16   offense conduct.  I am scared.  But I'm ready.

17        Regardless of the outcome, I will continue to provide

18   any information necessary to all victims, and I will work as

19   long and as hard as possible to find ways to make amends to

20   each individual affected.  I have every intention to focus on

21   restitution payment.  I don't know if I will be successful, but

22   I will try, and I'm eager to get started.

23        I am a single mother to a young son.  I know that I

24   was well aware of my responsibilities while behaving badly.  I

25   love this boy with all my heart, and I will do everything in my

P3JKSCHS

1    power to turn around the poor example I have set and to show

2    him that hope can rise up from the ashes.

3              Thank you, your Honor, and to everyone listening

4    today.

5              THE COURT:  Thank you.

6              Is there any reason sentence may not be imposed at

7    this time?

8              MS. VOGEL:  No, your Honor.

9              MR. ZELIN:  No, your Honor.

10             THE COURT:  In preparing to sentence the defendant, I

11   have considered the presentence report and probation's

12   recommendation, and the written and oral statements of defense

13   counsel and the defendant and the government, and all the

14   letters submitted in support of the defendant — family members,

15   Mr. Schiff and other family members — and also the victims'

16   statements, and all the other information that's been provided.

17   I'm required to consider the sentencing guidelines, which I

18   went through, although, as I said, they're not mandatory.  And

19   I'm required to consider several factors that are laid out in

20   the law — the nature and circumstances of the offense, the

21   defendant's history and characteristics, and the purposes of

22   sentencing, which are the need to reflect the seriousness of

23   the crime, the need to promote respect for the law, to provide

24   just punishment, to afford adequate deterrence to criminal

25   conduct both to other people in society and to the individual

P3JKSCHS

1    defendant, and the need to protect the public from criminal

2    activity, and the need to provide appropriate training and

3    treatment to a defendant before me.

4              I'm also required to consider the need to avoid

5    unwarranted disparities among similarly situated defendants who

6    were guilty of similar criminal conduct.

7              Ultimately, I'm required to consider all those things

8    and impose a sentence that is sufficient, but not greater than

9    necessary, to comply with those purposes.

10             The criminal conduct in this case was serious.  It was

11   quite brazen.  It involved lies to clients and friends over the

12   course of five years.  It was not what you see in some other

13   cases, which was just some brief lapse of judgment that

14   happened on one or two occasions.  Ms. Schiff used those lies

15   to essentially help herself to her clients' money, ultimately

16   stealing over $6 million from at least 15 victims, to use for

17   her own personal and businesses expenses.

18             The nature and circumstances of this crime call for

19   genuine punishment to serve the purposes of general deterrence

20   as well as specific deterrence, just punishment, and promoting

21   respect for the law.

22             The harm to the victims here was real, as reflected in

23   the victims' letters, the statements today, and as laid out by

24   counsel for the government.

25             There was also indirect harm that resulted from the

P3JKSCHS

1    defendant's conduct — harm to the art market and those involved

2    with it, including artists whose work was devalued in some

3    cases.  As I think the government points out very effectively,

4    this is a market characterized by a combination of valuable

5    assets and secrecy and little regulation, and that combination

6    creates real opportunities for fraud that can be difficult to

7    detect, and that highlights the need for punishment, to ensure

8    that a strong message is sent when it is detected.

9          As I said, I'm also required to consider the history

10   and characteristics of the defendant.  Ms. Schiff comes from a

11   good and loving family.  She's clearly intelligent and

12   talented, had a very successful career as an art advisor.  She

13   is much more privileged and fortunate than most of the

14   defendants, frankly, who appear in this courtroom in criminal

15   cases.  She's also thoughtful and clearly has a good side to

16   her character.  She's written a thoughtful letter to the Court

17   about her life and how she ended up here, a letter that

18   highlights some of the complicated behavioral issues she

19   struggled with.  The letters from her family members and

20   friends also highlight positive aspects of her character.

21         One of the great mysteries in cases like this is how

22   someone who's so talented and is so good in some ways and can

23   be such a good friend can also engage in this kind of behavior

24   over the course of time, and there's no answer to it, but it's

25   one of the mysteries of life.

P3JKSCHS

1        In particular, it's clear that she is really devoted

2   to her 12-year-old son.  And, obviously, he would suffer from

3   her having to serve a lengthy prison sentence.  These are

4   mitigating considerations, but they cannot justify a

5   noncarceratory sentence in this case.  And that's

6   particularly true because of the nature and seriousness of the

7   criminal conduct and the defendant's culpability.  She knew

8   what she was doing, and she knew it was wrong.  I mean, it's

9   striking that in 2020, she considered coming clean and even

10  spoke with a lawyer, but upon realizing that this was a serious

11  crime, a go-to-jail crime, she decided to continue the fraud,

12  and she chose month after month and year after year to continue

13  with the fraud until it was clear that she was going to be

14  discovered.

