UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

THE UNITED STATES OF AMERICA,

Case no.: 24-CR-605-JPO

-against-

LISA SCHIFF,

Defendant.

----------------------------------------------------------------X

## LISA SCHIFF'S SENTENCING MEMORANDUM

Randy Scott Zelin P.C
641 Lexington Ave., 29th Fl.
New York, New York 10022
(D) 212.204.2259 (C) 917.515.3800
Randy@zelinlaw.com
*Attorneys for Defendant*

Lisa Schiff is set to be sentenced on March 19, 2025 at 11 AM (ECF Document no. 15). Ms. Schiff, by counsel, respectfully submits this memorandum in connection with her sentencing.

## PRELIMINARY STATEMENT

This memorandum will be broken down into three parts. In Part I, we offer Ms. Schiff's objections to the Final Presentence Investigation Report filed on February 3, 2025 (ECF Document no. 18). In Part II, we offer directly from Ms. Schiff her acceptance of responsibility while addressing the nature and circumstances of her offense conduct, along with her history and characteristics, including her extraordinary family circumstances. Part II will also include a forensic report and character letters offered to support Ms. Schiff that will be attached as exhibits. In Part III, we will address an analysis on (a) other art fraud cases and why Ms. Schiff's case is distinguishable from those cases; (b) general deterrence and why it should not be driver in determining a sufficient sentence for Ms. Schiff; (c) the law on extraordinary acceptance of responsibility and extraordinary family circumstances and why they should positively impact a sufficient sentence for Ms. Schiff.

This memorandum, and in particular, Ms. Schiff's own words, is designed to light the runway for Ms. Schiff to address the Court at sentencing on: (a) why she engaged in this criminal offense conduct; (b) how she's internalized it; (c) what she has done and intends to make amends for her criminal offense conduct.

1

PART I

OBJECTIONS TO THE
<u>FINAL PRESENTENCE INVESTIGATION REPORT</u>

The Final Presentence Investigation Report (the "PSIR" or the "Final PSIR")

was filed on February 3, 2025 (ECF Document no. 18).  Ms. Schiff filed objections

with Probation Officer McMahon and the government on February 20, 2025.  By

almost return email, Probation Officer McMahon instructed us to file these

objections directly with the Court.  Here are Ms. Schiff's objections to the Final

PSIR:

**<u>Paragraph 15</u>**

████████████████████████████

█████████████████████████████

█████████████

**<u>Paragraph 21</u>**

███████████████████████

████████████████████████

████████████████████████████

███████████████████████████

█████████████████████████████

████

██████████████

███████████████████████

████████████████

2





**Paragraph 27**

**Paragraphs 35-37, 38**

---





**Paragraph 73**

**Paragraph 85**

**Paragraph 88**

**Paragraph 109**



## PART II

### MS. SCHIFF'S ACCEPTANCE OF RESPONSIBILITY

Ms. Schiff addresses the Court directly:

**The Way I Defrauded Clients:**

      *a.*    *When purchasing artwork for an advisory client:*

I had one major client in particular who often paid on payment plans.  Instead of paying the particular gallery when the client's funds came in as I should have and did in the past, I started to delay the payments to the gallery(ies) so I could use the funds.  This is why many artworks involved had partial payments on them.

      *b.*    *When selling a work for an advisory client:*

Mostly, I would lie and say that I was being paid on a payment plan even though I might have been paid all at once.  This bought me time as I was behind on everything.  On a few occasions, when a client wanted me to sell a particular work, I sold the work but I did not tell the client it sold. I did, however, enter the sale correctly into SFA's books.

      *c.*    *Sales for artists:*

I did not pay the estates of two artist's for a sale.  I also did not pay an artist for a sale.

7

## SFA'S BOOKS & RECORDS

Without excusing my criminal offense conduct, there was only one set of books for SFA detailing every transaction. This included every legitimate and every fraudulent transaction. SFA kept detailed Excel spreadsheets that included every legitimate and every fraudulent transaction. These spreadsheets included my strategies for making up losses I caused SFA's clients to suffer. These spreadsheets reflected the regular payments I made towards reducing the losses on any fraudulent transaction. All of these books and records were made available to the Bankruptcy Trustees and the government.

It was always my intention to make good on all of the money I took. All of these records were made available to the Bankruptcy Trustees and the government.

## THE BEGINNING OF MY PROBLEMS

A colleague once said to me, "don't pay all of your expense bills on time; no one does. You need to preserve cash flow. It's called being leveraged. Of course, my colleague was suggesting the legal way to be leveraged, rather than diverting funds a client provides to pay for works a client purchased or not immediately turning over funds you've received from the sale of a client's works.

Eventually I would think of this as an excuse when I got behind on an expense bill but slowly it bled into everything. What started as being a little behind slowly transformed over time into taking my clients' money – real criminal behavior. I refused to acknowledge this as criminal conduct. When I saw how much

8

in arrears I was, my reaction was not to cut costs but to make more money. I just had to work harder. I did make more money eventually but at the same time SFA's and my personal overhead grew too.  The hole kept growing and getting deeper.