15       It is true that she ultimately did come clean and

16  agreed to reveal the extent of her conduct to authorities, and

17  that warrants consideration, but as Ms. Vogel points out, it

18  has to be put in context.  It happened when it was clear that

19  this was going to be revealed.  And, of course, the effect of

20  her incarceration on her son warrants consideration.  That is a

21  very sad fact.  Having a 12-year-old son and going to prison

22  when you're a single parent is extremely hard, it's

23  excruciating.  But it is often the case with people who commit

24  crimes that their family members, including children, are the

25  ones who are affected, and most seriously affected, when they

P3JKSCHS

1    have to be punished.  And that consequence cannot entitle

2    someone to escape punishment for a serious crime, but, as I

3    said, I am considering it among other factors.

4         These considerations have to be balanced against the

5    culpability of the conduct here, the harm to victims, the need

6    to comply with the purposes of sentencing, deterrence and just

7    punishment.

8         Ultimately, when I balance these considerations,

9    including as the government has pointed out, the fact that

10    there will be some good-conduct credit, I believe that the

11    probation recommendation of 30 months is an appropriate

12    sentence that balances these considerations.  It sends a

13    message that is a strong message, but the hope is that she

14    won't have to serve all of the 30 months, which is two and a

15    half years, and, therefore, it will be as little as possible in

16    terms of her being away from her son.

17         The question is what is sufficient, but not greater

18    than necessary, to serve the purposes of sentencing.  Weighing

19    these considerations, I have determined that a 30-month

20    sentence is what is sufficient, but not greater than necessary.

21    Therefore, I intend to impose that sentence, followed by

22    two years of supervised release, along with the restitution and

23    forfeiture order I've previously ordered.

24         I'd like to ask counsel if you have any legal

25    objection to the sentence as I have indicated it?

P3JKSCHS

1                MS. VOGEL:  No, your Honor.

2                MR. ZELIN:  No legal objection, but a few applications

3    at the appropriate time, your Honor.

4                THE COURT:  Yes, thank you.

5                Ms. Schiff, it is the judgment of this Court that you

6    are hereby committed to the custody of the Bureau of Prisons

7    for a period of 30 months.

8                Following release, you will be on supervised release

9    for a period of two years, with the following conditions:

10               You will not commit another federal, state, or local

11   crime;

12               You will not possess or use an illegal controlled

13   substance;

14               You will submit to one drug testing within 15 days of

15   placement on supervised release and at least two thereafter;

16               You will cooperate in the collection of DNA, as

17   directed by the probation officer;

18               The standard conditions are imposed with the following

19   special conditions:

20               You must participate in an outpatient mental health

21   treatment program approved by the probation office;

22               You must continue to take any prescribed medications

23   unless otherwise instructed by the provider;

24               You must contribute to the cost of services rendered

25   based on your ability to pay and availability of any

P3JKSCHS

1    third-party payment.  And the Court authorizes the release of

2    available psychological and psychiatric reports and

3    evaluations, including the presentence report, to the

4    healthcare provider.  This is based on the need to assist

5    probation in addressing the defendant's mental health issues,

6    including referrals to treatment, and based on the defendant's

7    documented history of mental health issues.

8         Second, you will participate in an outpatient

9    treatment program approved by the probation office, which

10   program may include testing to determine whether you have

11   reverted to using drugs or alcohol.  Again, you will contribute

12   to the cost of services rendered based on ability to pay and

13   third-party payment, and I authorize the release of available

14   treatment evaluations and reports.  This is based on the

15   reported history of substance abuse issues and to assist

16   probation in assisting with the defendant's substance abuse

17   issues.

18        You must submit to a search of your person, property,

19   residence, office, vehicle, papers, computers, cell phones and

20   other devices or media used for electronic communications, data

21   storage, cloud storage, or network storage.

22        The probation officer may conduct a search under this

23   condition only when there is reasonable suspicion that you have

24   violated a condition of supervision or committed a new crime,

25   and that the areas to be searched contain evidence of this

P3JKSCHS

violation or crime.  The search must be conducted by a

probation officer, although law enforcement officers may assist

the probation officer.  And the search must be conducted at a

reasonable time and in a reasonable manner.  Failure to submit

to search may be ground for revocation.  You must warn any

other occupants that it may be subject to search.  This is

based on the fact that the offense involved wire fraud and

theft of client funds and to assist the probation office in

providing protection of the community and detecting if the

defendant is engaged in similar activity.

Next, you must not incur any new credit charges or

open additional lines of credit without the approval of

probation unless you are in compliance with the installment

payment schedule, and you must provide the probation officer

with access to any requested financial information.

The defendant is required to pay restitution as yet to

be determined and is subject to forfeiture, and this is to

assist probation in monitoring the defendant's compliance with

financial penalties.

If the probation officer determinates, based on

criminal record, personal history, or characteristics that you

pose a risk to another person, including an organization, the

probation officer, with prior approval of the Court, may

require you to notify the person about the risk, and you must

comply with that instruction.  The probation office may contact

P3JKSCHS

1    the person and confirm that you have notified the person about

2    the risk.  The offense was perpetrated through the defendant's

3    employment as an art advisor, and this condition is necessary

4    to assist probation in protecting the community and detecting

5    if the defendant is engaged in similar conduct.