I had already moved my home office to a real office building, but things ~~really~~ went sideways around 2018 when I decided SFA needed a ground-floor space. I believed I could make more money from capturing new collectors, advisors, and dealers with whom I might develop relationships and foster more secondary market private deals. While art advising was always my main activity, I did not "sell" to my advisory clients nor did I rely on the advisory business for cash flow.  It made up the bulk of my business but I found it to be both too unpredictable and, because most of my clients focused on young art at lower prices and often high volumes, the business I had set up over decades was not  sustainable on its own.  Private dealing was something I could focus on in the background and it often would result in a commission of $25-50k per sale.  I came to rely on those.  Hence the ground floor space was to maximize this side of the business.  It was a risk and ultimately it might have worked but it needed years to take hold and I was in over my head from the get-go.

In 2019, I found an affordable ground floor space in the Cast Iron district in Tribeca.  I posted my excitement on social media.  When the press got wind of this, I was written up as the "disruptor art advisor breaking the mold and doing something totally unconventional." My ego went into overdrive. The next thing I knew, my plans exploded into an exhibition space/private dealership/art advisory/concept store. Having no experience owning any property, I had zero

9

understanding of how to build out a space affordably.  Instead, I focused on

matching the image the press created with no attention or mind to the costs. I had

to hire a top designer.  The designer came in with his contractor and team. I had no

idea of the costs.  $1 million later, I am panicking. Making things more stressful, I

simultaneously started another company producing sustainable products in

collaboration with artists – to start we produced a line of sustainable sunglasses.

These two endeavors -- into which I sank way too much money -- were the

beginning of the end.  This is all without going into the new staff I hired to sustain

these businesses and the new expensive apartment I rented with the intention of

making it a salon space to augment the gallery. By the end of 2019, my drinking

and spending hit new heights and I was about to spiral uncontrollably.

## I BECOME PAINFULLY AWARE OF MY CRIMINALITY

In January 2020, I contacted my longtime art lawyer, John Cahill, for help. ▮

██████████████ . ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

███████████████████ at the beginning of March 2020, I was unable to

form a long-term nurturing support system necessary to ████████████████████

███████████████████████████ . As the pandemic worsened in New

York, I was frightened, overwhelmed, and isolated in the city with my son.  I tried

to continue the work of unwinding my business and coming clean.  I began but was

paralyzed after meeting with a criminal lawyer because I had no idea that my

actions could result in prison time.

## THE END

And the bomb exploded. Adam Sheffer had approached me at some time in 2022 expressing a need for liquidity. He had rightly sensed a softening in the art market overall and was concerned. Mr. Sheffer wanted to sell one of the many works he co-owned with Ms. Barasch. At that time, the only artwork in their joint collection that had potential liquidity was a painting by Adrian Ghenie, and even that was going to be a difficult sale. I reached out to the gallerist who originally sold the Ghenie to Ms. Barasch. I consulted with both Ms. Barasch and Mr. Sheffer to make sure they agreed with this. The gallerist had a new job with Sotheby's Private Sales in Hong Kong and understood the work and was eager to prove himself. Ghenie's secondary market was almost exclusively propped up by Asian collectors who were paying big prices for his works at auction. Because this was sold only to Ms. Barasch by the gallery under the auspices of her being a museum-level collector, my job of placing while generating a profit was already complicated.

The sale had to be private and off the grid from the galleries or artist finding out so as to protect Ms. Barasch's reputation. Mr. Sheffer was not exposed because the work was initially only sold to her. To sell the Ghenie discreetly would be

11

harder particularly since the "bullish" Chinese buyers were slowing down in general and they were more keen on buying publicly at auction. I truly did not know if I could get this sale done, but Mr. Sheffer seemed stressed, so I hoped so. Ms. Barasch did not really want to sell the Ghenie, but as a friend to Mr. Sheffer she capitulated.

Around a month later, the dealer in Hong Kong came back with a possible buyer. I had been reaching out to others during this time but I was getting zero traction. I had told both Mr. Sheffer and Ms. Barasch I believed the Ghenie would eventually be a $6 million+ painting but I didn't know when – tomorrow or twenty years from then. At that time, I felt like $2.5 million was the correct and only price we would get, so we could take it or leave it. I did not ever think to myself "let me sell the Ghenie so I can make some money." Against this backdrop (that I did not "force" a lowball sale of the Ghenie for my own selfish needs to backfill the hole I created), Mr. Sheffer is a more seasoned dealer than me. At the time, he was working at the gallery that represented the artist Ghenie. Mr. Sheffer would never let me undersell something he owned, and he had access to even more market data than I did.

The Ghenie sold and my undoing was that I could not hide from making late payments; I really did not want to unravel with Mr. Sheffer's money lost. He was not a billionaire. I paid the initial deposit of $225,000 but the remaining $900,000 I owed him was a huge deal to him, I blatantly and brazenly lied to him to keep him at bay. He could not wait any longer and I could not think of a lie that would make sense. I knew I could no longer sustain the growing gap in my debts but I hoped to

12

close out Mr. Sheffer's sale first. Overall I was internally not able to sustain the stress for much longer and in early April 2023 I started preparing my confession.