6             You will report to the nearest U.S. Probation Office

7    within 72 hours of release from imprisonment, and you shall be

8    supervised by the district of your residence.

9             I'm not imposing any fine because I find you're not

10   able to pay a fine and in light of the restitution obligation.

11            There is a $100 mandatory special assessment, which is

12   hereby imposed.

13            Forfeiture is ordered, as previously ordered at the

14   time of the plea, in the amount of $6,408,538.29, the amount

15   previously subject to the order of forfeiture.

16            And restitution is ordered to victims in the total

17   amount of $9,147,789.26, and I will sign the order of

18   restitution prepared by the government.  Restitution shall be

19   paid in monthly installments of at least 15 percent of gross

20   monthly income, payable on the 15th day of each month,

21   beginning one month after release from imprisonment.

22            And I will set a surrender date.  Before I do that,

23   I'm going to advise you of your right to appeal, which I'm

24   required to do.

25            You do have the right to appeal from your conviction

P3JKSCHS

```
1    and sentence except to the extent you have validly waived that

2    right as part of your plea agreement and guilty plea.  If you

3    cannot pay the cost of an appeal, you may apply for leave to

4    appeal without payment of costs.  Any appeal must be filed

5    within 14 days.

6         And a complete copy of the presentence report will be

7    provided to the BOP and Sentencing Commission.

8         Before I set a surrender date, are there any

9    applications from the defense?

10        MR. ZELIN:  Yes.  If your Honor please, with regard to

11   the surrender date, we would, first of all, ask that your Honor

12   recommend the residential drug and alcohol program, and that my

13   client's recommended designation, to the extent that your Honor

14   is prepared to recommend a designation, be the closest to the

15   metropolitan area where there is an RDAP program.

16        THE COURT:  Of the New York metropolitan area?

17        MR. ZELIN:  Yes, please.

18        THE COURT:  Yes, I will make that recommendation with

19   respect to the RDAP program and as close as possible to the New

20   York area, to permit visitation.

21        MR. ZELIN:  Thank you very much, your Honor.

22        THE COURT:  With respect to surrender date, is there

23   any application with respect to surrender date?

24        MR. ZELIN:  Yes.  May I have one moment, please?

25        THE COURT:  Yes.
```

P3JKSCHS

1          MS. VOGEL:  Your Honor, if I may after, raise two

2     issues?  Thank you.

3          (Pause)

4          MR. ZELIN:  July 1st, if your Honor please.

5          THE COURT:  Which is after the school year?

6          MR. ZELIN:  Yes.

7          THE COURT:  Is there any objection to July 1st?

8          MS. VOGEL:  No, your Honor.

9          THE COURT:  All right.

10         The defendant will surrender to the facility

11    designated by the Bureau of Prisons on July 1, 2025, by

12    2:00 o'clock p.m.

13         And, Ms. Vogel?

14         MS. VOGEL:  There were two issues I wanted to raise,

15    one with respect to restitution.  Your Honor set a schedule of

16    15 percent per month.  I just want to note that what was in the

17    restitution order said 20 percent.

18         THE COURT:  Oh, I'm sorry.  I just copied it down

19    wrong.  I am going to say -- I'm going to revise that to say

20    20 percent, because that's what I meant, and that's what's in

21    the restitution order.

22         MS. VOGEL:  Okay.

23         And then the second issue I wanted to raise was

24    regarding sealing of the defendant's sentencing submission.

25    Initially, the defense filed the entirety of their submission

P3JKSCHS

1    under seal, which I had flagged for counsel.  I did not think

2    there was a basis to do that.  And victims have also raised

3    with me their frustration that they had not been able to see

4    any of the submission in advance of the sentencing.

5         I know counsel has submitted a proposed redacted

6    version last night.  It's the government's view that some of

7    those redactions are still overly broad in terms -- that there

8    is no basis to redact some of the material.  We haven't had a

9    chance to really discuss it, other than for me to flag this for

10   counsel, but I want to bring that to the Court's attention.

11             THE COURT:  Okay.

12        So, while in the interim, why don't I have him file

13   the redacted version, and then you can discuss further

14   unredactions, and then if there's any dispute, I can rule on

15   those.

16             MS. VOGEL:  Okay.

17             MR. ZELIN:  If your Honor please, I discussed with the

18   government prior to the sentencing hearing, and I indicated to

19   the government that to the extent that your Honor would allow

20   it, that we could meet and confer and try to resolve any open

21   issues with regard to redactions, and if we can, great, and to

22   the extent that we can't, then that's what we have your Honor

23   for.

24             THE COURT:  Okay.  That's fine.

25             MS. VOGEL:  Thank you.

P3JKSCHS

1           THE COURT:  Anything further?

2           MS. VOGEL:  Not from the government.  Thank you.

3           THE COURT:  All right.  Thank you, all.  We're

4   adjourned.

5           MR. ZELIN:  Thank you, your Honor.

6           (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25