In April 2023, I engaged the same bankruptcy lawyer from 2020 and engaged a criminal law firm. My art lawyer offered to do the civil work pro-bono. When presented with options, in particular trying to negotiate financially with each client quietly, I did not want to even try this – I felt so out of control that I didn't trust myself with a bailout. That being the case, we collectively made the decision that I would self-report my criminal offense conduct; I would not declare bankruptcy, and I would disclose my wrongdoing to SFA's clients either in-person or by phone.

By the end of that month, my then-criminal counsel could not yet get an appointment on the books with the New York County District Attorney's Office ("DANY" or the "DA") but somewhere between April 28, 2023 and May 7, 2023 my then-criminal counsel contacted DANY and self-reported my criminal offense conduct. At this time, I felt an urgency to speak to the owners of the Ghenie (Mr. Sheffer and Ms. Barasch) to confess. I scheduled an emergency meeting with my legal team. My team assured me that confessing to the clients before sitting down with the DA was okay because the self-reporting was already noted with the DA. So I went ahead to meet with SFA's clients to explain. I planned to speak with Ms. Barasch and Mr. Sheffer first.

On or about 8:30 in the morning of May 8, 2023, I spoke to Ms. Barasch by phone because she was traveling. Ms. Barasch's first words were, "you are going to prison." I had been counseled not to say anything if a legal threat was made and it was made so immediately I was further stressed. I stayed on the call with her

13

regardless as I thought untenable to end the call but eventually I had to as I was late to meet with Mr. Sheffer in-person. Ms. Barasch must have immediately called Mr. Sheffer because when I arrived, he was already on the phone with Ms. Barasch. Mr. Sheffer denied it when I asked; he was very cold to me and remarked "no I was not, why is she firing you?" Sensing already that they were teamed up and thinking legally, I asked Mr. Sheffer to call my art lawyer, whom Mr. Sheffer knew well, and I apologized. Strangely, when Mr. Sheffer walked away he sent a text that was meant for Ms. Barasch but went to me by accident. I texted him back, and I pointed this out, telling him that I loved him and didn't mean this and would work every second to fix it.

On May 8, 2023, the same day as my call to Ms. Barasch and my meeting with Mr. Sheffer, my then-criminal counsel spoke with the DA concerning my self-reporting of criminal offense conduct. The following day, May 9, 2023, I went to the DA along with a paralegal from my then-criminal counsel's office. I signed releases and dropped off hardware with proof of my criminal offense conduct. I also sent emails to SFA's clients.

14

## MS. SCHIFF'S HISTORY AND CHARACTERISTICS

Ms. Schiff addresses the Court directly:

### Psychological overview

By way of explanation, albeit not of excuses, I offer a brief description

15

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

Money in particular was abstract and not real. I thought my lackadaisical attitude towards money was cool. I used to regularly quote Astor – "money is like manure, you have to spread it around for things to grow." The truth is that I did not respect money or have any understanding of it whatsoever. And yet a macro view of value became my specialty. At the height of my criminal activity, I spent a year toiling over an op-ed about the crisis in value-making. It was born from excessive pride, from hubris, and from a place of moral and intellectual superiority. This is the confusion that I brought not only to my victims but also to myself.

I did not create fake businesses, fake books, or sell fake positions in art works. I did not compromise my standards in collecting or in art. Instead, I found ways to master indirectness and omissions which are just other ways of saying selective transparency or soft dishonesty. In short, I had a proclivity for lying that did not involve a compromised qualitative integrity but it did involve the compromise of my basic integrity – the lack of the former enabled a surplus of the latter. Put more simply, I allowed myself to believe that I was not doing anything

16

wrong because I was so morally aware and superior. I would compartmentalize my actions and offset a lie with a good deed or a theft with a donation.

While on the one hand I would describe my day to day as being in a state of not knowing; this was a coping mechanism to preclude a stroke or a nervous breakdown. During the period in question, we suffered a pandemic whose effects on working life dissipated slowly. Once a normal working pace not only resumed but accelerated, somewhere I knew that I could not fix the problem and that ability to patch was part of my ability to function. Ironically, this fissure only propelled me to spend more aggressively and to behave more recklessly. I spent on frivolous things, on a lavish personal and work life. I did not invest in my future or in fixed assets. I did not plan an escape or an explanation. Instead I put the pedal to the medal and drove myself full speed into a brick wall.

Since everything imploded, I have had time to break down and hit bottom. ▌

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

█████████ I am beyond remorseful and full of regret but also determined to turn my life around so as to be able to provide restitution, to make amends where possible, and to strive for a life of redemption. I have to course-correct myself daily, to ensure I don't default to old behaviors. It's not easy and it requires a lifelong commitment. No matter what the outcome, I am determined to rebuild a

17

life for myself and for my son that aligns with higher values than those I have demonstrated here. It will be a life dedicated to restitution, amends, service, and humility.

## My Upbringing

I grew up middle class but privileged regarding education and prestige. My father ██████████████████████████████████████████████████████



██████████████████████████. My mother is from ████████. She met my father in ████████████████████████████. They got married, ████████ ████████████████████████████████████████████████████

██████

My father was a workaholic. He came home every night and he was super loving, funny and supportive. However, he did not have a lot of time for us.

My mother stayed home to care for my brother and me. She was also loving and supportive. As a family we were far from perfect and had our share of problems, but overall it was great and I was fortunate.

The prestige I had when it came to education started with private elementary school. When it was time to enter middle school, I wanted to follow some friends into public school which my parents allowed. I was immediately put into the gifted program. I also took all AP and Honors classes throughout high school.

My brother went to ████████████████ two years before I graduated high school. I went to the University of Michigan in Ann Arbor following in my ████████ ██████. I was only 17 when I left for college and I remember feeling terrified and

18

lost. The University of Michigan is an enormous campus.; it was overwhelming and socially I could not find my place. I was also comparatively not so smart. Not only did I have to work hard, but I actually had to learn how to study all over again. This is when anxiety, depression, and addiction with its compulsive behaviors noticeably began to coalesce.

Enhancing my lack of grounding in college, like many youngsters, I did not know what I wanted to do with my life at all.  I was certain, however, that it had to be something with impact and importance. I wanted to get married and have a family -- but not until after I could prove myself.

Between my sophomore and junior years, I backpacked through Europe with my best friend and fell madly in love with France. Upon return, I was determined to get into Columbia University's Reid Hall, which offered a one-year art history program in French. I spent my senior year there. I worked with an architectural historian and a film maker on a project that they were producing.  My thesis, written in French, was on the architecture of Eastern European banks that would make up a part of their larger program.

I met a Cardiology resident there, and we relocated to Montpellier, France, where he worked.  We got engaged.  We spent another year on the island of La Reunion, where he performed his military service.  Eventually, when we got back to Montpellier, I did not have to but wanted to find a job.  At the time, there was nothing art-related happening. Instead, I  decided to attend the Faculte de Droit de Montpellier, one of the oldest law schools in the world.  I was always told I would make a good lawyer, and although  I was a bit lost in my decision to stay in France

19

and marry, I thought that becoming a lawyer would satisfy my need for scholarship and prestige. It was beyond hard for me. I didn't know the meaning of much of the terminology in English, so I struggled; not to mention it was Napoleonic law. Eventually I began to get depressed and experienced my first wave of intense panic attacks. I had no idea what these were and it terrified me. While I was not drinking to excess here, I had a growing hole inside me that I looked to fill with accomplishment. Eventually, I felt so uncomfortable in my own skin that I broke off the engagement and returned home. It was maybe the worst decision of my life. My fiancé was the only decent man I have ever gone out with and who genuinely loved me. I did not even have a reason for leaving other than something that felt wrong with me, and I blamed it on France.

Upon returning home to ███ for the first time since I had left for college, I found work until I could enter the university again. It was either law school or a Ph.D. in Art History. I recall in Paris that, I felt something odd in the art world like there was some big secret that I didn't grasp at all but that some people could understand. I wanted access to that secret. I knew it had to do with quality and with value. Why were some things "good," in museums, of superior quality and seemingly decided objectively, and why on earth were some things $1million and some things worthless? I read Kant and decided that I had to develop a refined aesthetic sense through education and experience. The monetary value part I was lost on, but thought I had to start with being confident in my own ability to judge things aesthetically. I chose art history and decided to attend the University of Miami even though it only offered a terminal master's program in art history. I

20

would never just stop at a Master's, so I knew this was just a transitional time for me until I could re-ground myself and move on to a Ph.D. outside of Miami.

While working on my thesis in Paris, I became fixated on the history of economics and, specifically, its effect on the architecture of banks and by extension its relationship to aesthetics. I would never be able to shake my interest in economics (not practical but theoretical). Since it was the 90s, almost all academic art history was steeped in left-wing, Marxist, and French post-structural theory. I got lost in this with writers like Frederic Jameson, who were steeped in the language of Karl Marx, and this appealed to my awakened interest in the relationship between economics and aesthetics. On the flip side, there were professors who detested theory and clung to a traditional focus on pure formalism and looking. When I reflect on this now, it is obvious that in the academy there were two camps, left and right, with the former focused on ideas and Marxism and the latter focused on empirical visual data and formal analysis while avoiding conversations of economics. Later I would consider that working in the art world felt like being a party member of the extreme left and the extreme right and being expected to toe the line on both sides – impossible and circuitously hypocritical.

At the time, the Graduate School of the City University of New York was where the most influential group of professors were working (although they would soon decamp for Columbia University), and they formed their own group around a publication called October Magazine. They were left leaning, dedicated to anti-market theories and post-structuralism and they interestingly worked hard to incorporate formalism. This is the school I chose to attend for my doctorate, and my

21

first internship was working in editorial at October Magazine. I became a Graduate

Teaching Fellow, which allowed me to make some money – not enough, however, so

my parents still had to support me.  I was very fortunate. I think of Virginia Wolf's

*A Room of One's Own*.  My parents gave me that great privilege.

      At this time, I noticed an internal epistemological struggle. On the one hand,

I was perplexed because so much of academia was steeped in the language of Marx

and I was really seduced by it. On the other hand, I was a top-notch consuming

capitalist.  I remember now a moment when I walked the perimeter of a Prada store

daily for weeks until I finally broke down and bought two pairs of high platform

sandals that I could never walk in.  I put them on my parents' credit card. I never

wore them but this moment stands out because for two reasons: one is that I

remember ridiculously carrying the huge Prada bag into a Marxist rally I decided to

attend with my peers from my leftist sociology professor, Stanley Aronowitz's, class.

And two, it was the beginning of a long pattern of buying things that I would never

wear – almost like I would imbue them with some power or some idea of what I

wanted to be.  Furthermore, I also noted at some point that my two favorite books

were *Das Kapital* and *Atlas Shrugged* – two polar opposites, if you will, as Ayn

Rand's objectivist philosophy is firmly in the conservative sector.  I was clearly in

conflict but this conflict was interesting and drove me to explore value relationships

once I left academia for the commercial world.  It also was disturbing and that is

something I did not notice at the time.  Meanwhile I was still dealing with my

depression, anxiety, and what was bubbling over into a slow-progressing package of

comorbidities that seemed to be led by alcoholism (none of which I recognized at the

22

█████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Looking at art did not come naturally to me. Truth be told, I am less interested in objects in and of themselves and more with the secret histories or ideologies they have the potential to inadvertently reveal. Every great work of art says something significant about the world within which it was made. I eventually developed a system for my advisory where I would allow three tenets to guide me: (1) is the work aesthetically compelling to the client; (2) is the work historically relevant; and (3) is it strategically placed.

When I entered the world of commerce, it was almost comical. For one thing, I felt entitled. I believed I was intellectually superior and took any criticism personally, getting angry easily. .Eventually I branched out on my own. Early on I hired a PR firm because I wanted to be taken seriously and art advisors by default are often not; I wanted to be seen not as a socialite but as a thought leader. I wanted the NYT, the WSJ, the Financial Times and the Economist – and they delivered.

Over time I became fairly good at earning money in the art world. This was challenging because the atmosphere had transformed since I began art advising in the early 2000s. A new kind of speculation developed on young contemporary art propelling a bizarre and expanding frenzy. The interest in profit became so blatant and fetishized that we completely stopped speaking about art or art history. Instead, we replaced art with talk of the art market -- one that is saturated with

23

meaningless, made-for-market stuff that is distributed and consumed with a self-congratulatory pat on the back for the players involved. I did not sell out like so many so-called spin doctors propping up the worst of the worst works merely for financial gain. I did, however, sell out by stealing.

The cruelest irony is that I, who stood on my soapbox of superior morality, am the one who turned into a criminal – a thief. And at a time when I wanted so desperately to change the course that the art world was headed towards. I even wrote an op-ed at the height of my criminal activity that took over a year to compose. It's about the crisis in value-making plaguing the art world. It is about the integrity of art and meaning and history and caring about these things more than money. Ironically, I wrote this while I was stealing from my art clients.



24



25









29





31



Thank you, your Honor for this chance.

## MS. SCHIFF'S HISTORY & CHARACTERISTICS CONTINUED



## CHARACTER LETTERS

Annexed as Exhibit B for your Honor's consideration are letters of support from Ms. Schiff's business colleagues, family and friends. The common thread running through these letters is, knowing why they are being asked and being aware of Ms. Schiff's criminal offense conduct notwithstanding, they are testaments to Ms. Schiff's good heart, good character, selflessness and devotion to ▓▓▓

Some of the many letters written about Ms. Schiff are highlighted below:













36





## PART III

### MS. SCHIFF'S FRAUD WAS ON CLIENTS
### RATHER THAN ON THE ART MARKET

For sure, Ms. Schiff's criminal offense conduct was very serious. She has accepted responsibility for her fraud. However, unlike Inigo Philbrick, Ms. Schiff was not responsible for fraud in a "rather opaque art market where there are other people who do the same things" as Inigo Philbrick – things like:

> *Selling more than 100 percent of various artwork to multiple individuals without their knowledge; his selling artwork without the owners' knowledge; his using artwork as collateral without the owner's knowledge; his falsifying documents, inflate claim purchase prices, for selling percentages to investors. You're talking about his forging signatures...*

{*United States v. Philbrick*, 20-CR-351-SHS Sentencing transcript, p. 9, L.14-20 (ECF Document no. 67)}.

And, unlike Ezra Chowaiki, Ms. Schiff's criminal offense conduct was not the product of her taking advantage of the view that the "art markets...are very poorly regulated." {*United States v. Chowaiki*, 18-CR-323-JSR, Sentencing Transcript, p. 4, L.20-21 (ECF Document no. 77)}.

Lisa Schiff did not create fake businesses, or fake books and records, or sell fake positions in artworks. She did not sell more than 100% of a work multiple times to different buyers without the buyers' knowledge. She did not use works owned by others as collateral without the owners' knowledge. Lisa Schiff never falsified a document; she never artificially inflated prices for works; she never inflated purchase prices when selling fractional interests in works to investors. Hers was not a fraud on the art market. Hers was a fraud on individual clients by lying to her clients when she stole their money. From a loss perspective, perhaps it is a distinction without a difference for advisory Sentencing Guidelines calculations purposes. However, it is respectfully submitted that the distinction matters when we look at the impact of general deterrence on the question of what is a "sufficient but not greater than.." sentence for Lisa Schiff.

## GENERAL DETERRENCE

It is most respectfully suggested that general deterrence should not be the straw that breaks Ms. Schiff's back. We offer two reasons to mitigate the otherwise potentially devastating impact of general deterrence on a first-time, non-violent offender who is not likely to recidivate and who has accepted responsibility for her offense conduct.

1.    **The Art Market Was Not Victimized by Ms. Schiff**

The Honorable Sidney H. Stein in *United v. Philbrook* and the Honorable Jed
S. Rakoff in *United States v. Chowaiki* suggested that general deterrence was of
greater concern given that a largely unregulated art market fostered the
defendants' fraud. {see *United States v. Philbrook, Id.*, Sentencing transcript, p. 5,
L.13-14; p. 6, L.7-12; p. 52, L.8, (ECF Document no. 67) and *United States v.
Chowaiki, Id.*, Sentencing transcript p. 4, L.18-24)}.

However, in Ms. Schiff's case, Ms. Schiff's criminal offense conduct revolved
around failing to use the funds SFA received to pay for works or failing to turn over
the sales proceeds of the sales of works SFA received. "Art" could be easily
substituted for a vehicle, a boat, real property, or a personal injury settlement. Ms.
Schiff's offense conduct did not move the art market as a whole. Against this
backdrop, the concerns raised in *Philbrook, Id.* and *Chowaiki, Id.* that general
deterrence was called on to address are not applicable to Ms. Schiff.

2.    **The Severity of Punishment Does Not Satisfy General Deterrence**

"[T]he certainty of being caught is a vastly more powerful deterrent than the
punishment." (see, for example: *Five Things About Deterrence*, U.S. Department of
Justice, Office of Justice Programs *National Institute of Justice*, May 2016,
https://www.ojp.gov/pdffiles1/nij/247350.pdf).

40

In January 2019, Legislative Analyst Ben Johnson authored a report for the Minnesota House Research Department for use by the Minnesota House of Representatives titled *Do Criminal Laws Deter Crime? Deterrence Theory in Criminal Justice Policy: A Primer*. This report also found that "policies that increase the likelihood of being caught deter crime more effectively than those that increase punishment." (see: https://www.house.mn.gov/hrd/pubs/deterrence.pdf).

Brian Jacobs' article in *Forbes*, titled *The Cost Of Affording Deterrence*, argues that "[r]ecent scholarship (however), has confirmed (again) that the "deterrence" theory under which thousands of defendants are sentenced has no scientific basis." Mr. Jacobs points to two publications: (1) *The Behavioral Code: The Hidden Ways the Law Makes Us Better . . . Or Worse;* and (2) *The Effects of DNA Databases on the Deterrence and Detection of Offenders*. The takeaway?

> *that certainty matters more than severity, meaning that rather than focus on meting out longer sentences or higher fines, we should find ways to increase the chances that would-be offenders are apprehended and punished.*

Mr. Jacobs goes on to point out that:

> *[Th]e research in this area has moved in the direction of finding bigger deterrent effects from increasing the probability of getting caught for a crime, rather than increasing the punishment.*

{https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/[2]}.

And, as former Judge John Gleeson noted:

> *Imprisonment is not the only way we punish. Supervised release brings with it a series of significant restrictions on a defendant's liberty. Offenders on supervised release, like the probationer in Gall, "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." Imprisonment is concededly a more onerous form of punishment, and different in kind from supervision, but Zimmerman is being punished.*

> {*United States v. Zimmerman*,
> 2012 U.S. Dist. LEXIS 85046 (E.D.N.Y., 2012)}.

---

[2] Other studies and decisions come to the same conclusion. See, for example: M. Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006); see also, *United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes"). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." Id.; see also, Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflt. Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

## LISA SCHIFF'S ACCEPTANCE OF RESPONSIBILITY
## HAS BEEN EXTRAORDINARY

Lisa Schiff self-reported her criminal offense conduct to DANY before there was any criminal investigation into her. Lisa Schiff cooperated fully with DANY and voluntarily turned over inculpatory proof before there was a criminal investigation into her. While Ms. Schiff and I will more fully outline her efforts to assist DANY, the government, the Bankruptcy Trustees and her victims (and prevent there from being additional victims) at the time of sentencing, here are a few things for the Court's consideration.  First, annexed as Exhibit B is proof of Ms. Schiff's efforts to self-report and cooperate, including: (a) text messages between her then criminal counsel and DANY concerning her self-reporting; (b) proof that was provided to DANY by counsel; (c) counsel's letter to the government and along with inculpatory  supporting proof; (d) letters from John Cahill, Esq. and Eric Snyder, Esq, outlining Ms. Schiff's efforts to self-report her criminal offense conduct and assist the Bankruptcy Trustees (the "Trustees") maximize recovery for the benefit of creditors.

Second, Ms. Schiff was instrumental in gathering inculpatory and explanatory proof for both DANY and the government so that they could understand in detail the roadmap of the art transactions underlying her offense conduct, including the financial consequences.  Ms. Schiff made sure that SFA's massive proprietary database of information (ArtBase) related to all of SFA's clients was made available. Ms. Schiff worked -- client by client -- to organize and provide documentation to DANY, the government and the Bankruptcy Trustees – and to

counsel for some of the victims. Literally, as this memorandum is being finalized, Ms. Schiff is working on preparing documentation for counsel representing the largest victim -- a time-consuming process that Ms. Schiff hopes to complete in the next month or so.

Speaking of the bankruptcy proceedings, also annexed as part of Exhibit B is the Docket Sheet for Ms. Schiff's bankruptcy cases, which reflect the level of cooperation we've provided to the Trustees and creditors. It is our understanding that the Trustees collectively have recovered approximately $900,000, which represent (a) funds turned over from the Assignee; and, (b) the proceeds of public and private sales and miscellaneous receipt of assets that were disposed of. This amount is net of expenses incurred by the Estates and various payments already made under Court Order and excludes any funds in escrow relating to settlements that may be the subject of litigation or sales that have not yet been approved by Court Order. This amount also does not reflect future private and public auction sales or other transactions entered into by the Trustees with third parties. We will provide a more fulsome account of our efforts to assist both the Trustees and creditors/victims at Ms. Schiff's sentencing hearing (if for no other reason than those efforts are continuing).

We respectfully submit that this is not a case where Ms. Schiff "accepted responsibility only after being caught." This is not a case where Ms. Schiff never accepted responsibility for her scheme during the almost three and one-half years during which her fraud went undetected." *United States v. Kim,* 313 F. Supp. 2d 295, 301 (            ).

44

Ms. Schiff's cooperation was not the "usual response:"

> *As one court has remarked, cooperation is "not an unusual response on the part of a defendant who is caught red-handed and who realizes that cooperation is the only means of salvaging her situation."*

> {*Charles v. United States,* 2003 U.S. Dist. LEXIS 8434, No. Civ. A. 02-12312, 2003 WL 21184022, at *5 (D. Mass. May 20, 2003); *cf. United States v. Rogers,* 972 F.2d 489, 491 (2d Cir. 1992) cited by *United States v. Kim,* 313 F. Supp. 2d 295, 301}.

It is respectfully submitted that the proof shows Lisa Schiff was the genesis of her own criminal investigation. Ms. Schiff cooperated against herself and assisted authorities in prosecuting herself. Ms. Schiff's self-reporting and cooperation constitute mitigating factors not considered by the advisory Sentencing Guidelines and warrant a downward variance. *United States v. Rogers*, 972 F.2d 489, 492 (2d Cir. 1992).

## LISA SCHIFF'S FAMILY CIRCUMSTANCES ARE EXTRAORDINARY

If the Court finds that a defendant's family ties and relationships are "extraordinary," the Court has the power to downwardly depart (or in our case, give a downward variance). *United States v. Sharpsteen,* 913 F.2d 59, 63 (2d Cir. 1990), cited by *United States v. Johnson*, 964 F.2d 124, 128-130 (2d Cir. 1992).

A "close-knit family whose stability depends on [the defendant's] continued presence" proves a reason for a downward departure. *United States v. Alba,* 933 F.2d 1117 (2d Cir. 1991) cited by *United States v. Johnson, Id.,* 964 F.2d at 128-130. Downward departures have been granted and upheld in instances where the facts demonstrated that the "defendant's family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments." *United States v. Greene,* 249 F. Supp. 2d 262, 265–66 (S.D.N.Y. 2003), quoting *United States v. Sprei,* 145 F.3d 528, 535 (2d Cir.1998)); see also: *United States v. Galante,* 111 F.3d 1029, 1037 (2d Cir.1997).

Like in *Johnson, Id.* and *Greene, Id.,* it is respectfully submitted that a downward variance for Ms. Schiff is appropriate so as not to:

> *wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.*

{*United States v. Johnson, Id.,* 964 F.2d 124 at 128-130}.

46



## **CONCLUSION**

Lisa Schiff's acceptance of responsibility has been and continues to be extraordinary. This extraordinary acceptance of responsibility looms large over the discussion on general deterrence. She is a first time offender and not likely to recidivate. Lisa Schiff's family circumstances are extraordinary. Lisa Schiff has worked tirelessly to make amends. Lisa Schiff is fundamentally a good person.

For these reasons, once the Court has heard from the victims, Ms. Schiff, the government and me on March 19, 2025, we respectfully submit that a sentence sufficient to meet the goals of sentencing need not separate an innocent little boy from his mother.

Dated:        March 5, 2025

                                                          Respectfully submitted,

                                                          */s/ Randy Zelin*
                                                          Randy Scott Zelin P.C.
                                                          641 Lexington Ave., 29th Fl.
                                                          New York, New York 10022
                                                          (D) 212.204.2259 (C) 917.515.3900
                                                          Randy@zelinlaw.com
                                                          *Attorneys for Defendant*

To:    Cecilia Vogel, Esq.
       Jennifer Ong, Esq.
                       (for the government)

       Stephanie McMahon, U.S.P.O.

48



**The Honorable J. Paul Oetken**

United States District Judge United States District
Court
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Honorable J. Paul Oetken,

I am Lisa's mother, and I want to share a few words about her background and the person she is. Lisa grew up in a home full of love and support. I was a stay-at-home mom, and her father, ███████████████ worked tirelessly to provide for our family. Even at the age of ██, he continues to work every day, embodying the values of hard work and perseverance.

Lisa had always aspired to be a college professor, much like ██████████ However, after living in New York, she realized that her love for the city pushed her toward a different path. Wanting to support herself, she turned to the commercial side of her field, but I believe that at heart, she has always been an academic. She's a dedicated professional, and we often saw her name in the New York Times, the Financial Times, and other prestigious outlets, which filled us with immense pride. It was clear to us how hard she worked to achieve her success.

Above all, Lisa loves her son more than anything else in this world. His arrival was a surprise gift, and I truly believe that motherhood has given Lisa the clarity and focus she needed to reshape and realign her life. I have no doubt that being a mother will guide her to make the right choices, not only for herself but also as a role model for her son. She wants to show him the values of hard work, integrity, and making amends when necessary.

I'd like to think that Lisa's love for art could be traced back to my own passion for design and art, although I am by no means on her caliber. I've always admired how deeply she connects with her creative side, and I believe it was nurtured in our home. Watching her grow in her field has been a constant source of joy for me.

We are fully aware of the gravity of Lisa's situation, and it is our hope that she will be given the opportunity to work to pay back the debts she owes. More than anything, we hope that she will be able to keep her eleven-year-old son with her, as he is her world. Lisa is a good person who made a mistake, and we know she is committed to learning from this experience and moving forward in the right way.

Thank you for your consideration in this matter. We sincerely appreciate your time and understanding.





December 5, 2024

The Honorable J. Paul Oetken
United States District Judge United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Honorable J. Paul Oetken,

I am writing as a concerned father to provide a character reference for my daughter, Lisa, who is facing sentencing after pleading guilty to serious charges. As a professor of medicine specializing in liver disease, my career required frequent travel, which unfortunately led to my being absent during much of my children's formative years. My wife ▇▇▇ has been a constant source of love and support for Lisa and her brother throughout their lives.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ While we remain committed to supporting Lisa and her son, our age limits our ability to fully care for her ▇▇▇▇▇▇▇▇ should Lisa be incarcerated. He relies on her emotional support, and his well-being would be significantly affected by her absence. He is an outstanding student, very mature for his age, and a loving son and grandson. Given our age, neither of us can fully provide the care and stability he needs at this critical time in his life.

One of Lisa's most notable qualities is her strong work ethic and her incessant pursuit of knowledge. She went on to pursue multiple degrees in art history learning French fluently, living in France, and even attending law school in Montpellier. In addition, she has always been willing to help others, sometimes to her own detriment. She has nurtured aspiring art world students and always made herself available to give advice. She is a natural teacher and although she abandoned her desire to be a professor, she did teach as a Graduate Teaching Fellow in NY.

Beyond educating and advising others, Lisa has a deep love for animals and nature. She has always been drawn to animals, and her compassion for them is evident in her actions. Over the years, she has been a devoted pet owner to both dogs and cats, always ensuring they receive the utmost care. She has also offered her time as a pet sitter for friends, even looking after a turtle with the same dedication and attentiveness.

Lisa's passion for nurturing living things goes beyond her love for animals. Just before closing her business, she transformed a beautiful ground-floor space into a welcoming environment for the community. She achieved this by creating a stunning vertical garden, with the assistance of a specialist, featuring numerous species. The garden was visible through the window from the street, it attracted a wide range of people and became a source of pride and inspiration for Lisa and her community. She particularly enjoyed inviting children in to explore and learn about the garden. In addition to her personal endeavors, Lisa has shown an extraordinary commitment to supporting the arts and artists. She founded a non-profit organization that grants financial support to artists, an initiative that has grown to operate on the level of national programs such

as the National Endowment for the Arts. Through this organization and even outside of this organization, Lisa has worked tirelessly to provide opportunities for artists to flourish and has made a lasting impact on the creative community. Her dedication to helping others in this way highlights her generosity and her belief in the transformative power of art.

Lisa is a loving and devoted mother to her ████████████. Her presence in his life is crucial to his well-being. Six months ago, my wife ██████ required 24-hour assistance following a ███████████ Lisa prioritized ██████ recovery and provided her with unwavering support, despite her own emotional distress and legal challenges.

Lisa made a grave mistake by defrauding her clients of approximately $6.5 million. I was shocked and deeply disappointed by her actions. However, Lisa has acknowledged the harm she caused to her victims, her family, and herself. Since pleading guilty, she has expressed genuine remorse and a commitment to making amends. She is fully committed to learning from her mistakes and dedicated to living with honesty and integrity. Particularly, in addition to being focused on trying to pay everyone back and apologizing for the betrayal, she is determined to salvage her life for her son by showing him that there are consequences in life and that no matter what adversity arises, it is never too late to turn things around

I respectfully ask that you consider a sentence that allows Lisa the opportunity to serve the community and work toward restitution. In my view, this would be a more constructive outcome than incarceration. Lisa is dedicated to rebuilding her life, and I am confident that she can make a positive impact moving forward. She has already made significant changes to her lifestyle and has had honest discussions with her son about their current situation. She is determined to show him that redemption and rebuilding are possible.

I sincerely hope you will allow Lisa the chance to prove that she can be a responsible, loving mother and make a positive difference in her community.

Thank you for your time and consideration. My ████████████ is attached for your reference, and I am available to provide any additional information you may need.

Sincerely,